**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,** | |
| Plaintiff, | 2:10-cv-11366-AC-MJH |
| v. | |
| **GENERAL MOTORS LLC,** | **Honorable Avern Cohn** **Magistrate Judge Michael Hluchaniuk** |
| Defendant. | |

**PLAINTIFF UAW's MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and this Court's September 21, 2012 Scheduling Order (Dkt No. 31), Plaintiff International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") hereby moves for summary judgment on its claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, that Defendant General Motors LLC ("GM") is in breach of its obligation under a June 22, 2007 contract between the parties and Delphi Corporation to make a payment of $450 million to a voluntary employees' beneficiary association known as the "DC VEBA."  The UAW requests entry of judgment against GM in the amount of $450 million together with:

(a) pre-judgment interest assessed at the rate provided by Mich. Comp. Law § 600.6013(8) and beginning to accrue "as of the [October 29, 2009] date of [the UAW's] demand for payment" of the $450 million, Int'l Broth. of Elec. Workers,

1

<u>Local 58, AFL-CIO v. Metro Elec. Eng'g Technologies, Inc.</u>, 11-14333, 2012 WL

3064672, at *7 (E.D. Mich. July 25, 2012); and

(b)      post-judgment interest as mandated by 28 U.S.C. § 1961.

     The grounds supporting this Motion and the relief requested herein are fully set forth in

the accompanying Brief.  The Motion is also accompanied by a Statement of Material Facts Not

Genuinely in Dispute, as required by this Court's Motion Practice Guidelines.

                    Respectfully submitted,

|  |  |
|---|---|
|  | <u>/s/ ANDREW D. ROTH</u> |
| Jeffrey D. Sodko (P65076) | Andrew D. Roth (DC Bar 414038) |
| jsodko@uaw.net | aroth@bredhoff.com |
| Associate General Counsel, | Ramya Ravindran (DC Bar 980728) |
| International Union, UAW | rravindran@bredhoff.com |
| 8000 East Jefferson Avenue | W. Gary Kohlman (DC Bar 177527) |
| Detroit, Michigan 48214 | gkohlman@bredhoff.com |
| Telephone: (313) 926-5216 | BREDHOFF & KAISER, PLLC |
| Facsimile: (313) 926-5240 | 805 Fifteenth Street, N.W., Suite 1000 |
|  | Washington, D.C. 20005 |
|  | Telephone: (202) 842-2600 |
|  | Facsimile: (202) 841-1888 |
|  |  |
| Dated:  November 15, 2012 | *Counsel for Plaintiff UAW* |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,** | 2:10-cv-11366-AC-MJH |
| Plaintiff, | |
| v. | **Honorable Avern Cohn** |
| **GENERAL MOTORS LLC,** | **Magistrate Judge Michael Hluchaniuk** |
| Defendant. | |

**BRIEF IN SUPPORT OF PLAINTIFF UAW's
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................iii

STATEMENT OF ISSUES PRESENTED.......................................................................1

MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT.....................................2

STATEMENT OF THE CASE..........................................................................................3

    A. The 2007 Delphi Restructuring MOU .................................................................3

    B. Subsequent Developments Pertaining To GM's $450 Million Payment
       Obligation Under The 2007 Delphi Restructuring MOU .................................5

       1. Further Dealings and Agreements Between the Three Parties
          to the 2007 Delphi Restructuring MOU .................................................5

       2. Delphi's Proposed Modified Plan of Reorganization .................................9

    C. The UAW's Payment Demand and GM's Rejection Of That Demand..........................10

    D. The Course Of Proceeding In This Case.......................................................................11

       1. The Parties' Respective Pleadings ..........................................................11

       2. GM's Subsequent Foray into the GM Bankruptcy Court ...........................11

       3. Subsequent Proceedings in this Court.......................................................13

ARGUMENT ...................................................................................................................14

   I. GM's DEFENSE THAT ITS $450 MILLION PAYMENT OBLIGATION TO
      THE DC VEBA HAS BEEN "EXTINGUISHED" BY "THE EXPRESS
      TERMS" OF THE 2009 UAW RETIREE SETTLEMENT AGREEMENT
      FAILS AS A MATTER OF LAW ...........................................................................14

    A. The Clear And Unambiguous Contract Language.........................................................14

    B. The Conclusion That GM's Extinguishment Defense Fails As A Matter Of Law
       Is Confirmed By Extrinsic Evidence Properly Considered By This Court On
       This Motion For Summary Judgment By The UAW.....................................18

i

II.  ON THE UNDISPUTED FACTS OF RECORD, GM IS IN BREACH OF
      ITS $450 MILLION PAYMENT OBLIGATION TO THE DC VEBA
      IMPOSED BY THE 2007 DELPHI RESTRUCTURING MOU .........................................22

      A.  GM Has Assumed The 2007 Delphi Restructuring MOU................................................22

      B.  The Conditions Precedent To GM's $450 Million Payment
           Obligation To The DC VEBA Have Been Satisfied..........................................................23

III.  JUDGMENT SHOULD BE ENTERED AGAINST GM IN THE AMOUNT
       OF $450 MILLION PLUS APPLICABLE INTEREST ......................................................28

CONCLUSION........................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

Bricklayer's Pension Trust Fund v. Taiariol, 671 F.2d 988 (6th Cir. 1982) ................................. 28

DeSilvio v. Prudential Lines, Inc., 701 F.2d 13 (2d Cir. 1983).................................................... 18

Drennan v. Gen. Motors Corp., 977 F.2d 246 (6th Cir. 1992) .................................................... 29

Force v. Ameritech Corp., Inc., No. 03-71618,
  2007 WL 1760909 (E.D. Mich. June 15, 2007)........................................................................ 29

Hardy v. Reynolds & Reynolds Co., No. 06-12331, 2007 WL 2713736
  (E.D. Mich. Sept. 17, 2007), aff'd, 311 F. App'x 759 (6th Cir. 2009)...................................... 18

Int'l Bhd. of Elec. Workers, Local 58 v. Metro Elec. Eng'g Techs., Inc.,
  No. 11-14333, 2012 WL 3064672 (E.D. Mich. July 25, 2012) ................................................ 29

Mkt. St. Assocs. v. Frey, 941 F.2d 588 (7th Cir. 1991)................................................................ 17

Sweet v. Consol. Aluminum Corp., 913 F.2d 268 (6th Cir. 1990)................................................ 29

Tackett v. M&G Polymers USA, LLC, 853 F. Supp. 2d 697 (S.D. Ohio 2012) ........................... 21

Tiemeyer v. Cmty. Mutual Ins. Co., 8 F.3d 1094 (6th Cir.1993) ................................................ 29

UAW Local 540 v. Baretz, 159 F. Supp. 2d 968 (E.D. Mich. 2001) ........................................... 29

UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007)....................................................... 4

UMWA v. Apogee Coal Co., 330 F.3d 740 (6th Cir. 2003).......................................................... 18

United Rentals (N. Am.), Inc. v. Keizer, 355 F.3d 399 (6th Cir. 2004) ....................................... 14

Winnett v. Caterpiller, 553 F.3d 1000 (6th Cir. 2009) ................................................................ 18

## STATUTES

11 U.S.C. § 1121(c) ..................................................................................................................... 26

28 U.S.C. § 1961........................................................................................................................... 29

29 U.S.C. § 185............................................................................................................................. 11

Mich. Comp. Laws § 600.6013(8) ................................................................................................ 29

## STATEMENT OF ISSUES PRESENTED

The ultimate issue presented by plaintiff UAW's motion for summary judgment is whether the UAW is entitled to judgment as a matter of law on its claim that defendant GM is in breach of a contractual $450 million payment obligation to a voluntary employees' beneficiary association known as the "DC VEBA." The two sub-issues on which the resolution of that ultimate issue depends are:

1.       Whether GM's affirmative defense that its contractual obligation to make the $450 million payment to the DC VEBA was "extinguished" by the "express terms" of a 2009 settlement agreement between the parties fails as a matter of law.

2.       Whether, on the undisputed facts of record, the conditions precedent to GM's contractual $450 million payment obligation have been satisfied.

A further issue presented by the UAW's motion is whether pre-judgment interest should be included in a judgment against GM.

1

## MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

There is no case law authority directly on point.  The most appropriate non-judicial authorities for the relief sought are the two contracts directly at issue in this case:  the 2007 Delphi Restructuring MOU (Ex. 2), and the 2009 UAW Retiree Settlement Agreement (Ex. 9). As we demonstrate below, the plain and unambiguous language of these contracts requires, as a matter of law, that the UAW's contract breach claim be upheld, and that GM's "extinguishment defense" to the UAW's contract breach claim be rejected.

Plaintiff International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") submits this Brief in support of its motion for summary judgment on its claim that Defendant General Motors, LLC ("GM" or "New GM") is in breach of a contractual $450 million payment obligation to a voluntary employees' beneficiary association known as the "DC VEBA," and should be ordered to make that $450 million payment forthwith, together with applicable pre- and post- judgment interest.

## STATEMENT OF THE CASE

A.     The 2007 Delphi Restructuring MOU

In June of 2007, the pre-bankruptcy GM (then called General Motors Corporation and henceforth called "Old GM"), the UAW and Delphi Corporation entered into the tri-partite contract that forms the basis of this breach of contract lawsuit by the UAW.  See UAW's Statement of Material Facts Not Genuinely in Dispute ("SMF") ¶ 4.  That contract is titled "UAW-DELPHI-GM MEMORANDUM OF UNDERSTANDING DELPHI RESTRUCTURING," and is henceforth called the "2007 Delphi Restructuring MOU" or "Restructuring MOU."[1]

Taking note of the fact that Delphi was in the midst of a Chapter 11 bankruptcy proceeding at the time, the 2007 Delphi Restructuring MOU begins with the following statement of Old GM's and the UAW's respective interests in the matters covered by that contract:  "As GM's largest supplier and the employer of thousands of UAW-represented employees, indirectly supporting tens of thousands of dependents, retirees and surviving spouses, the Parties have a critical interest in Delphi's successful emergence from bankruptcy with certain UAW-

---

[1] Based on an oral representation by Defendant GM's counsel to this Court, we understand that GM does *not* contest the point that it assumed the 2007 Delphi Restructuring MOU when it purchased Old GM's assets in 2009 in Old GM's bankruptcy proceeding.  Nonetheless, out of an abundance of caution, we make an affirmative showing on this point infra pp. 22-23.

3

represented operations." Ex. 2, 2007 Delphi Restructuring MOU, at 1. The contract then goes on to recite the fact that the parties already had agreed on certain steps aimed at aiding Delphi's reorganization efforts—including a UAW "attrition program" under which the UAW, inter alia, "waived Delphi obligations to hire thousands of new employees as a result of the departures caused by the attrition program"; and the assumption by Old GM of billions of dollars of Delphi's employee benefit obligations pursuant to a "Term Sheet" incorporated by reference into the contract as "Attachment B." Id.

The contract then goes on to recite that "[i]n addition to" these prior agreements, the parties have reached a number of other agreements set out in the body of the contract. Id. One of those other agreements—the agreement squarely at issue in this breach of contract lawsuit by the UAW—is the following agreement set out in section J.2 of the contract:

> The Parties agree to the following in partial consideration for the UAW entering into this Agreement and in consideration for the releases to be provided pursuant to Section K.
>
> …
>
> 2.      The UAW has asserted a claim against Delphi in the amount of $450 million as a result of the modifications encompassed by this Agreement and various other UAW agreements during the course of Delphi's bankruptcy. Although Delphi has not acknowledged this claim, *GM has agreed to settle this claim by making a payment in the amount of $450 million*, which the UAW has directed to be paid directly to the DC VEBA established pursuant to the settlement agreement approved by the court in the case of Int'l Union, UAW, et al. v. General Motors Corp., Civil Action No. 05-73991.

Id. at 20-21 (emphasis added).[2]

----

[2] The district court decision approving the settlement agreement establishing the "DC VEBA" was affirmed by the Sixth Circuit in UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007). As that Sixth Circuit decision explains, the acronym "DC VEBA" is shorthand for a trust fund formally known as "the defined contribution Voluntary Employees' Beneficiary Association trust" established by the UAW and Old GM in 2006. See id. at 624; infra pp. 15-16 (distinguishing the DC VEBA from the "New VEBA" subsequently established by the parties in 2008).

Pursuant to section K.2 of the contract, certain specified provisions of the 2007 Delphi Restructuring MOU were made expressly conditional on the happening of certain "events"— including, inter alia, the provision (section J.2) obligating Old GM to pay $450 million to the DC VEBA, and the "Term Sheet" provisions obligating Old GM to assume billions of dollars of Delphi's employee benefit obligations.  Id. at 22.  Those "events" are as follows:

> **(a) execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them and (b) the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with all of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM**.

Id. (emphasis added).

The 2007 Delphi Restructuring MOU sets out one other agreement among the parties of relevance to this lawsuit:  the agreement that Delphi would continue to "own[ ]" and "operate[ ]" four "Keep Sites" (Kokomo, Lockport, Rochester and Grand Rapids), each of which employed workers represented by the UAW.  Id. at 2.

The 2007 Delphi Restructuring MOU was submitted to the Delphi Bankruptcy Court for approval, and was approved by that court on July 19, 2007.  SMF ¶ 5.

B.     Subsequent Developments Pertaining To GM's $450 Million Payment Obligation Under The 2007 Delphi Restructuring MOU

1.     Further Dealings and Agreements Between the Three Parties to the 2007 Delphi Restructuring MOU

As section K.2 of the 2007 Delphi Restructuring MOU makes clear, that contract did not address and "resolv[e]" all of "the financial, commercial, and other matters between" Old GM and Delphi raised by Delphi's bankruptcy.  To the contrary, when in section K.2 the contracting parties made certain of their contractual undertakings (including Old GM's contractual commitment to pay $450 million to the DC VEBA) expressly conditional on, inter alia,

"execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them," they clearly contemplated that Old GM and Delphi would engage in further negotiations aimed at achieving a global "resol[ution]" of "the financial, commercial, and other matters between them" raised by Delphi's bankruptcy.

In the event, these contemplated further negotiations took various twists and turns over the course of several years, culminating in a "comprehensive settlement agreement" between Defendant GM and Delphi that did indeed "resol[ve] the financial, commercial, and other matters between them."  And, that "resol[ution]" was made possible in two key respects by the UAW's agreement to certain conforming modifications to the terms of the 2007 Delphi Restructuring MOU sought by GM and Delphi.  The pertinent details are as follows:

      a.    On September 6, 2007, Old GM and Delphi entered into an agreement titled "GLOBAL SETTLEMENT AGREEMENT" (hereinafter, "Original GSA"). SMF ¶ 8.  That agreement set forth certain Old GM commitments to provide financial support for Delphi's restructuring efforts, as well as approximately $4 billion in cash, stock and notes that Old GM would receive from Delphi on the effective date of a Delphi plan of reorganization approved by the Delphi bankruptcy court.  SMF ¶ 9.  On December 10, 2007, Delphi filed a proposed plan of reorganization with the Delphi bankruptcy court that incorporated and endorsed the terms of the Original GSA, but because of deteriorating economic conditions and Delphi's loss of exit financing, this plan was never consummated.  SMF ¶ 10.

      b.    Further negotiations between Old GM and Delphi over the terms of their financial and commercial relationship ensued at this point, culminating in a superseding, September 12, 2008 agreement between the parties titled "AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT" (hereinafter, "Amended and Restated GSA").  SMF

¶¶ 20-21.  Under the terms of the Amended and Restated GSA, Old GM agreed to enhance its

financial support for Delphi's restructuring efforts.  SMF ¶ 22.  In addition, the Amended and

Restated GSA modified the compensation that would be received by Old GM from Delphi.  Id.

Under the terms of the Amended and Restated GSA, Old GM would receive approximately $2

billion in allowed administrative expense claims, as well as an allowed general unsecured claim

in the amount of $2.5 billion.  Id.

The Amended and Restated GSA was submitted to the Delphi bankruptcy court for

approval, which was given on September 26, 2008.  SMF ¶ 23.  Under the court's order

approving the Amended and Restated GSA, Delphi was authorized to implement certain

provisions of that agreement immediately pursuant to separately-negotiated "implementation

agreements" with the unions that represented Delphi workers, including the UAW.  Id.

On September 26, 2008, Old GM, the UAW and Delphi entered into such an

"Implementation Agreement."  SMF ¶¶ 24-25.  The recital portion of that Implementation

Agreement states, "[b]y way of background," that the UAW is "agree[ing] and consent[ing]" to

certain "adjustments" to the terms of the 2007 Delphi Restructuring MOU to enable Old GM and

Delphi to fully implement the terms of the Amended and Restated GSA.  Ex. 6, Implementation

Agreement, at 1-2.  And, ¶ 6 of the Implementation Agreement spells out what these

"adjustments" to the terms of the Restructuring MOU are.  (In ¶ 6, these "adjustments" are also

described as "conform[ing]" amendments to, or "modifi[cations]" of, the Restructuring MOU).

To the extent relevant here, ¶ 6 of the Implementation Agreement provides that—with

one notable exception—those provisions of the Restructuring MOU that were made expressly

conditional on the happening of certain "events" under section K.2 of that contract are no longer

conditional, and shall instead be implemented immediately upon the effective date of the

7

Implementation Agreement.  Id. at 3.  The one notable exception stated in ¶ 6 pertains to Old GM's $450 million payment obligation to the DC VEBA under sections J.2 and K.2(e) of the Restructuring MOU.  As to that $450 million payment obligation, ¶ 6 of the Implementation Agreement expressly states:  "The payment required by sections J(2) and K(2)(e) shall remain payable as set forth in the Restructuring MOU."  Id.; SMF ¶ 26.

          c.      As Defendant GM has noted elsewhere, "[a]fter execution of the [Amended and Restated GSA] and the 2008 Implementation Agreement in the Fall of 2008, the U.S. economy plunged into one of the deepest recessions since the Great Depression of the 1930s."  Ex. 23, Motion of General Motors LLC (f/k/a General Motors Company) to Enforce Sale Order ("Motion to Enforce"), at 8.  These economic circumstances dictated further negotiations between Delphi and Old (and, ultimately, New) GM over the terms of their financial and commercial relationship, culminating in the execution of a "Master Disposition Agreement" between Delphi, New GM and certain third parties.

The Master Disposition Agreement modified the terms of the Amended and Restated GSA in various respects, SMF ¶ 30, including in two respects directly pertinent here:

First, under section 3.1.1(C) of the Master Disposition Agreement, GM agreed to waive its rights and claims under the Amended and Restated GSA to billions of dollars in payments from Delphi.  Id.

Second, under section 2.1.3 of the Master Disposition Agreement, GM agreed to assume ownership of the four Keep Sites (Kokomo, Lockport, Rochester and Grand Rapids) that Delphi was to own and operate under the terms of the Restructuring MOU.  Id.

With regard to the latter provision of the Master Disposition Agreement dealing with the Keep Sites, two points are noteworthy:

First, because Delphi's continued ownership and operation of the Keep Sites was a term of the Restructuring MOU to which the UAW was a party, GM could not properly assume ownership of those Keep Sites without first obtaining the UAW's agreement to adjust or modify that term of the Restructuring MOU.  In recognition of this contractual reality, GM approached the UAW prior to entering into the Master Disposition Agreement with Delphi seeking such an agreement from the UAW, which the UAW provided in a May 16, 2009 agreement with GM titled "Memorandum of Understanding Delphi Keep Sites."  SMF ¶¶ 27-28.

Second, in a motion filed with the GM bankruptcy court seeking that court's approval for GM's entry into the Master Disposition Agreement, GM stated that it was "imperative" that it be permitted to enter into a commercial transaction with Delphi under which it would assume ownership of the Keep Sites—both because those Sites produced parts that were "essential" to GM's operations and successful emergence from its own bankruptcy proceeding, and because those Sites "are important to GM's relationship with the UAW."  SMF ¶ 31; Ex. 21, GM Motion for Order Approving Master Disposition Agreement at 1, 7.[3]

### 2.   Delphi's Proposed Modified Plan of Reorganization

On June 1, 2009, Delphi filed a proposed modified plan of reorganization with the Delphi bankruptcy court (hereinafter, "Modified Plan of Reorganization").  SMF ¶ 36.   Delphi's Modified Plan of Reorganization incorporated and endorsed, in the manner spelled out in the accompanying footnote:  (a) all of the terms of the Master Disposition Agreement; (b) all of the terms of the Amended and Restated GSA "except" as modified by the Master Disposition

---

[3] GM further pointed out in this motion that it had agreed to "waive all recoveries in respect of" its allowed administrative claims against Delphi as part of this "imperative" commercial transaction with Delphi, and GM urged the bankruptcy court to approve its entry into the Master Disposition Agreement because, inter alia, GM had exercised "sound business judgment" in reaching that agreement with Delphi. Ex. 21 at 11, 20.

Agreement; and (c) all of the terms of the 2007 Delphi Restructuring MOU, including the two

"conforming" modified terms described in subsections 1.b and 1.c above.  SMF ¶¶ 38-40.[4]

On July 30, 2009, the Delphi bankruptcy court confirmed the Modified Plan of

Reorganization.  SMF ¶ 37.  In doing so, the court recognized that the Master Disposition

Agreement was "an essential element of the Modified Plan," and the court thus "approved" the

Master Disposition Agreement "in all respects."  Ex. 19, Order Approving Modified Plan of

Reorganization, at 34 ¶ HH.  On October 6, 2009, Delphi's Modified Plan of Reorganization was

substantially consummated.  SMF ¶ 41.

C.     The UAW's Payment Demand and GM's Rejection Of That Demand

On October 29, 2009, the UAW wrote a letter to GM asserting that GM's obligation to

make the $450 million payment required by the Restructuring MOU "has ripened and must be

---

[4] The transactions described in the Master Disposition Agreement were incorporated by
reference in their entirety into the Modified Plan of Reorganization.  See Ex. 18, Modified Plan
of Reorganization, at § 1.80 (defining the "Disposition Transactions" as "those transactions
described in the Master Disposition Agreement").  This included the transactions involving GM.
Id. at §§ 1.104, 1.108, 1.109 (incorporating by reference terms of Master Disposition Agreement
regarding "GM Acquired Assets," "GM Assumed Contracts," and "GM Assumed Liabilities").
The Modified Plan of Reorganization further set forth the execution and consummation of the
transactions from the Master Disposition Agreement.  Id. at § 7.3 (directing that Debtors "shall
take such actions as may be necessary…to execute the Disposition Transactions"); § 7.6
(providing for consummation of the Disposition Transactions including the GM transactions).

The Modified Plan of Reorganization contained a specific "request to authorize and approve" the
terms of the Master Disposition Agreement.  Id. at § 7.7(a).  Furthermore, it expressly reaffirmed
the terms and obligations of the Amended and Restated GSA "except" as modified by the Master
Disposition Agreement.  Id. at § 1.56 (defining "Delphi-GM Definitive Documents" to include
the Amended and Restated GSA); § 11.4 (providing that "nothing in this Plan shall be deemed to
release…any of the Debtors or GM from their obligations under the Delphi-GM Definitive
Documents or the transactions contemplated thereby, except to the extent set forth in the Master
Disposition Agreement").  The Modified Plan of Reorganization also reaffirmed the terms and
obligations of the 2007 Delphi Restructuring MOU.  Id. at §§ 1.233, 1.235 (including the 2007
Delphi Restructuring MOU among the "Union Settlement Agreements" described in the
Modified Plan of Reorganization); § 11.4 (providing that "nothing in this Plan shall be deemed to
release…any of the Debtors, the Unions, or GM from their obligations under the Union
Settlement Agreements or the transactions contemplated thereby").

paid." SMF ¶ 42; Ex. 12 at 3. On November 11, 2009, GM responded to the UAW's letter,

rejecting the UAW's payment demand on a number of asserted grounds. SMF ¶ 43; Ex. 13.

    D.    <u>The Course Of Proceedings In This Case</u>

    1.    <u>The Parties' Respective Pleadings</u>

On April 6, 2010, the UAW filed its Complaint in this Court setting out its breach of

contract claim against GM. <u>See</u> Complaint, Dkt. No. 1. The Complaint alleged, in pertinent

part, that GM had assumed the 2007 Delphi Restructuring MOU in Old GM's 2009 bankruptcy

proceeding; that the conditions precedent to GM's $450 million payment obligation to the DC

VEBA imposed by the Restructuring MOU had been satisfied; and that GM's failure and refusal

to make the $450 million payment, as demanded by the UAW on October 29, 2009, constituted a

breach of the Restructuring MOU that is remediable in this action brought under § 301 of the

Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. <u>Id.</u> at ¶¶ 6-14. After a period of

unsuccessful settlement discussions between the parties, the UAW served its Complaint on GM

on September 17, 2010. <u>See</u> Affidavit of Service, Dkt. No. 4.

On October 8, 2010, GM filed its Answer to the UAW's Complaint. <u>See</u> Answer, Dkt.

No. 5. That Answer included a "PRELIMINARY STATEMENT" in which GM asserted: (a)

that the UAW's breach of contract claim in this case is "bar[red]" by a July 10, 2009 settlement

agreement between the parties (hereinafter, "the 2009 UAW Retiree Settlement Agreement");

and (b) under the terms of the 2009 UAW Retiree Settlement Agreement, the GM bankruptcy

court has "exclusive jurisdiction" over the instant dispute. <u>Id.</u> at 1-2.

    2.    <u>GM's Subsequent Foray into the GM Bankruptcy Court</u>

On October 22, 2010, GM filed a "Motion to Enforce" in the GM bankruptcy court

seeking to have that court assert jurisdiction over the instant dispute and resolve that dispute in

GM's favor.  See Ex. 23, Motion to Enforce.  In its Motion to Enforce, GM fleshed out its position that the UAW's breach of contract claim in this case is "bar[red]" by the 2009 UAW Retiree Settlement Agreement.  As GM would have it, that "bar" exists because "[a]ny contingent obligation in [the 2007 Delphi Restructuring MOU] calling for contributions to a VEBA has been superseded and extinguished by the express terms of the [2009] UAW Retiree Settlement Agreement."  Id. at p. 3 ¶ 4; see also id. pp. 31-32 & ¶¶ 58-59.  For ease of reference, we henceforth refer to GM's position on this issue as GM's "extinguishment defense" to the UAW's breach of contract claim.

The GM bankruptcy court determined that it would resolve the jurisdictional issues raised by GM's Motion to Enforce before delving into the merits of that Motion (including the merits of GM's extinguishment defense), and to this end directed the parties to brief those jurisdictional issues.  In the meantime, this Court stayed all proceedings in this case pending the bankruptcy court's ruling on those jurisdictional issues.  See Order Staying Proceedings, Dkt. No. 15.

In its briefing, the UAW opposed the GM bankruptcy court's assertion of jurisdiction over the instant dispute on a number of grounds—including the ground that GM's extinguishment defense was essentially frivolous and thus not sufficiently "colorable" to invoke the GM bankruptcy court's retained jurisdiction under the 2009 UAW Retiree Settlement Agreement.  In a Decision and Order dated August 23, 2011, the GM bankruptcy court found that it had jurisdiction over the instant dispute but declined to exercise it.

As a threshold matter, the GM bankruptcy court rejected the UAW's argument that GM's extinguishment defense was essentially frivolous and thus not sufficiently "colorable" to invoke the court's jurisdiction.  Ex. 24, Bench Decision and Order on New GM's Motion to Enforce Sale Order With Respect to Dispute With UAW ("Bankruptcy Court Order on Jurisdiction"), at

17-18.  In doing so, the GM bankruptcy court acknowledged the UAW's central point that the 2009 UAW Retiree Settlement Agreement "didn't expressly mention the $450 million obligation," and thus could not plausibly be read to have "extinguished" that obligation.  Id. at 18; see also id. at 9.  But the court nevertheless concluded that "each side" to this dispute had "respectable" arguments on the merits of GM's extinguishment defense.  Id. at 18.

       In the end, however, the GM bankruptcy court decided to "abstain" from exercising its asserted jurisdiction over this dispute "in favor of" this Court.  Id. at 3, 28.  The bankruptcy court gave two principal reasons for abstaining.  First, "[t]his controversy doesn't involve anything as to which I'd have particular knowledge or expertise warranting my exercise of … jurisdiction …and I think that a Michigan federal judge could decide the controversy at least as well as I could."  Id. at 2.  Second, "[n]or would determination of this controversy bear on objectives to be achieved in Old GM's chapter 11 case, or otherwise advance bankruptcy needs and concerns." Id.

              3.      Subsequent Proceedings in this Court

       In light of the GM bankruptcy court's abstention, this Court entered a Scheduling Order lifting the stay of proceedings in this case and allowing the parties to proceed with discovery. See Scheduling Order, Dkt. No. 19; Amendment to Scheduling Order, Dkt. No. 21.  Consistent with consensual, Court-approved amendments to that initial Scheduling Order, the discovery period closed on August 31, 2012, and following a September 20, 2012 status conference, the Court entered a further Scheduling Order directing the UAW to file this motion for summary judgment on or before November 15, 2012.  See Scheduling Order No. 2, Dkt. No. 31.

**ARGUMENT**

The UAW's entitlement to summary judgment on its breach of contract claim turns on the answer to the following two questions:

1. Does GM's affirmative defense that its $450 million payment obligation to the DC VEBA has been "extinguished" by the "express terms" of the 2009 UAW Retiree Settlement Agreement fail as a matter of law?

2. On the undisputed facts of record, have the conditions precedent to GM's $450 million payment obligation to the DC VEBA been satisfied, such that GM's failure and refusal to make that payment constitutes a breach of contract by GM?

As we now show, the answer to both of these questions is "yes," with the upshot being that the UAW is entitled to summary judgment on its breach of contract claim.

**I.   GM's DEFENSE THAT ITS $450 MILLION PAYMENT OBLIGATION TO THE DC VEBA HAS BEEN "EXTINGUISHED" BY THE "EXPRESS TERMS" OF THE 2009 UAW RETIREE SETTLEMENT AGREEMENT FAILS AS A MATTER OF LAW**

      A.    The Clear And Unambiguous Contract Language

GM's defense that its $450 million payment obligation to the DC VEBA has been "extinguished" by the "express terms" of the 2009 UAW Retiree Settlement Agreement raises a pure issue of contract interpretation. And, under controlling Sixth Circuit authority, a pure issue of contract interpretation may properly be resolved as a matter of law at the summary judgment stage where the contract's language is clear and unambiguous. See e.g. United Rentals (N. Am.), Inc. v. Keizer, 355 F.3d 399, 406 (6th Cir. 2004). That is decidedly the situation here.

      1.    As readily can be seen from a review of the 2009 UAW Retiree Settlement Agreement between the UAW and GM, there is not a single, solitary "express term" therein that purports to "extinguish" GM's $450 million payment obligation to the DC VEBA imposed by

14

the Restructuring MOU.  See Ex. 9, 2009 UAW Retiree Settlement Agreement.  Indeed, as the GM bankruptcy court accurately observed in its abstention decision, the 2009 UAW Retiree Settlement Agreement "didn't expressly mention the $450 million obligation" at all.  Ex. 24, Bankruptcy Court Order on Jurisdiction, at 18.

It stands to reason that if the parties to a settlement agreement had a mutual intention to "extinguish" a payment obligation of one of the parties arising under an earlier contract between them, they would include express language in the settlement agreement providing for such an "extinguishment."  That is especially so where the payment obligation is of a magnitude—$450 million—of the payment obligation at issue here.  The absence of such express language in the 2009 UAW Retiree Settlement Agreement, we submit, is fatal to GM's extinguishment defense to the UAW's breach of contract claim in this case.

2.     Undaunted by the absence of such express language in the 2009 UAW Retiree Settlement Agreement, GM previously has sought to breathe life into its extinguishment defense by seizing on language in the 2009 UAW Retiree Settlement Agreement "fixing and capping" GM's payment obligations to a legal entity known as the "New VEBA."  See Ex. 23, Motion to Enforce, at p. 2 ¶ 2 ("A singular component of [the 2009 UAW Retiree Settlement Agreement] … was its express and repeated admonition that New GM's obligations to make contributions to the New VEBA were 'fixed and capped' at the amount and structure of the specific payments denominated in the agreement—and no more.").  But that effort by GM to breathe life into its extinguishment defense fails utterly.

The 2009 UAW Retiree Settlement Agreement expressly defines and describes the "New VEBA" as the legal entity formally known as the "UAW Retiree Medical Benefits Trust" that was established in 2008 pursuant to a settlement agreement between the UAW and Old GM

15

known as the "Henry II Settlement."  See Ex. 9, 2009 UAW Retiree Settlement Agreement, at 1,

7, 10; SMF ¶ 11.  And, at the same time, the 2009 UAW Retiree Settlement Agreement defines

and describes the DC VEBA—dubbed "the Existing External VEBA" in the Agreement—as *the*

*separate and distinct legal entity* formally known as the "defined contribution – Voluntary

Employees' Beneficiary Association trust" that was established in 2006 pursuant to a settlement

agreement between the UAW and Old GM known as the "Henry I Settlement."  See Ex. 9, 2009

UAW Retiree Settlement Agreement, at 1, 5; SMF ¶ 6; supra p. 4 n.2.

Given these contractual definitions, and the recognition embodied therein that the New

VEBA and the DC VEBA were, at the time of contracting, *separate and distinct legal entities*,

there simply is no substance whatsoever in GM's asserted legal position herein that the language

in the 2009 UAW Retiree Settlement Agreement "fixing and capping" GM's payment

obligations to the *New* VEBA can be read as "extinguishing" GM's $450 million payment

obligation to the *DC* VEBA at issue in this case.

3.      To be sure, in accordance with section 12.C of the 2009 UAW Retiree

Settlement Agreement, the assets and liabilities of the DC VEBA were transferred into the New

VEBA on January 16, 2010, and the DC VEBA was then terminated.  SMF ¶ 45.  Thus, if the

UAW prevails on its breach of contract claim in this case, the $450 million payment that GM

will be required to make in satisfaction of its payment obligation to the DC VEBA imposed by

the Restructuring MOU will flow into the coffers of the New VEBA rather than the now defunct

DC VEBA.  But that fact avails GM nothing here, for two independent reasons.

First and foremost, section 12.C of the 2009 UAW Retiree Settlement Agreement

expressly provides, in full:

> The Approval Order shall direct the committee and the trustees of the Existing
> External VEBA [i.e., the DC VEBA] to transfer all assets and liabilities into the

16

New VEBA and terminate the Existing External VEBA [i.e., the DC VEBA] within 15 days after the Implementation Date.  *This transfer of assets* and liabilities *shall include, but not be limited to*, the transfer of all rights and obligations granted to or imposed on the Existing External VEBA [i.e., the DC VEBA] under Section 14.C(e) of the Henry I Settlement.

Ex. 9, 2009 UAW Retiree Settlement Agreement, at 15 (emphasis added).  It is thus clear on the face of section 12.C that:  (a) upon the "transfer of assets" from the DC VEBA to the New VEBA provided for by section 12.C, the New VEBA acquired whatever rights the DC VEBA had prior to the transfer; and (b) these rights acquired by the New VEBA "include[d]," inter alia, the DC VEBA's contractual right as a third-party beneficiary of the Restructuring MOU to receive the $450 million payment required by that contract upon satisfaction of the conditions precedent to GM's payment obligation.

Second, and in any event, the conditions precedent to GM's obligation to make the $450 million payment to the DC VEBA required by the Restructuring MOU were satisfied upon the substantial consummation of Delphi's proposed Modified Plan of Reorganization *on October 6, 2009*, infra pp. 23-28, and the UAW made a timely demand for that payment *on October 29, 2009*, SMF ¶ 42 – more than two months *before* the *January 16, 2010* transfer of the DC VEBA's assets to the New VEBA.  Therefore, had GM honored its $450 million payment obligation to the DC VEBA upon the UAW's timely demand, the $450 million payment would have gone into the coffers of the DC VEBA, which still existed as of that time.  SMF ¶ 44.  GM cannot take advantage of its own delay in fulfilling its contractual obligation to make the $450 million payment to the DC VEBA required by the Restructuring MOU by pointing to the fact that, as a consequence of its own delay, the DC VEBA no longer exists to receive the $450 million payment, and that payment, if ordered by this Court, would flow into the coffers of the New VEBA instead.  See generally e.g. Mkt. St. Assocs. v. Frey, 941 F.2d 588, 592 (7th Cir.

17

1991) ("[A] contracting party cannot be allowed to use his own breach to gain an advantage by impairing the rights that the contract confers on the other party."); <u>DeSilvio v. Prudential Lines, Inc.</u>, 701 F.2d 13, 16 (2d Cir. 1983) ("th[e] principle" that "no man may take advantage of his own wrong" is "[d]eeply rooted in our jurisprudence" and "has been applied in many diverse classes of cases by both law and equity courts").

*          *          *          *

In sum, under the clear and unambiguous language of the 2009 UAW Retiree Settlement Agreement, GM's extinguishment defense to the UAW's breach of contract claim fails as a matter of law, and this Court should so rule on this motion for summary judgment by the UAW.

> B.    The Conclusion That GM's Extinguishment Defense Fails As A Matter Of Law Is Confirmed By Extrinsic Evidence Properly Considered By This Court On This Motion For Summary Judgment By The UAW

The normal rule is that extrinsic evidence "cannot be considered when contract language is unambiguous."  <u>See</u> <u>e.g.</u> <u>Winnett v. Caterpiller</u>, 553 F.3d 1000, 1008 (6th Cir. 2009) (internal quotations omitted).  However, under an exception to this rule recognized by the Sixth Circuit and this Court, extrinsic evidence may be considered for the limited purpose of confirming the legal conclusion to be drawn from the unambiguous language of a contract.  <u>See</u> <u>e.g.</u> <u>UMWA v. Apogee Coal Co.</u>, 330 F.3d 740, 747 (6th Cir. 2003) (relying on extrinsic evidence "to confirm the lack of ambiguity as to the meaning of the ['unequivocal' contract] term 'operations'."); <u>Hardy v. Reynolds & Reynolds Co.</u>, No. 06-12331, 2007 WL 2713736, at *7 (E.D. Mich. Sept. 17, 2007) (Cohn, J.) ("While the contractual language is clear enough that resort to extrinsic evidence is unnecessary to aid in construction, the Court notes that the parties' conduct lends support to its reading."), <u>aff'd</u> 311 F. App'x 759 (6th Cir. 2009).

As we now show, consideration of the extrinsic evidence set out below is appropriate here under this exception, because that extrinsic evidence confirms the legal conclusion to be

18

drawn from the clear and unambiguous language of the 2009 UAW Retiree Settlement

Agreement: to wit, that the 2009 UAW Retiree Settlement Agreement did *not* "extinguish"

GM's $450 million payment obligation to the DC VEBA imposed by the Restructuring MOU.

        1.      As previously noted, the New VEBA was established by the UAW and

Old GM in 2008 pursuant to a settlement agreement referred to by the parties as the "Henry II

Settlement."  SMF ¶ 11.  Two points respecting the Henry II Settlement and its relationship to

the 2009 UAW Retiree Settlement Agreement are significant here:  *First*, the Henry II

Settlement itself included language "fixing and capping" the payment obligations to the New

VEBA established by that agreement.  See Ex. 4, Henry II Settlement, at Preamble & §§ 2, 8.

*Second*, that "fixing and capping" language in the Henry II Settlement was later carried over, in

haec verba, into the 2009 UAW Retirement Settlement Agreement.  See Ex. 9, 2009 UAW

Retiree Settlement Agreement, at Preamble & §§ 2, 8.[5]

      These two points are significant here because the extrinsic evidence set out in subsections

2(a)-(c) below conclusively establishes that the Henry II Settlement *did not*, through *any*

language set forth therein, have the effect of "extinguishing" the $450 million payment

obligation to the DC VEBA imposed by the Restructuring MOU.  That being so, GM's

extinguishment defense in this matter ultimately rests on the following proposition:  although the

"fixing and capping" language in the Henry II Settlement *did not* have the effect of

"extinguishing" the $450 million payment obligation, when that "fixing and capping" language

---

[5] Indeed, when drafting the 2009 UAW Retiree Settlement Agreement, the parties used the
Henry II Settlement as their starting point and modified only those terms in the Henry II
Settlement that needed to be changed to reflect subsequent agreements between the parties on the
restructuring of GM's payment obligations to the New VEBA.  If an entire section of the Henry
II Settlement had become moot or was no longer applicable, that section was listed as "reserved"
in the 2009 UAW Retiree Settlement Agreement rather than deleting the section so that even the
paragraph numbering could remain the same.  See SMF ¶ 33.

was later carried over, in haec verba, into the 2009 UAW Retiree Settlement Agreement, that "fixing and capping" language *did* have the effect of "extinguishing" the $450 million payment obligation.  This proposition, we submit, is wholly illogical and untenable.

       2.      The following extrinsic evidence conclusively establishes that the Henry II Settlement *did not*, through *any* language set forth therein, have the effect of "extinguishing" the $450 million payment obligation to the DC VEBA imposed by the Restructuring MOU:

       a.      When the parties established the New VEBA in 2008 in the Henry II Settlement, they worked closely together to calculate the amount of contributions to the New VEBA that would be necessary to fund the New VEBA's anticipated expenses to achieve 80 years of solvency for the New VEBA.  SMF ¶ 16.  And, in these shared calculations, the $450 million payment obligation to the DC VEBA was specifically included as a funding source by both parties.  SMF ¶ 17.  In other words, in determining funding levels for the New VEBA under the Henry II Settlement, the parties proceeded on the mutual understanding that the $450 million payment to the DC VEBA *would be made* upon satisfaction of the conditions precedent to that payment obligation, and would then be part of the assets transferred to the New VEBA upon the eventual folding of the DC VEBA into the New VEBA.  SMF ¶ 18.

Standing alone, this extrinsic evidence showing that the parties to the Henry II Settlement had a mutual understanding that the $450 million payment to the DC VEBA *would be made* upon satisfaction of the conditions precedent to that payment obligation, and would then be used to help fund the New VEBA, belies any notion that the Henry II Settlement had the effect of "extinguishing" the $450 million payment obligation.

       b.      In September of 2008, several months after the UAW and Old GM had entered into the Henry II Settlement, the UAW and Old GM entered into the Implementation

Agreement providing, in pertinent part, that "[t]he [$450 million] payment required by sections J(2) and K(2)(e) [of the Restructuring MOU] *shall remain payable* as set forth in the Restructuring MOU." Supra pp. 7-8 (emphasis added).

This post- Henry II Settlement affirmation by the parties of *the continued existence of the $450 million payment obligation imposed by the Restructuring MOU* likewise belies any notion that the Henry II Settlement had the effect of "extinguishing" that obligation.

        c.      Additionally, Fritz Henderson – Old GM's lead negotiator in the bargaining that led to the Henry II Settlement – has acknowledged in his deposition testimony in this case that the Henry II Settlement *did not* have the effect of "extinguishing" the $450 million payment obligation imposed by the Restructuring MOU. SMF ¶¶ 13-14. Indeed, as Mr. Henderson put it in his deposition, "it didn't occur to me *or anybody* that [the $450 million payment obligation] had been extinguished as a result of this 2008 document." SMF ¶ 15 (emphasis added).

Although this concession by lead negotiator Henderson is unsurprising in light of the extrinsic evidence set out in subsections 2(a)-(b) above, its independent evidentiary significance is manifest. Compare Tackett v. M&G Polymers USA, LLC, 853 F. Supp. 2d 697, 719 (S.D. Ohio 2012) (assigning substantial weight to statements made by the company's lead negotiator in a case involving the construction of language in a collective bargaining agreement).

        *      *      *      *

In sum, although GM's extinguishment defense can and should be rejected as a matter of law based on the clear and unambiguous language of the 2009 UAW Retiree Settlement Agreement, the extrinsic evidence set out above confirms the legal conclusion that GM's extinguishment defense is meritless.

## II.     ON THE UNDISPUTED FACTS OF RECORD, GM IS IN BREACH OF ITS $450 MILLION PAYMENT OBLIGATION TO THE DC VEBA IMPOSED BY THE 2007 DELPHI RESTRUCTURING MOU

The remaining issue presented by the UAW's summary judgment motion is whether, on the undisputed facts of record, the conditions precedent to GM's $450 million payment obligation to the DC VEBA have been satisfied, such that GM's failure and refusal to make that payment constitutes a breach of contract by GM.

Before turning to this issue, however, we pause briefly to show that GM assumed the 2007 Delphi Restructuring MOU—and thus assumed all contractual obligations imposed by that contract *including* the $450 million payment obligation to the DC VEBA at issue here—when GM purchased Old GM's assets in Old GM's bankruptcy proceeding.  We make this showing out of an abundance of caution only, inasmuch as GM does not appear to be contesting this point in this litigation.  See supra p. 3 n.1.

### A.     GM Has Assumed The 2007 Delphi Restructuring MOU

The terms of the sales transaction between Old GM and GM in the Old GM bankruptcy proceeding were set by a Master Sale and Purchase Agreement ("MPA").  SMF ¶ 34; Ex. 10, MPA.[6]  Under section 2.2(a)(x) of the MPA, GM agreed to assume many of Old GM's executory contracts, including the "UAW Collective Bargaining Agreement."  Ex. 10, MPA, at 25.  The MPA defines the "UAW Collective Bargaining Agreement" as "any written or oral Contract, understanding or mutually recognized past practice" between Old GM and the UAW with respect to "Employees," and further defines the term "Employees" to include "any current, former or retired employee" of Old GM or its affiliates.  Id. at 6-7, 21.  Virtually all of the Delphi retirees covered by the 2007 Delphi Restructuring MOU are former Old GM employees by virtue

_____

[6] The MPA was approved by the GM bankruptcy court in a "Sale Order" dated July 5, 2012. SMF ¶ 35.

of their employment at Delphi prior to Delphi's 1999 spin-off from Old GM.  SMF ¶ 46.

Accordingly, under the plain terms of the MPA, the 2007 Delphi Restructuring MOU is a

contract between Old GM and the UAW with respect to "Employees" that was among the

contracts assumed by GM upon its purchase of Old GM's assets.

Indeed, in a Delphi bankruptcy court filing, GM has made the following point-blank

statement regarding its assumption of the 2007 Delphi Restructuring MOU (and the various

monetary obligations imposed by the MOU) that leaves GM no wiggle room on this point:

> Pursuant to the GM Sale Order [approving the MPA], New GM assumed the UAW 2007
> MOU (which is included as a 'UAW Collective Bargaining Agreement' as that term is
> used in the GM Sale Order), and thus agreed, among other things, to top up the pension
> benefits of the covered UAW employees of the [Delphi] Debtors.

Ex. 22, Reply of General Motors LLC (f/k/a General Motors Company) to Objection to Motion

to Enforce Modified Plan and Plan Modification Order, at p. 8 ¶ 19.

> B.    The Conditions Precedent To GM's $450 Million Payment Obligation To The DC
>       VEBA Have Been Satisfied

On the undisputed facts of record, the conditions precedent to GM's $450 million

payment obligation to the DC VEBA unquestionably have been satisfied—as we now show.

1.    The first condition precedent to GM's $450 million payment obligation

stated in section K.2 of the Restructuring MOU—and bolded below for emphasis—is as follows:

**execution by Delphi and GM of a comprehensive settlement agreement resolving the**
**financial, commercial, and other matters between them.**

As detailed supra pp. 5-9, it is undisputed (and indisputable) that the following sequence

of events transpired over a period of years following the execution of the Restructuring MOU:

*First*, Old GM and Delphi entered into a "GLOBAL SETTLEMENT AGREEMENT" or

"Original GSA" dealing with various financial and commercial matters between them that had

not been resolved by the Restructuring MOU itself.  *Second*, Old GM and Delphi subsequently

executed an "AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT or

"Amended and Restated GSA" that—as its name indicates—superseded the Original GSA as the

agreement dealing with the financial and commercial matters between Old GM and Delphi.

*Third*, Delphi, Defendant GM and various third parties subsequently entered into a "MASTER

DISPOSITION AGREEMENT" in which GM and Delphi agreed on certain modifications to the

Amended and Restated GSA that altered in various respects the terms of the financial and

commercial relationship between GM and Delphi to be incorporated into Delphi's proposed plan

of reorganization – two of those key alterations being GM's waiver of its right to recover on

billions of dollars in claims against Delphi, and GM's acquisition of the Delphi Keep Sites.

Against this undisputed factual background, it is clear that, over the course of time, GM

and Delphi forged and executed "**a comprehensive settlement agreement resolving the**

**financial, commercial, and other matters between them**"—to wit, the Amended and Restated

GSA as modified by the Master Disposition Agreement—thus satisfying the first condition

precedent to GM's $450 million payment obligation to the DC VEBA.

2.     The remaining conditions precedent to GM's $450 million payment

obligation stated in section K.2 of the Restructuring MOU—and bolded below for emphasis—

are as follows:

> **the substantial consummation of a plan of reorganization proposed by Delphi in its**
> **chapter 11 cases and confirmed by the Bankruptcy Court which incorporates,**
> **approves and is consistent with all of the terms of this Agreement and the**
> **comprehensive settlement agreement between Delphi and GM.**

For clarity's sake, these remaining conditions can be broken down into three constituent parts:

> a. the "**substantial consummation of a plan of reorganization proposed by Delphi**
>    **in its chapter 11 cases and confirmed by the Bankruptcy Court**";
>
> b. the plan of reorganization "**incorporates, approves and is consistent with all of**
>    **the terms of… the comprehensive settlement agreement between Delphi and**
>    **GM**";

24

**c.  the plan of reorganization "incorporates, approves and is consistent with all of the terms of [the Restructuring MOU]"**

It is equally clear on the record before this Court that all of these conditions have been

satisfied as well:

> **a.      the "substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court"**

As detailed <u>supra</u> pp. 9-10, it is undisputed (and indisputable) that Delphi filed a

proposed plan of reorganization in its Chapter 11 cases on June 1, 2009; that Delphi's proposed

plan of reorganization was confirmed by the Delphi Bankruptcy Court on July 30, 2009; and that

the Delphi plan of reorganization confirmed by the Delphi Bankruptcy Court was substantially

consummated as of October 6, 2009.  All this being so, there clearly has been satisfaction of

these conditions stated in the Restructuring MOU.

> **b.      the plan of reorganization "incorporates, approves and is consistent with all of the terms of… the comprehensive settlement agreement between Delphi and GM"**

As detailed <u>supra</u> pp. 9-10 & n.4, it is undisputed (and indisputable) that the Delphi

Modified Plan of Reorganization incorporates and endorses in every respect the terms of the

Amended and Restated GSA as modified by the Master Disposition Agreement (<u>i.e.</u>, the terms of

what we have shown in subsection B.1 above is the "comprehensive settlement agreement

between Delphi and GM" contemplated by the Restructuring MOU).  That being so, the Delphi

Modified Plan of Reorganization "incorporates, approves, and is consistent with all of the terms

of…the comprehensive settlement agreement between Delphi and GM," and this further

condition has been satisfied.

   c. **the plan of reorganization "incorporates, approves and is consistent with all of the terms of [the Restructuring MOU]"**

Finally, as detailed <u>supra</u> pp. 7-10 & n.4, it is undisputed (and indisputable) that: (i) the UAW, GM and Delphi modified the terms of the Restructuring MOU as necessary to ensure that the terms of that 2007 contract conformed to (and, indeed, enabled the full implementation of) the terms of the subsequently-executed "comprehensive settlement agreement between Delphi and GM"; and (ii) those "conforming" modified terms of the Restructuring MOU (including, in particular, the modified term under which GM acquired the Delphi Keep Sites) were then incorporated into and endorsed by the Delphi Modified Plan of Reorganization. That being so, the Delphi plan of reorganization "incorporates, approves, and is consistent with all the terms of [the Restructuring MOU]," and this further condition has been satisfied.

   3. The conclusion that the conditions precedent to GM's $450 million payment obligation to the DC VEBA have been satisfied is fortified by the following additional points as to which there is no room for genuine disagreement:

   a. On their face, the conditions precedent stated in the Restructuring MOU were designed and intended to afford GM a measure of contractual protection against the prospect that Delphi, GM's "largest supplier," would propose and emerge from bankruptcy under a plan of reorganization that incorporated and endorsed terms which GM could not accept from a business standpoint.[7] The conditions precedent served this purpose by conditioning GM's provision of billions of dollars in financial relief to Delphi in aid of Delphi's reorganization

---

[7] Another threat to GM's business interests, also guarded against by the conditions precedent stated in the Restructuring MOU, was the threat that a third-party would propose a plan of reorganization for Delphi that incorporated and endorsed terms which GM could not accept from a business standpoint. <u>See</u> 11 U.S.C. § 1121(c) (providing that "[a]ny party in interest," including creditors and bond holders, may propose a plan of reorganization for a debtor after a statutorily-prescribed grace period in which the debtor itself has the exclusive right to propose such a plan).

efforts – including GM's satisfaction of the UAW's $450 million claim against Delphi at issue here – on Delphi's proposal of and emergence from bankruptcy under a plan of reorganization that incorporated and endorsed the terms of agreements that GM was a party to and thus, by definition, found acceptable from a business standpoint.

In this regard, GM unquestionably received the full measure of contractual protection it bargained for in the Restructuring MOU, inasmuch as Delphi *did in fact* propose and emerge from bankruptcy under a plan of reorganization that incorporated and endorsed the terms of agreements that GM was a party to and thus, by definition, found acceptable from a business standpoint.

b.      In its November 11, 2009 letter to the UAW rejecting the UAW's demand that GM fulfill its $450 million payment obligation to the DC VEBA, GM asserted that the conditions precedent to that payment obligation stated in the Restructuring MOU have not been satisfied because the plan of reorganization under which Delphi emerged from bankruptcy did not include terms that would have provided GM with certain specific financial and commercial benefits—including a term providing for Delphi's payment of billions of dollars to GM in consideration for GM's financial support of Delphi's reorganization efforts, and a term providing for Delphi's retention of the obligation to own and operate the Delphi Keep Sites.  See Ex. 13.  But this assertion rests on a patently erroneous reading of the Restructuring MOU, under which GM seeks to obtain for itself far greater contractual protection from the imposition of the conditions precedent stated in that contract than GM bargained for.

As we have shown, section K.2 of the Restructuring MOU states that the plan of reorganization under which Delphi emerges from bankruptcy must incorporate, approve and be consistent with the terms of "a" comprehensive settlement agreement between GM and Delphi

27

that "resolv[es]" – on *any* basis acceptable to both parties – "the financial, commercial, and other matters between them."  <u>See</u> Ex. 2, Restructuring MOU, at 22.  It most assuredly does *not* state, as GM would have it, that the Delphi plan of reorganization incorporating "a" comprehensive settlement agreement between GM and Delphi must include terms that provide GM with certain specific financial and commercial benefits.  Accordingly, under the plain language of the Restructuring MOU, GM cannot evade its $450 million payment obligation to the DC VEBA on the ground that the plan of reorganization under which Delphi emerged from bankruptcy did not include terms that would have provided GM with the specific financial and commercial benefits identified by GM in its November 11, 2009 letter rejecting the UAW's payment demand.[8]

*          *          *          *

In sum, on the undisputed facts of record, the conditions precedent to GM's $450 million payment obligation to the DC VEBA have been satisfied, and GM stands in breach of its contractual obligation to make that payment.

## III.   JUDGMENT SHOULD BE ENTERED AGAINST GM IN THE AMOUNT OF $450 MILLION PLUS APPLICABLE INTEREST

Because GM is in breach of its contractual obligation to make the $450 million payment required by the Restructuring MOU, judgment should be entered against GM in the amount of $450 million (payable at this juncture to the New VEBA, <u>see</u> <u>supra</u> pp. 16-17).  That judgment should include pre-judgment interest from the date the UAW demanded payment on October 29, 2009, through the date of judgment, as well as post-judgment interest from the date of judgment.

---

[8] GM's effort to evade its $450 million payment obligation on the ground that Delphi's plan of reorganization did not provide for Delphi's retention of the obligation to own and operate the Delphi Keep Sites is particularly astounding given:  (a) GM's statements to the GM bankruptcy court regarding how "imperative" it was from a business standpoint that GM be allowed to purchase those Keep Sites from Delphi; and (b) the UAW's accommodation of this GM business interest through an agreed-upon modification to the terms of the Restructuring MOU sought by GM and Delphi.  <u>See</u> <u>supra</u> p. 9.

28

Pre-judgment interest is "in the discretion of the court," <u>Bricklayer's Pension Trust Fund v. Taiariol</u>, 671 F.2d 988, 990 (6th Cir. 1982), and "should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable." <u>Force v. Ameritech Corp., Inc.</u>, No. 03-71618, 2007 WL 1760909, at *5 (E.D. Mich. June 15, 2007). Such awards are appropriate when they are "compensatory" in nature. <u>Drennan v. Gen. Motors Corp.</u>, 977 F.2d 246, 253 (6th Cir. 1992). Courts routinely award pre-judgment interest to make the plaintiff whole for the lost time-value of money, adding that to do otherwise "would be to approve of an unjust enrichment" of the defendant. <u>Sweet v. Consol. Aluminum Corp.</u>, 913 F.2d 268, 270 (6th Cir. 1990) (internal quotation marks omitted); <u>see also</u> <u>Int'l Bhd. of Elec. Workers, Local 58 v. Metro Elec. Eng'g Techs., Inc.</u>, No. 11-14333, 2012 WL 3064672, at *7 (E.D. Mich. July 25, 2012) (awarding pre-judgment interest in LMRA § 301 case to compensate plaintiff for "the impact that Defendant's failure to pay has had on lost interest income to Plaintiff's funds"); <u>UAW Local 540 v. Baretz</u>, 159 F. Supp. 2d 968, 976 (E.D. Mich. 2001) (Defendant should not be allowed "'to retain the interest it earned on funds wrongfully withheld.'") (quoting <u>Tiemeyer v. Cmty. Mut. Ins. Co.</u>, 8 F.3d 1094, 1102 (6th Cir.1993)).

Here, an award of pre-judgment interest is necessary to compensate for the lost time-value of money caused by GM's failure to make the $450 million payment as required in October of 2009. Indeed, GM has been receiving the benefit of the interest earned on this $450 million for more than three years at this point, and to that extent has been "unjust[ly] enrich[ed]" by its own contract breach. <u>Compare</u> <u>Sweet</u>, 913 F.2d at 270.

Because there is no federal statute setting the rate of pre-judgment interest, pre-judgment interest should be assessed at the rate provided by Mich. Comp. Laws § 600.6013(8), and should begin to accrue "as of…the [October 29, 2009] date of [the UAW's] demand for payment." <u>Int'l</u>

Bhd. of Elec. Workers, Local 58, 2012 WL 3064672, at *7.  In addition, post-judgment interest should be awarded as mandated by 28 U.S.C. § 1961.

## CONCLUSION

For the foregoing reasons, the UAW's motion for summary judgment should be granted, and the Court should enter the judgment requested in that motion.

Respectfully submitted,

/s/ ANDREW D. ROTH

| | |
|---|---|
| Jeffrey D. Sodko (P65076) | Andrew D. Roth (DC Bar 414038) |
| jsodko@uaw.net | aroth@bredhoff.com |
| Associate General Counsel, | Ramya Ravindran (DC Bar 980728) |
| International Union, UAW | rravindran@bredhoff.com |
| 8000 East Jefferson Avenue | W. Gary Kohlman (DC Bar 177527) |
| Detroit, Michigan 48214 | gkohlman@bredhoff.com |
| Telephone: (313) 926-5216 | BREDHOFF & KAISER, PLLC |
| Facsimile: (313) 926-5240 | 805 Fifteenth Street, N.W., Suite 1000 |
| | Washington, D.C. 20005 |
| | Telephone: (202) 842-2600 |
| | Facsimile: (202) 841-1888 |
| Dated:  November 15, 2012 | *Counsel for Plaintiff UAW* |

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2012, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Robert S. Walker
Email: rswalker@jonesday.com
Jones Day
North Point,   901 Lakeside Avenue
Cleveland, Ohio 44114

Johanna F. Parker
Email: jfparker@jonesday.com
Jones Day
North Point, 901 Lakeside Avenue
Cleveland, OH 44114-1190

Edward W. Risko
Email: edward.w.risko@gm.com
General Motors Corporation
Legal Staff
300 Renaissance Center
Suite MC 482-C24-C66
Detroit, MI 48265-3000

/s/ ANDREW D. ROTH
Andrew D. Roth (DC Bar 414038)
**Bredhoff & Kaiser, PLLC**
805 Fifteenth Street, N.W., Suite 1000
Washington, DC 20005
(202) 842-2600
Email: aroth@bredhoff.com