UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNION, UNITED ) 
AUTOMOBILE, AEROSPACE AND )     2:10-cv-11366-AC-MJH
AGRICULTURAL IMPLEMENT )
WORKERS OF AMERICA, )
 )
 )
     Plaintiff, )
   v. )     Honorable Avern Cohn
 )
GENERAL MOTORS LLC, )
 )
     Defendant. )

DEFENDANT GENERAL MOTORS LLC'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF UAW'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
GENERAL MOTORS LLC'S MOTION FOR SUMMARY JUDGMENT

Robert S. Walker (Ohio Bar No. 0005840)
(Admitted E.D. Mich. 8/18/93)
rswalker@jonesday.com
Johanna Fabrizio Parker (Ohio Bar No. 0071236)
(Admitted E.D. Mich. 9/20/12)
jfparker@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: 216-586-3939
Facsimile: 216-579-0212

Edward W. Risko (P 36699)
edward.w.risko@gm.com
300 Renaissance Center
Detroit, Michigan 48265-3000
Telephone: 313-665-4920
Facsimile: 248-267-4268

*Counsel for Defendant General Motors LLC*

# TABLE OF CONTENTS

Page

ISSUES PRESENTED..............................................................................................ii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ...................................iii

TABLE OF AUTHORITIES ...................................................................................iv

PRELIMINARY STATEMENT ............................................................................... 1

SUMMARY OF UNDISPUTED MATERIAL FACTS............................................. 3

    I.    2009 Retiree Settlement Agreement ("2009 RSA") ............................. 3

    II.   2007 Memorandum of Understanding For Delphi Restructuring ("2007 MOU")..................................................................................................... 5

    III.  Old GM-Delphi Comprehensive Settlement Agreements ..................... 6

    IV.  Events of Late 2008 and Into 2009 ....................................................... 7

ARGUMENT ......................................................................................................... 9

    I.    THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION.................................................................................... 9

        A.    Multiple Provisions Of The 2009 RSA Make Clear That New GM Has No Obligation To Make The $450M Payment................................ 11

        B.    The UAW's Arguments To The Contrary Are Meritless ....................... 16

    II.   THE UAW HAS NOT CARRIED ITS BURDEN OF PROVING THAT ALL CONDITIONS PRECEDENT TO THE MAKING OF THE $450M PAYMENT HAVE BEEN SATISFIED.................................................... 22

        A.    The 2007 MOU Imposed Significant Conditions Precedent To The Making Of The $450M Payment That Have Not Been Met.................. 22

            1.    Delphi's Liquidating Plan Was Not A "Plan of Reorganization."........................................................................ 23

            2.    Even Assuming Delphi's Plan Was A "Plan of Reorganization," The Plan Was Not Consistent With All Of The Terms Of The 2007 MOU And The Comprehensive Settlement Agreement.................................................................. 24

                (a)    Delphi's Modified Plan Was Not Consistent With All Of The Terms Of The 2007 MOU ............................ 25

                (b)    The Modified Plan Was Not Consistent With All Of The Terms Of The Comprehensive Settlement Agreement................................................................ 28

CONCLUSION.................................................................................................... 30

-i-

<u>ISSUES PRESENTED</u>

1.      In May 2009, General Motors Corporation ("Old GM") and the UAW negotiated a settlement agreement to address retiree healthcare for UAW retirees of Old GM and Delphi Corporation (the "2009 RSA"), approved by the bankruptcy court and executed by General Motors LLC ("New GM") and the UAW on July 10, 2009. It is undisputed that the 2009 RSA is not ambiguous and the $450 million at issue (the "$450M Payment") is a payment for retiree healthcare for UAW retirees. The first issue is whether language of the 2009 RSA—including unambiguous, multiple provisions that New GM's "sole" obligations are those in the "fixed and capped" list of "certain obligations" detailed in the 2009 RSA, which set up the New Plan and New VEBA to be "exclusively responsible" for "all" Retiree Medical Benefits (*i.e.*, "all post-retirement medical benefits"), and which is the "entire agreement," "supersed[ing]" all others—sets forth New GM's sole obligations for retiree healthcare benefits for UAW retirees and extinguished New GM's obligation to make the contingent $450M Payment.

2.      The $450M Payment originally arose out of a 2007 Restructuring Memorandum of Understanding among Old GM, Delphi, and the UAW (the "2007 MOU"), which New GM and the UAW agree is not ambiguous. Under the 2007 MOU, the $450M Payment was conditional on "*all*" of the specified events, including "substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the bankruptcy court which incorporates, approves and is consistent with all of the terms of this Agreement [the 2007 MOU] and the comprehensive settlement agreement between Delphi and GM." If the Court determines that the 2009 RSA did not extinguish the $450M Payment obligation, the second issue is whether, as a matter of law, all these conditions of the 2007 MOU were met. Failure of even one condition mandates judgment for New GM.

<u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

The controlling or most appropriate authority is the unambiguous language of the 2009 RSA, including its language providing that:

- New GM's "sole" obligations are those listed in the 2009 RSA;

- New GM's obligations are "fixed and capped" as set forth in the 2009 RSA;

- the UAW never can ask for additional monies for Retiree Medical Benefits for the Class and Covered Group, where Retiree Medical Benefits are defined to be "all post-retirement medical benefits" and the "Class" and "Covered Group" include Delphi-UAW retirees;

- The New VEBA is the "exclusive funding mechanism for the New Plan," and the New Plan and New VEBA shall be "exclusively responsible" for "all Retiree Medical Benefits for which [New Co], and the [New Co] and any other [New Co] entity or benefit plan formerly would have been responsible with respect to the Class and the Covered Group"; and

- the 2009 RSA is the "entire agreement" and "supersedes" any prior "understandings, agreements, or representations" (whether "written or oral"), and all contrary agreements are "terminated" or "amended" so as to be consistent with its terms.

The Sixth Circuit directs that "traditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983); *accord Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991). "[C]ourts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Armistead*, 944 F.2d at 1293; *accord Yard-Man*, 716 F.2d at 1479. In doing so, courts should "interpret each provision in question as part of the integrated whole," and the "agreement's terms must be construed so as to render none nugatory and avoid illusory promises." *Yard-Man*, 716 F.2d at 1479–80.

## TABLE OF AUTHORITIES

Page

CASES

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008)..................................................................................................13

*Am. Fed'n of Television & Radio Artists, AFL-CIO v. WJBK-TV*,
    164 F.3d 1004 (6th Cir. 1999) ..........................................................................9-10

*Armistead v. Vernitron Corp.*,
    944 F.2d 1287 (6th Cir. 1991) .................................................................. iii, 10, 28

*Auto Indus. Supplier Employees Stock Ownership Plan v. Snap Sys., Inc.*,
    No. 03-74357, 2006 WL 3627935 (E.D. Mich. Dec. 12, 2006) .............................16

*Ciao Cucina Corp. v. The Glazier Group, Inc.*,
    92 Fed. App'x 213 (6th Cir. 2004) .......................................................................22

*Cook v. Little Caesars Enters., Inc.*,
    210 F.3d 653 (6th Cir. 2000) ..........................................................................16, 19

*Cottage Inn Carryout & Delivery, Inc. v. True Freedom Invs.*,
    No. 10-12833, 2010 WL 4188311 (E.D. Mich. Oct. 20, 2010)...................2, 16, 19

*Dist. of Columbia v. Greater Wash. Bd. of Trade*,
    506 U.S. 125 (1992)..............................................................................................13

*Green Constr. Co. v. First Indem. of Am. Ins. Co.*,
    735 F. Supp. 1254 (D.N.J. 1990) .........................................................................28

*Hardy v. Reynolds & Reynolds*,
    No. 2:06-CV-12331, 2007 WL 2713736 (E.D. Mich. Sept. 17, 2007).......10, 11, 12

*Heights Driving Sch., Inc. v. Top Driver, Inc.*,
    51 Fed. App'x 932 (6th Cir. 2002) .......................................................................22

*In re Dorsey Trailer Co.*,
    No. 04-32662, 2007 WL 4166170 (Bankr. M.D. Ala. Nov. 20, 2007)...................24

*In re DPH Holdings Corp.*,
    437 B.R. 88 (Bankr. S.D.N.Y. 2010)...........................................................8, 23, 25

*In re General Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009)...............................................................5, 8

*In re Geneva Steel Co.*,
    236 B.R. 770 (Bankr. D. Utah 1999) ...................................................................24

Page

CASES

*In re Motors Liquidation Co.*,
   457 B.R. 276 (Bankr. S.D.N.Y. 2011) ............................................................24, 26

*In re Port Royal Land & Timber Co.*,
   105 B.R. 72 (Bankr. S.D. Ala. 1989), *vacated sub. nom. on other grounds Port Royal
   Land & Timber Co. v. Berkowitz, Lefkovits, Isom & Kushner*, 924 F.2d 208 (11th Cir.
   1991) ......................................................................................................................24

*Mech. Contractors' Ass'n Indus. Promotion Fund v. Gem Indus., Inc.*,
   310 Fed. App'x 750 (6th Cir. 2009) ......................................................................11

*Neely v. Good Samaritan Hosp.*,
   345 Fed. App'x 39 (6th Cir. 2009) ..................................................................13, 15

*Schachner v. Blue Cross & Blue Shield of Ohio*,
   77 F.3d 889 (6th Cir. 1996) .............................................................................10, 19

*Serv. Employees Int'l Union Local 3 v. Knight Facilities Mgmt., Inc.*,
   No. 04-73571, 2005 WL 1355092 (E.D. Mich. May 13, 2005) ............................12

*Stafford v. First Tenn. Nat'l Bank*,
   No. 98-6391, 2000 WL 1359631 (6th Cir. Sept. 14, 2000) ..................................22

*Standard Alliance Indus., Inc. v. Black Clawson Co.*,
   587 F.2d 813 (6th Cir. 1978) ................................................................................22

*Tubby's #14, Ltd. v. Tubby's Sub Shop, Inc.*,
   No. 04-70918, 2006 WL 2796181 (E.D. Mich. Sept. 27, 2006)...........................25

*UAW v. Yard-Man, Inc.*,
   716 F.2d 1476 (6th Cir. 1983) ....................................................................iii, 10, 17

*United States v. Donovan*,
   348 F.3d 509 (6th Cir. 2003) ...........................................................................10, 19

*United States v. Johnson*,
   752 F.2d 206 (6th Cir. 1985) ................................................................................28

*Winnett v. Caterpillar, Inc.*,
   553 F.3d 1000 (6th Cir. 2009) ........................................................................10, 19

*Witmer v. Acument Global Techs., Inc.*,
   694 F.3d 774 (6th Cir. 2012) ................................................................................19

Page

CASES

*Zirnhelt v. Mich. Consol. Gas Co.*,
526 F.3d 282 (6th Cir. 2008) .................................................................................10

OTHER AUTHORITIES

30B Federal Practice & Procedure § 7023 n.14 (2d ed. 2012) ....................................................28

PRELIMINARY STATEMENT

This case is about the UAW's effort to gain through litigation what it could not achieve through contract negotiation or the bankruptcy process. Specifically, it represents the UAW's attempt to impose on New GM a $450 million obligation that the unambiguous, fully integrated 2009 RSA extinguished and that, even if not extinguished, was nullified by now-unsatisfiable conditions precedent set forth in the 2007 MOU. Those conditions are unsatisfiable because the transaction to reorganize Delphi in 2007 proved impossible to consummate in the face of the subsequent financial crisis, and a completely different approach ultimately was pursued. In any event, any reasonable reading of the key contracts at issue—the 2009 RSA and the 2007 MOU— and any fair application of the relevant legal principles compel the conclusion that New GM has no obligation to make the additional $450M Payment. In the end, this is a simple case involving unambiguous contractual provisions that demand denial of summary judgment for the UAW and entry of judgment for New GM.

The UAW's motion papers mention only a subset of the relevant contractual provisions, offer only conclusory assertions regarding the relevant conditions precedent (despite the UAW's burden to prove that all the conditions were satisfied), and contain scant, if any, legal support for its key assertions. Making matters worse, the UAW misconstrues or misapplies the few provisions and principles it does reference.

Some context: In June 2009, Old GM filed for bankruptcy protection. One month later, New GM was created by the governments of the United States and Canada to purchase certain Old GM assets and assume certain Old GM contracts. To achieve the critical, government-mandated restructuring and fixing and capping of New GM's obligations regarding UAW-retiree medical benefits, New GM and the UAW negotiated and executed the 2009 RSA, the central

feature of which is its express, clear, and repeated admonition that New GM's sole obligations relating to UAW-retiree medical benefits are "fixed and capped" at the amount and structure of the payments specified in the agreement. In no uncertain terms, the 2009 RSA states that, other than the payments set forth in the agreement, New GM has no obligation "in any way related to Retiree Medical Benefits" and the agreement "supersedes any prior understandings, agreements or representations by or between the parties" regarding those obligations.

This certainty was essential to securing necessary government assistance and putting New GM on a path toward long-term viability. So, too, was converting from cash to equity approximately half of New GM's obligations for UAW-retiree medical benefits, another feature of the 2009 RSA. The 2009 RSA was a cornerstone of a plan to give New GM a fresh start. Yet the UAW now makes the untenable argument that a nearly half-billion-dollar obligation—an entirely *cash* obligation, no less—somehow survived the bankruptcy process and slipped through a crack in the airtight 2009 RSA—in essence, retroactively increasing New GM's purchase price by almost $500 million.

The UAW's claim fails for two separate and independently sufficient reasons. *First*, the 2009 RSA makes clear that New GM has no obligation to make the $450M Payment. This case should begin and end within the four corners of that unambiguous and fully integrated agreement. The UAW attempts to rely on extrinsic evidence in the hope that the Court will rewrite the 2009 RSA. But, as this Court recently explained, "[c]lear and unambiguous language may not be rewritten under the guise of interpretation," particularity in the presence of the 2009 RSA's "integration clause . . . which prevent[s] application of the parol evidence rule." *Cottage Inn Carryout & Delivery, Inc. v. True Freedom Invs.*, No. 10-12833, 2010 WL 4188311, at *3 (E.D. Mich. Oct. 20, 2010) (Cohn, J.). Moreover, the relevant fact which the extrinsic evidence *does*

establish is that the matter at issue was discussed and negotiated prior to execution of the 2009 RSA. With that background, there is no legal basis to disregard the clear provisions of a fully integrated settlement agreement.

*Second*, even if the Court were to conclude that the $450M Payment obligation somehow survived the 2009 RSA as a contingency, it still should deny summary judgment to the UAW and grant judgment to New GM because the UAW has not carried, and cannot carry, its burden of establishing that each of the conditions precedent to the making of the payment in the 2007 MOU has been satisfied.

<u>SUMMARY OF UNDISPUTED MATERIAL FACTS</u>

I.      <u>2009 Retiree Settlement Agreement ("2009 RSA")</u>.

In May 2009, Old GM and the UAW—with the assistance and involvement of the U.S. government—negotiated the 2009 RSA. SMF ¶ 58.[1] The 2009 RSA was presented to the bankruptcy court for approval in Old GM's § 363 asset sale. SMF ¶ 34, Ex. 10. The UAW's counsel attended that sale hearing—on behalf of UAW-represented employees and retirees—and the UAW's David Curson testified in support of the 2009 RSA. SMF ¶¶ 53, 55. The bankruptcy court approved the 2009 RSA, and New GM and the UAW executed it on July 10, 2009. SMF ¶ 32, Ex. 9. The UAW admits that the 2009 RSA is not ambiguous. SMF ¶ 48. The UAW acknowledges that the $450M Payment was meant to be a payment for Retiree Medical Benefits for Delphi retirees and that these very same retirees are part of the Covered Group under the

---

[1] "SMF" refers to the UAW's statement of material facts along with New GM's responses to those facts, as well as New GM's Statement of Additional Material Facts. Pursuant to this Court's Motion Practice Guidelines and scheduling Order, the SMF is consolidated.

2009 RSA. SMF ¶¶ 50, 51.[2]

The 2009 RSA makes no express mention of the $450M Payment. It does, however, state repeatedly that the obligations it specifies are New GM's "sole" obligations to the New VEBA, that the New VEBA and New Plan shall be "exclusively responsible" for providing Retiree Medical Benefits, and that New GM's obligations to the New VEBA and New Plan are "fixed and capped" as described in the agreement. SMF ¶ 32, Ex. 9, §§ 2, 5, 8. The 2009 RSA states that it shall "cover and [have] application to" a specified list, including the "Existing External VEBA" (which is the DC VEBA). *Id.* at 1. In a section entitled "Future Contributions," the UAW agrees never to seek any additional monies for Retiree Medical Benefits, and in fact releases all claims against New GM regarding Retiree Medical Benefits, a term defined to mean "all post-employment medical benefits" for the Class and Covered Group (*i.e.*, UAW retirees of Old GM and Delphi). *Id.* §§ 1, 14. And the 2009 RSA explicitly states that it is the "entire agreement" and "supersedes" any prior "understandings, agreements or representations" ("written or oral"), and that all contrary agreements are "amended" so as to be consistent with its terms. *Id.* §§ 5.D, 32.C.

---

[2] Prior to finalizing the 2009 RSA, the UAW raised and GM addressed the UAW's desire to receive the $450M Payment. SMF, Ex. 11, Sherrick Dec. ¶ 8; SMF ¶¶ 80-83. On May 18, 2009, Old GM made a presentation to the UAW (in the presence of Treasury officials) stating that the $450M Payment was excluded. SMF ¶ 80, Ex. 33-2. This same presentation further stated that New GM's OPEB liability (*i.e.*, liability for retiree healthcare benefits) for UAW retirees would be $0. *Id.* Lazard's Andrew Yearly, a financial and bankruptcy advisor to the UAW who was present for these negotiations, testified that former UAW General Counsel Daniel Sherrick knew the $450M Payment was not in the VEBA calculations, but told his team "let's go to getting a deal"; New GM "[is] going to pay [the $450 million], whether they pay it on their own or they pay it as a result of us having to go litigate to get it . . . . I don't know what they going [sic] to say in all these meetings or what Treasury says, we will get [the $450 million] later." SMF ¶ 84. Based on this instruction, the UAW provided a counterproposal on May 19, 2009, which did not include the $450M as part of New GM's VEBA obligations. SMF ¶ 83.

4

Although the UAW now asserts that the $450M Payment continues to exist as an obligation and is owed by New GM, the UAW never represented this to the government at any time during the 2009 VEBA negotiations. SMF ¶ 59. The UAW did not inform its own members and retirees of an alleged additional $450 million to be paid when seeking their approval of the new VEBA agreement. SMF ¶ 56, Ex. 31-3. The UAW did not tell the bankruptcy court or Old GM creditors of this potential half-billion-dollar cash claim, even when the Bondholders introduced into evidence an exhibit stating that the $450M Payment was "exclu[ded]" under the 2009 RSA. SMF ¶¶ 53-55. The UAW instead stated its public support for the 2009 RSA because it was "comfortable that whatever the level of, whatever the [VEBA] funding was could provide the required level of benefits we had to have." SMF ¶ 49. *See also In re General Motors Corp.*, 407 B.R. 463, 519–20 (Bankr. S.D.N.Y. 2009) (relying on the UAW's Curson's testimony and finding that "[t]he UAW was successful in preserving an acceptable level of core medical benefits" so that the 2009 RSA "is fair, reasonable and in the best interests of the UAW retirees").

II.     2007 Memorandum of Understanding For Delphi Restructuring ("2007 MOU").

The UAW's $450M Payment claim had its roots in the historic relationship between Old GM and Delphi. In 2005, Delphi filed for Chapter 11 bankruptcy. SMF ¶ 31, Ex. 21. Old GM negotiated with the Delphi debtors to facilitate Delphi's successful emergence from bankruptcy as a first-tier manufacturer of automotive parts and a major supplier to Old GM. *Id.* As part of that effort, Old GM entered into a series of agreements with Delphi and, among others, the UAW, including the 2007 MOU. *Id.*

Under the 2007 MOU, Old GM agreed to make the $450M Payment to a voluntary employees' beneficiary association, or VEBA, that previously had been established (the "DC VEBA"). SMF ¶ 4, Ex. 2 at § J.2. (In general, a VEBA is a trust fund established to pay for beneficiaries' health benefits.) Old GM was to make the $450M Payment to the DC VEBA

5

because the payment's purpose was to fund medical benefits for certain Delphi retirees affected by Delphi's bankruptcy and the 2007 MOU. SMF ¶ 50.

Old GM's obligation to make the $450M Payment, however, would "not become effective until all of the following events have occurred": (1) the "execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them"; and (2) "the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with *all* of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM." SMF ¶ 4, Ex. 2 at § K.2 (emphasis added).

The UAW agrees that the 2007 MOU had many terms and that no terms were excluded from the second condition precedent to the $450M Payment; "[i]t's a 46-page document." SMF ¶ 61. Those terms included:

- Delphi would "successful[ly] emerge[] from bankruptcy with certain UAW-represented operations" and an improved "labor cost structure and ongoing business operations" so that it could remain one of "[Old] GM's largest supplier[s]." SMF ¶ 4, Ex. 2 at Introduction.

- A "Site Plan," pursuant to which four "Keep Sites" were to "remain owned and operated by Delphi," and Delphi would make certain financial investments—*totaling more than $200 million*—in these Keep Sites. *Id.* § B.1, Attachment A.

III.    Old GM-Delphi Comprehensive Settlement Agreements.

Later in 2007, Old GM and Delphi entered into a Global Settlement Agreement and Master Restructuring Agreement (the "Original GSA/MRA") in the Delphi bankruptcy—the "comprehensive settlement agreement" contemplated in the 2007 MOU—and the Delphi debtors filed their first amended plan of reorganization (the "Original Plan"). SMF ¶¶ 8, 10. The Original Plan was confirmed by the Delphi bankruptcy court in early 2008, but because of deteriorating economic conditions, the Delphi debtors were unable to consummate the plan. SMF ¶ 10 and Ex.

18 at p. 1.

At the time, it was clear that the transaction as originally envisioned would not be consummated and the interested parties could have gone back to square one. However, a different approach was taken. Delphi and Old GM negotiated and entered into a new comprehensive settlement agreement, the Amended and Restated Global Settlement Agreement and Master Restructuring Agreement (the "Amended GSA/MRA"), which was approved by the Delphi bankruptcy court in September 2008. SMF ¶¶ 20, 23. To implement the revised transaction structure, Delphi, Old GM, and the UAW negotiated and executed a September 2008 agreement (the "Implementation Agreement"). SMF ¶ 25, Ex. 6. The Implementation Agreement amended some of the provisions of the 2007 MOU and conformed them to the new approach embodied in the Amended GSA/MRA. *Id.* It also provided that, notwithstanding the significant changes in circumstances over time, the $450M Payment "would remain payable as set forth in the [2007] MOU"—that is, payable upon satisfaction of all of the 2007 MOU's conditions. *Id.* ¶ 6. This provision was requested by the UAW, undoubtedly because it recognized the issue was otherwise at least questionable, for the expressed reason that "discussions [about the $450M Payment] are on-going. Assuming those discussions result in some agreement, then—as a matter of drafting mechanics—I think it's important to deal with that obligation explicitly. This is particularly important since we're otherwise pulling forward broad releases." SMF ¶ 26, Ex. 27-2. With the Implementation Agreement, there is no dispute that the $450M Payment again was a potential payment for retiree healthcare benefits. SMF ¶ 14.

IV.    Events of Late 2008 and Into 2009.

In 2008, the U.S. economy plunged into one of the deepest recessions since the Great Depression. By mid-2009, it was clear that Delphi could not reorganize in bankruptcy with ongoing operations as provided for in the 2007 MOU and the Amended GSA/MRA. Instead,

with no source of external financing, Delphi was compelled to (1) sell its operating assets to third-party purchasers funded by New GM and Delphi creditors, (2) distribute the proceeds of those sales to its creditors, and (3) liquidate the shell left behind. SMF ¶ 29, Ex. 8. In June 2009, Delphi filed a modified plan reflecting this new strategy (the "Modified Plan"). SMF Ex. 18. As the UAW concedes, under the Modified Plan, Delphi's employing UAW members and making automobile components "never came to fruition. It didn't happen." SMF ¶ 65. As stated by the Delphi bankruptcy court, "Delphi's plan [wa]s a liquidating plan." *In re DPH Holdings Corp.*, 437 B.R. 88, 98 (Bankr. S.D.N.Y. 2010). Neither Old GM nor New GM received the substantial consideration provided for in the Amended GSA/MRA.

In December 2008, the U.S. Department of Treasury provided emergency financing to Old GM to keep it afloat. SMF ¶ 33, Ex. 37. On June 1, 2009, Old GM filed for bankruptcy. Treasury provided billions of dollars of assistance to facilitate the bankruptcy process. *In re Gen. Motors Corp.*, 407 B.R. 463, 473 (Bankr. S.D.N.Y. 2009). Treasury asked Old GM to consider a transaction under which substantially all of Old GM's assets would be purchased by a Treasury-sponsored purchaser in an expedited process. *Id.* at 480. New GM was created to purchase, free and clear of all liens, claims, and encumbrances, substantially all of the assets of the GM debtors. *Id.* at 481–83.

Treasury demanded a "fresh start" for New GM—free from many of Old GM's liabilities and obligations—having rejected Old GM's request to restructure in a less fundamental manner without a bankruptcy filing. In particular, Treasury required a CBA competitive with foreign competitors and restructuring of the VEBA with at least half of all obligations of Old GM for UAW-retiree medical benefits to be payable in equity, rather than cash. SMF ¶ 33, Ex. 37. Towards this end, Old GM and the UAW negotiated amendments to the 2007 CBA (including a

8

new VEBA agreement), which were presented to the bankruptcy court. SMF ¶ 56, Ex. 31-3. A memorandum of understanding regarding the Delphi "Keep Sites" ("Keep Sites MOU") was part of these amendments, reflecting that New GM would become the employer of the UAW-represented employees working at those sites. *Id.* at 103-04. But no provision of the Keep Sites MOU states that New GM or Old GM waived any provision of the 2007 MOU.

In early July 2009, New GM and the UAW executed the 2009 RSA. SMF ¶ 32, Ex. 9. As discussed, the 2009 RSA lists New GM's "sole obligations" relating to "Retiree Medical Benefits" for the defined class, and the $450M Payment is not among those obligations. *Id.*

In October 2009, the Delphi debtors substantially consummated their Modified Plan. SMF ¶ 41. A third party acquired substantially all of Delphi's core businesses; a New GM affiliate acquired the debtors' non-core steering business and certain U.S. manufacturing plants; and the Delphi debtors continued on as liquidating entities to dispose of remaining assets and wind up their affairs. SMF Ex. 18. Under the Modified Plan, Delphi no longer employed any UAW-represented employees or operated any UAW-represented sites. SMF ¶ 65. Neither Old GM nor New GM ever received the consideration as provided by the Amended GSA/MRA.

ARGUMENT

The UAW's motion should be denied, and New GM should be awarded summary judgment, for two separate and independent reasons: (1) the 2009 RSA makes clear that New GM has no obligation to make the $450M Payment; and (2) in any event, the conditions precedent to the making of the payment under the 2007 MOU have not been satisfied.

I.    THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION.

Federal common law governs the interpretation of the 2009 RSA. SMF 32, Ex. 9 at § 32.H (the agreement "shall be construed in accordance with applicable federal laws"). *See Am.*

9

*Fed'n of Television & Radio Artists, AFL-CIO v. WJBK-TV*, 164 F.3d 1004, 1009 (6th Cir. 1999) ("[T]he substantive law to apply in suits under [LMRA] § 301(a) is federal law."). "[T]raditional rules for contractual interpretation are applied as long as their application is consistent with federal labor policies." *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).

"[C]ourts should first look to the explicit language of the agreement to determine, if possible, the clear intent of the parties." *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991). In doing so, courts should "interpret each provision in question as part of the integrated whole," and the "agreement's terms must be construed so as to render none nugatory and avoid illusory promises." *Yard-Man*, 716 F.2d at 1479–80.

"Extrinsic evidence . . . cannot be considered when contract language is unambiguous." *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1008 (6th Cir. 2009) (internal quotation marks and alteration omitted). Rather, "in this circuit, before a district court can consider extrinsic evidence of the parties' intent, it must find ambiguity *on the face of the contract*." *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996) (emphasis added). "A court . . . may not use extrinsic evidence to create an ambiguity; the ambiguity must be apparent on the face of the contract." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (internal quotation marks omitted). As this Court has held, courts "must take care not to create ambiguity where none exists." *Hardy v. Reynolds & Reynolds*, No. 2:06-CV-12331, 2007 WL 2713736, at *6 (E.D. Mich. Sept. 17, 2007) (Cohn, J.) (internal quotation marks omitted); *see also Cottage Inn*, 2010 WL 4188311, at *3.

An agreement's language is not ambiguous unless it is "subject to two *reasonable* interpretations." *Zirnhelt v. Mich. Consol. Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008) (internal quotation marks omitted). "Whether an agreement's language is ambiguous is a question of law

that may be resolved summarily." *Mech. Contractors' Ass'n Indus. Promotion Fund v. Gem Indus., Inc.*, 310 Fed. App'x 750, 754 (6th Cir. 2009) (internal quotation marks omitted). "If the language is unambiguous, the meaning of the contract is likewise a question of law for the Court to decide." *Hardy*, 2007 WL 2713736, at *6.

Here, the UAW concedes that the 2009 RSA is unambiguous. SMF ¶ 48. The UAW also concedes that the 2009 RSA is one of the two most appropriate authorities to resolve this dispute. *See* UAW Br. at 2. Yet the UAW fails to present to this Court the applicable contractual provisions. The 2009 RSA is susceptible to only one reasonable interpretation: New GM has no obligation to make the $450M Payment.

A.     Multiple Provisions Of The 2009 RSA Make Clear That New GM Has No Obligation To Make The $450M Payment.

1.     The Introduction and Sections 2, 5.B, and 8 of the 2009 RSA establish that New GM has no obligation relating to the $450M Payment. Sections 2 and 5.B provide that the New VEBA and New Plan shall be "exclusively responsible" for *all* Retiree Medical Benefits and that "[New Co]'s *sole* obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement." SMF ¶ 32, Ex. 9 at §§ 2, 5.B (emphasis added). Setting forth those "sole obligations," Section 8 of the agreement then states that, "[p]ursuant to this Settlement Agreement, [New Co] shall have the following, *and only the following*, obligations to the New VEBA and the New Plan," and subsequently lists four categories of obligations that indisputedly do not include the $450M Payment. *Id.* (emphases added); *see also* SMF ¶ 52 (UAW "stipulat[ing] that the [$]450 [million] is not mentioned" in the 2009 RSA). Section 8 further states that "[New Co's] financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement" and provides for the termination of "all obligations of [New Co] and/or the [New Co] Plan for Retiree Medical Benefits for the Class

11

and the Covered Group." SMF ¶ 32, Ex. 9 at § 8; *see also* Ex. 9 at Introduction ("[New Co]'s obligation to pay into the New VEBA is fixed and capped as described herein."). The New Plan is defined as the "retiree welfare benefit plan" for "providing Retiree Medical Benefits to the Class and the Covered Group." *Id.* § 1.

Taken together, these provisions admit of only one interpretation: New GM's obligations to provide funding for Retiree Medical Benefits are found solely in the 2009 RSA, which does not include the $450M Payment. A contrary reading would depart from the 2009 RSA's text and run directly afoul of the maxim "expressio unius est exclusio alterius" (the expression of one thing is the exclusion of another), which this Court has recognized as a "well-established rule[ ] of contract construction." *Hardy*, 2007 WL 2713736, at *7. That the $450M Payment is not mentioned as one of New GM's "sole" remaining obligations in the 2009 RSA is itself fatal to the UAW's claim. By expressly listing New GM's "sole obligations to the New Plan and the New VEBA" and by excluding the $450M Payment from that list, the 2009 RSA reflects the parties' intent that New GM have no obligation regarding the $450M Payment. *See also Serv. Employees Int'l Union Local 3 v. Knight Facilities Mgmt., Inc.*, No. 04-73571, 2005 WL 1355092, at *6 (E.D. Mich. May 13, 2005) (Cohn, J.) ("Had [defendant] intended to require the successful bidder to hire all of [the company's] former employees and at their existing pay, it would have stated that requirement in the RFP. In short, the RFP cannot reasonably be read to contain the 'job guarantee' provision that plaintiffs now say forms the gravamen of their claims.").

2.      Bolstering this conclusion, and confirming the plain language of the Introduction and Sections 2, 5.B, and 8, Section 5.D states—in unmistakably broad terms—that the bankruptcy court's order approving and incorporating the agreement shall provide that:

> *all* obligations of [New Co] and all provisions of the [New Co]
> Plan *in any way related to* Retiree Medical Benefits for the Class
> and/or the Covered Group, and *all* provisions of applicable
> collective bargaining agreements, contracts, letters and
> understandings *in any way related to* Retiree Medical Benefits for
> the Class and the Covered Group are terminated on the
> Implementation Date, *or otherwise amended so as to be consistent
> with this Settlement Agreement* and the fundamental understanding
> that *all* [New Co] obligations regarding Retiree Medical Benefits
> for the Class and the Covered Group are terminated, as set forth in
> this Settlement Agreement.

*Id.* § 5.D (emphases added). The agreement further defines "Retiree Medical Benefits" as "*all*

post retirement medical benefits." *Id.* § 1 (emphasis added).

As with the Introduction and Sections 2, 5.B and 8, a plain reading of Section 5.D

compels the conclusion that New GM has no obligation to make the $450M Payment. The

section sets forth the parties' "fundamental understanding" that, except "as set forth in th[e]

Settlement Agreement," New GM has no obligation "in any way related to Retiree Medical

Benefits for the Class and the Covered Group." This language contains no words of limitation; it

applies broadly to "all" of New GM's obligations and "all" applicable provisions "in any way

related to" Retiree Medical Benefits for the Class and the Covered Group. The terms utilized by

the parties here—"any," "related to," and "all"—are broad and expansive and should be read as

such.[3]

---

[3] *E.g., Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) ("We have previously
noted that '[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some
indiscriminately of whatever kind.'" (citation omitted) (alteration in original)); *Dist. of Columbia
v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 129 (1992) ("This reading is true to the ordinary
meaning of 'relate to,' . . . and thus gives effect to the 'deliberately expansive' language
chosen . . . ." (citation omitted)); *Neely v. Good Samaritan Hosp.*, 345 Fed. App'x 39, 44 (6th Cir.
2009) ("The plain language of paragraph 2 . . . unmistakably conveys that the parties agreed to
generally release *any and all* manner of action or actions . . . .").

13

It bears emphasis that the UAW and New GM agree that the $450M Payment was intended to provide retiree medical benefits for Delphi retirees. The UAW made this exact point in its jurisdictional briefing in this matter. SMF ¶ 50, Ex. 39. Ronald Gettelfinger, the UAW's former president, confirmed that in the 2007 negotiations "all parties agreed" that the "450 million" was related to the "transfer of Delphi retirees to the VEBA." SMF ¶ 50.

The "Class and the Covered Group" referenced in the 2009 RSA indisputably include those same Delphi retirees. The 2009 RSA's definitions state that the "Class" shall include, among others, "UAW retirees of Delphi" who as of October 2007 were, or could become, entitled to "Retiree Medical Benefits . . . under the terms of the UAW-Delphi-GM Implementation Agreement, dated September 26, 2008." SMF ¶ 32, Ex. 9 at § 1. The definition of "Covered Group" includes similar language. *Id.*; *see also* SMF ¶ 51.

Based on the straightforward record, this "Court cannot read into the [2009 RSA] an implicit promise" by New GM to make the $450M Payment. *Cottage Inn Carryout*, 2010 WL 4188311, at *3.

3.      Further bolstering this conclusion are Sections 14 and 25.C of the 2009 RSA. Section 14 states (SMF ¶ 32, Ex. 9 at § 14 (emphases added)):

> The UAW, acting on its own behalf and as the authorized representative of the Class and the Covered Group, also agrees not to seek to obligate [New Co] to: (i) provide *any* additional payments to the New VEBA other than those specifically required by this Settlement Agreement; (ii) make *any* other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group; or (iii) provide or assume the cost of Retiree Medical Benefits for the Class or the Covered Group through *any* other means.

As with the plain terms of Section 5.D, this language contains no words of limitation. Rather, it unambiguously reflects the parties' understanding that, "other than those [payments] specifically required by th[e] Settlement Agreement," New GM is not obligated to "provide *any*

14

additional payments to the New VEBA" or to "make *any* other payments for the purpose of

providing Retiree Medical Benefits to the Class or the Covered Group." *Id.* (emphases added).

Section 14's broad and plain language is bolstered by the language of Section 25.C, in which the

UAW waives and releases all claims against New GM concerning Retiree Medical Benefits.

*Id.* § 25.C. These provisions underscore that New GM has no obligation regarding the $450M

Payment. Indeed, both Section 14 and Section 25.C also affirmatively prohibit the UAW from

seeking to obligate New GM to make the payment.

      4.     Section 32 of the 2009 RSA is an integration clause (*id.* § 32.C):

> This Settlement Agreement constitutes the entire agreement
> between the parties regarding the matters set forth herein, and no
> representations, warranties or inducements have been made to any
> party concerning this Settlement Agreement, other than
> representations, warranties and covenants contained and
> memorialized in this Settlement Agreement. This Settlement
> Agreement supersedes any prior understandings, agreements or
> representations by or between the parties, written or oral, regarding
> the matters set forth in this Settlement Agreement.

This clause memorialized the parties' intent that the 2009 RSA be considered fully integrated

and a complete expression of their agreement regarding New GM's obligations relating to

Retiree Medical Benefits for the Class and the Covered Group. Disputes like this case are

precisely why agreements often include integration clauses—to prevent one party (here, the

UAW) from attempting to vary the agreed-upon, written terms through extrinsic evidence. As the

Sixth Circuit explains, such clauses "are routinely incorporated in agreements in order to signal

to the courts that the parties agree that the contract is to be considered completely integrated."

*Neely*, 345 Fed. App'x at 44 (quoting *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372

(6th Cir. 1999)). "[T]he purpose and effect of including [the] clause is to preclude the subsequent

introduction of evidence of preliminary negotiations or side agreements in a proceeding in which

a court interprets the document." *Id.* at 44–45 (quoting *Sec. Watch*, 176 F.3d at 372); *see also*

*Cook v. Little Caesars Enters., Inc.*, 210 F.3d 653, 657 (6th Cir. 2000).[4]

The 2009 RSA's integration clause makes clear that the agreement not only represents

the parties' "entire agreement regarding the matters set forth [t]herein," but also "supersedes any

prior understandings, agreements or representations by or between the parties, written or oral,

regarding the matters set forth [therein]." SMF ¶ 32, Ex. 9 at § 32.C. Coupled with the

indisputable fact that one of the "matters set forth" in the 2009 RSA is the extent of New GM's

obligations relating to Retiree Medical Benefits for Delphi retirees, the integration clause sets

forth the parties' understanding that New GM has no such obligations other than those set forth

in the 2009 RSA—and thus no obligation to make the $450M Payment, which undisputedly

relates to Retiree Medical Benefits for Delphi retirees.

B.      <u>The UAW's Arguments To The Contrary Are Meritless</u>.

1.      The UAW's primary contention is that "the absence of . . . express language

[regarding the $450M Payment] in the 2009 [RSA] . . . is fatal to GM's [position]." UAW Br. at

15; *see also* SMF ¶¶ 78-79. This contention stands the 2009 RSA on its head. The 2009 RSA

---

[4] This Court has employed the same understanding of integration clauses in rejecting a contractual party's attempt to vary—through parol or extrinsic evidence or otherwise—the plain language of an agreement containing an integration clause. *E.g.*, *Cottage Inn*, 2010 WL 4188311, at *3 ("[T]he agreement is not ambiguous. It also contains an integration clause and a no oral modification clause, which prevent application of the parol evidence rule."); *Auto Indus. Supplier Employees Stock Ownership Plan v. Snap Sys., Inc.*, No. 03-74357, 2006 WL 3627935, at *7 (E.D. Mich. Dec. 12, 2006) (Cohn, J.) ("The contracts were fully integrated as clearly evidenced by the integration clauses."). The UAW agrees. The UAW's David Curson admitted that integration clauses are included in collectively bargained agreements to "memorialize the understanding of the negotiations." SMF ¶ 77. Integration language would "absolutely" give him pause to make sure the agreement says what it is intended to say. *Id.*

does not state that all obligations other than those listed shall remain obligations of New GM. Rather, it states the exact opposite: it lists New GM's "sole obligations" that remain, states that "all" other obligations "in any way related to Retiree Medical Benefits for the Class and/or the Covered Group" are "terminated" or "amended" to be consistent with it, and prohibits the UAW from seeking from New GM "any other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group." That the $450M Payment is not expressly listed as an obligation in the 2009 RSA, therefore, extinguishes the UAW's claim.[5]

2.      The UAW asserts that, because the $450M Payment originally was to be made to the DC VEBA, not the New VEBA, the 2009 RSA had no effect on New GM's obligation to make the payment. This argument ignores the plain language of the 2009 RSA. On its first page, the 2009 RSA states that it "shall cover and ha[ve] application to," among other things, the "Existing External VEBA" (*i.e.*, the DC VEBA). SMF ¶ 32, Ex. 9 at p.1. It further states that the New VEBA "shall receive certain payments *as described* herein from the Existing Internal VEBA, the Existing External VEBA, and [New Co], " and that the New VEBA "shall serve as the exclusive funding mechanism for the New Plan." *Id.* at Introduction (emphasis added). Under the UAW's view, these provisions would be rendered nugatory—a result in clear conflict with Sixth Circuit precedent. *See Yard-Man*, 716 F.2d at 1479–80. More fundamentally, as discussed, Section 5.D makes plain that the agreement sets forth "all obligations" of New GM "in any way

---

[5] The UAW's brief also misrepresents the GM bankruptcy court's opinion. The UAW's brief states that "the GM bankruptcy court acknowledged the UAW's central point that the 2009 [RSA] . . . could not plausibly be read to have 'extinguished' [the $450 million obligation]." UAW Br. at 13. To the contrary, the GM bankruptcy court rejected the UAW's argument that New GM's interpretation of the 2009 RSA was not colorable. *See In re Motors Liquidation Co.*, 457 B.R. 276, 287 (Bankr. S.D.N.Y. 2011) ("But I can't agree with the UAW's further contention that the 'colorable invocation' exception results in a lack of jurisdiction here.").

related to" Retiree Medical Benefits for the Class and the Covered Group. SMF ¶ 32, Ex. 9 at § 5.D. That language does not speak in terms of the DC VEBA or New VEBA. It speaks in terms of "all" of New GM's obligations related to Retiree Medical Benefits for the Class and the Covered Group—terms that encompass, and by exclusion extinguish, New GM's obligation to make the $450M Payment.

In addition, Section 14 of the 2009 RSA states that the UAW "agrees not to seek to obligate" New GM to provide or make any of the following three categories of payments: (1) "additional payments to the New VEBA other than those specifically required by this Settlement Agreement"; (2) "any other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group"; or (3) payments that would require New GM to "provide or assume the cost of Retiree Medical Benefits for the Class or the Covered Group through any other means." *Id.* § 14. The $450M Payment unquestionably falls within the second and third categories—a "payment[] for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group," and a payment requiring New GM to "provide" and "assume" the "cost of Retiree Medical Benefits for the Class or the Covered Group." *Id.*

What all of these provisions establish is that, as the 2009 RSA's opening paragraphs make plain, the express purposes of the 2009 RSA were: (1) to terminate the DC VEBA and transfer the DC VEBA's assets to the New VEBA; (2) to make the New VEBA the "exclusive funding mechanism"; and (3) to "fix[] and cap[]" New GM's obligations to the New VEBA. SMF ¶ 32, Ex. 9 at p. 2. By providing for the termination of the DC VEBA, the transfer of the DC VEBA's assets to the New VEBA, the fixing and capping of New GM's obligations to the New VEBA, and the extinguishment of all other New GM obligations relating to Retiree Medical Benefits for the Class and the Covered Group, the agreement embodies the parties'

18

intent to set forth New GM's sole obligations not only to both VEBAs but also, more broadly, in any way related to Retiree Medical Benefits for the Class and the Covered Group.

3.      The UAW attempts to salvage its case by resorting to extrinsic evidence. As an initial matter, the 2009 RSA is unambiguous and therefore extrinsic evidence is inadmissible. *Winnett*, 553 F.3d at 1008; *Donovan*, 348 F.3d at 512; *Schachner*, 77 F.3d at 893. Attempting to evade this rule—and citing dicta in support—the UAW asserts that "an exception to th[e] rule" allows courts to consider extrinsic evidence "for the limited purpose of confirming the legal conclusion to be drawn from the unambiguous language of a contract." UAW Br. at 18. Even assuming that this rule-swallowing "exception" exists—which it does not, *see Winnett*, 553 F.3d at 1008—it would be unavailable to the UAW here. The UAW is attempting to introduce extrinsic evidence not to confirm the 2009 RSA's unambiguous language, but in the hope that the Court will rewrite it. As the Sixth Circuit recently explained, using extrinsic evidence for this purpose is plainly impermissible:

> Everything else raised by the plaintiffs—a declaration from Acument's former general counsel, CBA drafting history, plant-closure agreements, retiree letters—amounts to extrinsic evidence. Such extra-contractual intimations of meaning cannot alter the straightforward meaning of the language found within the four corners of [the agreement].

*Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774, 778 (6th Cir. 2012). That is particularly true here, in view of the 2009 RSA's integration clause, which further "prevent[s] application of the parol evidence rule." *Cottage Inn*, 2010 WL 4188311, at *3; *accord Cook*, 210 F.3d at 657.

Moreover, the UAW's extrinsic evidence purports to address the effect of the Henry II Agreement, not the 2009 RSA. (The Henry II Agreement was a separate, earlier agreement between Old GM and the UAW regarding retiree healthcare benefits. SMF ¶ 12, Ex. 4.) Both parties agree that Old GM's obligation to make the $450M Payment existed after the execution

19

of the Implementation Agreement and Amended GSA/MRA, in which the parties agreed to reformat the Delphi restructuring transaction *after* a variety of changed circumstances, including the Effective Date of the Henry II Agreement. As a result, any asserted prior effect of the Henry II Agreement on that obligation is completely irrelevant. SMF ¶ 14. That New GM was not a party to the Henry II Agreement and never assumed that superseded agreement makes the UAW's reliance on Henry II-related evidence even more inappropriate. SMF ¶ 12, Ex. 4 and ¶ 18, Ex. 32.

What is more, the UAW's three pieces of extrinsic evidence actually undermine its argument. *First*, leaving aside that the pre-Henry II calculations prove nothing about the 2009 RSA's terms (indeed, the UAW's counsel admits that the "context of the negotiations in 2009 was different," SMF Ex. 11, Sherrick Dec. ¶ 7), the UAW offers no evidence about calculations prepared in connection with the 2009 RSA's execution—the agreement that matters here. The UAW ignores that calculations prepared in connection with the 2009 RSA—and presented to the bankruptcy court—show that the 2009 RSA extinguished New GM's obligation to make the $450M Payment. SMF ¶ 54, Ex. 44. Making matters worse for the UAW, its counsel fully participated in the bankruptcy proceedings yet never mentioned the $450M Payment—even after the Bondholders' exhibit (showing that the $450M Payment was excluded from New GM's obligations) was introduced into evidence, even when questioned about the consideration to be received by the UAW and UAW retirees in connection with the sale to New GM, and even during the UAW's closing argument discussing VEBA-related matters. SMF ¶ 55. The UAW's silence then speaks volumes now.

*Second*, the Implementation Agreement undermines the UAW's claim. That agreement shows that, when the parties intended Old GM to preserve an obligation relating to the $450M

Payment notwithstanding changed circumstances and new agreements, they knew how to include, and knew the importance of including, express language setting forth that obligation. Such language is included in the Implementation Agreement, but is absent from the 2009 RSA. The UAW's reliance on the Implementation Agreement, therefore, is entirely misplaced. That the UAW's General Counsel (1) recognized the "important[ce of] deal[ing] with that [$450M] obligation explicitly" during the negotiations of the Implementation Agreement (and admitted "if there was an agreement regarding the $450 million, it was important to write it down") (SMF ¶ 26, Ex. 27-2), and (2) acknowledged that the $450M Payment obligation was on the table during the 2009 RSA negotiations (SMF Ex. 11, Sherrick Dec. ¶ 8), confirms this conclusion.[6]

*Third*, Fritz Henderson's testimony undermines the UAW's claim. Mr. Henderson testified that, although it simply "hadn't occurred to" him or others that the Henry II Agreement extinguished the $450M Payment obligation, he was certain that the 2009 RSA extinguished the obligation. SMF ¶ 14 (Henderson, the lead negotiator for the 2009 RSA, explaining that "it was quite clear to us [that the 2009 RSA] was fully encompassing because we were getting ready to go through bankruptcy and we wanted to deal with everything, absolutely everything before

_____

[6] Further undermining the UAW's assertions, the Implementation Agreement reflects the parties' intent to (1) reestablish the obligation that the Henry II Agreement plainly extinguished and (2) specify that the reestablished obligation would, as the UAW's brief states (UAW Br. at 7–8), remain "conditional on the happening of [the] events under section K.2 of [the 2007 MOU]." If the UAW were correct that the $450M Payment survived the Henry II Agreement, there would have been no reason to include any reference to that payment in the Implementation Agreement, given that agreement's unambiguous language that, "[o]ther than as adjusted, conformed or modified by this Implementation Agreement, or as required to carry out this Implementation Agreement, the other terms and conditions of the . . . [2007 MOU] and any other agreement between and among the parties involving UAW-represented employees, retirees, surviving spouses, or dependents remain unchanged." SMF ¶ 25, Ex. 6 at concluding paragraph. Yet the UAW demanded that the $450M Payment be dealt with "explicitly." SMF ¶ 26, Ex. 27-2.

coming out"). Mr. Henderson referenced the Bondholders' exhibit showing that the $450M Payment was excluded from New GM's obligations. *Id.* In the final analysis, Mr. Henderson's testimony—and, indeed, all of the UAW's extrinsic evidence—confirm what the 2009 RSA plainly states: New GM has no obligation to make the $450M Payment.

II.   THE UAW HAS NOT CARRIED ITS BURDEN OF PROVING THAT ALL CONDITIONS PRECEDENT TO THE MAKING OF THE $450M PAYMENT HAVE BEEN SATISFIED.

Assuming for argument's sake that the $450M Payment remained viable after the 2009 RSA, this Court nevertheless should deny the UAW's motion and grant summary judgment to New GM on the separate and independent ground that the UAW has not satisfied its burden of proving that all conditions precedent to New GM's making of the $450M Payment have been satisfied. *E.g.*, *Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir. 1978) ("[I]nasmuch as [the contract section] operates as a condition precedent to any recovery, the burden of proof is on the plaintiff to show that [the condition was satisfied]."); *Heights Driving Sch., Inc. v. Top Driver, Inc.*, 51 Fed. App'x 932, 940 n.3 (6th Cir. 2002) (same). "It is ... a basic maxim of legal interpretation that failure to fulfill a condition precedent nullifies antecedent obligations." *Stafford v. First Tenn. Nat'l Bank*, No. 98-6391, 2000 WL 1359631, at *7 n.4 (6th Cir. Sept. 14, 2000); *accord Ciao Cucina Corp. v. The Glazier Group, Inc.*, 92 Fed. App'x 213, 215 (6th Cir. 2004). Because conditions precedent to New GM's making of the $450M Payment have not been and cannot be fulfilled, any antecedent obligation of New GM to make the payment has been nullified.

A.   The 2007 MOU Imposed Significant Conditions Precedent To The Making Of The $450M Payment That Have Not Been Met.

The parties agreed in the 2007 MOU that Old GM's obligation to make the $450M Payment would "not become effective until *all* of the following events have occurred and as of

the date when the last of such events shall have occurred":

>  (a) "execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them"; and
>
>  (b) "the substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the Bankruptcy Court which incorporates, approves and is consistent with *all* of the terms of this Agreement and the comprehensive settlement agreement between Delphi and GM."

SMF ¶ 4, Ex. 2 at § K.2 (emphases added). These conditions allocated to the UAW the risk that Delphi might not consummate a "plan of reorganization . . . [that] is consistent with all of the terms of [the 2007 MOU] and the comprehensive settlement agreement." If Delphi was unable to consummate such a plan, or if there was *any* inconsistency, Old GM's obligation to make the $450M Payment would "not become effective."

Not only did Delphi fail to consummate a reorganization plan, but the Modified Plan that it consummated—a liquidating plan—was flatly inconsistent with key terms of the 2007 MOU and the comprehensive settlement agreement. These events cost Old GM billions of dollars and resulted in New GM having to take over sites that, under the 2007 MOU and Amended GSA/MRA, were to remain owned and operated by Delphi. Old GM had bargained for an operating Delphi, but it received a liquidating Delphi.

> 1.   Delphi's Liquidating Plan Was Not A "Plan of Reorganization."

As stated in the 2007 MOU, when the parties executed it, they contemplated that Delphi would "successful[ly] emerge[]" as a reorganized entity with "ongoing business operations." SMF ¶ 2, Ex. 2 at Introduction, § B.1 & Attachment A. Rather than providing for Delphi's "successful emergence" as a rehabilitated operating entity, however, Delphi's Modified Plan required the sale of the majority of Delphi's assets and the subsequent liquidation of the debtors' estates. The Delphi bankruptcy court stated in no uncertain terms that, though nominally a reorganization plan, "Delphi's plan [wa]s a *liquidating* plan." *In re DPH Holdings Corp.*, 437

23

B.R. 88, 98 (Bankr. S.D.N.Y. 2010) (emphasis added); *see also id.* at 96 (discussing "the

*liquidation* of the [Delphi] estate pursuant to its Chapter 11 plan" (emphasis added)). The GM

bankruptcy court also described the plan in liquidation terms. *See In re Motors Liquidation Co.*,

457 B.R. 276, 285–86 (Bankr. S.D.N.Y. 2011) (following certain asset sales, the "Delphi

Debtors then *liquidated*, disposing of their remaining assets" (emphasis added)). A plan that the

bankruptcy courts correctly considered to be a liquidating plan and that provided for the

liquidation of the debtors' estates simply cannot qualify as a "plan of reorganization" under the

2007 MOU.[7]

        2.    <u>Even Assuming Delphi's Plan Was A "Plan of Reorganization," The Plan</u>
              <u>Was Not Consistent With All Of The Terms Of The 2007 MOU And The</u>
              <u>Comprehensive Settlement Agreement.</u>

Even assuming that Delphi's Modified Plan was a "plan of reorganization" that involved

"emergence" for purposes of the 2007 MOU, the 2007 MOU required Delphi's "plan of

reorganization" to be "consistent with *all* of the terms of [the 2007 MOU] and the

comprehensive settlement agreement between Delphi and GM." SMF ¶ 4, Ex. 2 at § K.2

(emphasis added). The finding of a single inconsistency, therefore, means that this condition

precedent has not been satisfied and that New GM has no obligation to make the $450M

---

    [7] "Liquidations and reorganizations are divergent concepts. . . . A reorganization connotes a financial reconstruction or rehabilitation. . . . Antipodally, a liquidation connotes an appropriation of assets towards the discharge of indebtedness." *In re Port Royal Land & Timber Co.*, 105 B.R. 72, 73 n.1 (Bankr. S.D. Ala. 1989), *vacated sub. nom. on other grounds Port Royal Land & Timber Co. v. Berkowitz, Lefkovits, Isom & Kushner*, 924 F.2d 208 (11th Cir. 1991). Other courts draw this same distinction. *E.g.*, *In re Dorsey Trailer Co.*, No. 04-32662, 2007 WL 4166170, at *1 (Bankr. M.D. Ala. Nov. 20, 2007) (stating that "[l]iquidation plans are significantly different than plans of reorganization"); *In re Geneva Steel Co.*, 236 B.R. 770, 774 (Bankr. D. Utah 1999) ("Because the Motion specifically refers to a 'plan of reorganization,' the court will construe the Motion as proposing [a payment] only in the event that a 'plan of reorganization' is confirmed, and not a Chapter 11 liquidating plan.").

Payment, even without reference to the 2009 RSA. *See* cases cited *supra* note 3; *see also Tubby's #14, Ltd. v. Tubby's Sub Shop, Inc.*, No. 04-70918, 2006 WL 2796181, at *18 (E.D. Mich. Sept. 27, 2006) ("There is no broader classification than the word 'all.'" (internal quotation marks and alteration omitted)). This condition has not been, and cannot be, satisfied. To the contrary, Delphi's Modified Plan was starkly inconsistent with the terms of both agreements.

(a)      Delphi's Modified Plan Was Not Consistent With All Of The Terms Of The 2007 MOU.

Delphi's Modified Plan was inconsistent with many key terms of the 2007 MOU. *First*, as discussed, the Modified Plan provided for the sale and liquidation of Delphi's assets, while the 2007 MOU provided for Delphi's continuing operations. "Delphi's sole purpose" following its bankruptcy under the Modified Plan was "to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend," *In re DPH Holdings Corp.*, 437 B.R. at 97–98 (describing Delphi's "liquidating plan"), whereas the 2007 MOU provided for "Delphi's successful emergence from bankruptcy with certain UAW-represented operations," with "transform[ed]" "ongoing business operations" and in a "better position . . . to retain existing business and attract new business." SMF ¶ 4, Ex. 2 at 1. The UAW concedes that the restructuring plan for Delphi "never came to fruition. It didn't happen." SMF ¶ 65.

*Second,* under the "Site Plan" of the 2007 MOU, the parties agreed that four "Keep Sites" were "to remain owned and operated by Delphi," including Delphi's continuing to be the employer of UAW-represented employees at each of these sites. SMF ¶ 4, Ex. 2 at § B.1. The chief UAW negotiator admits that the Site Plan was the "foundation" of the 2007 MOU. SMF ¶ 64. Under Delphi's Modified Plan, however, Delphi no longer had the obligation to own or operate any of these four sites, nor would it any longer have any UAW-represented employees. SMF ¶ 65. In effect, the UAW asks this Court to ignore "foundation[al]" provisions in the 2007

25

MOU. But "there's a big difference between Delphi's obligations and GM's obligations relative to these sites. These sites were losing a lot of money every day and every month, so it was not equal, [as to] who picked up responsibility and liability for those." SMF ¶ 27.

*Third,* Delphi further agreed to "produce [certain GM-related] products at the Keep Sites." SMF ¶ 4, Ex. 2 at Attachment A; *see also id.* § B ("GM and Delphi agree to implement the site plans as outlined below and described in detail in Attachment A."). However, under the Modified Plan, Delphi would not produce any GM-related products at the Keep Sites. The Modified Plan instead provided for the sale and liquidation of Delphi's assets and the winding up of its affairs. SMF ¶ 36, Ex. 18.

*Fourth*, under the 2007 MOU, Delphi committed to make an "[e]ngineering and capital investment" of $22.5 million, $134 million, and $48 million at the Grand Rapids, Rochester, and Lockport sites, respectively. SMF ¶ 4, Ex. 2 at Attachment A. However, Delphi's Modified Plan contained no such commitment by Delphi (and the UAW concedes it has no evidence that these Delphi investments ever happened, SMF ¶ 68). Instead, the Modified Plan provided for Delphi's outright sale of those facilities. *See In re Motors Liquidation Co.*, 457 B.R. at 285–86.[8]

The UAW admits that Delphi's Modified Plan was far different from what was required by the parties when they drafted and executed the 2007 MOU. *E.g.*, UAW Br. at 6, 25–26; *see*

---

[8] The UAW also fails to present evidence that the Modified Plan was consistent with the 2007 MOU's remaining terms. For example, the UAW offers no evidence that the CBAs continued through September 2011 (as required by 2007 MOU § A) or that Delphi management had "equivalence of sacrifice" with UAW-represented employees (as required by 2007 MOU § I). Instead, according to the UAW, the CBAs did not continue in effect and there was not equivalence of sacrifice. SMF ¶¶ 69-70. Additionally, the UAW fails even to address how there could be flowback opportunities between New GM and Delphi or between different Delphi locations (as required by 2007 MOU § C), an impossibility given that there are no Delphi-UAW locations. *See also* SMF ¶ 67.

*also* SMF ¶ 65. But the UAW nonetheless asserts that Delphi's Modified Plan was consistent with the 2007 MOU because, according to the UAW, the 2007 MOU's terms subsequently were "modified to ensure that [they] conformed to . . . the comprehensive settlement agreement . . . [and] were then incorporated into and endorsed by the Delphi Modified Plan." UAW Br. at 26. But the UAW already has conceded the contrary to New GM and this Court. In a letter from the UAW to New GM dated October 29, 2009, expressly incorporated into the UAW's Complaint, ¶ 11, the UAW admitted that the 2007 MOU "*was not amended or modified in any way during Delphi's bankruptcy*, during the 2007 class action settlement in the <u>Henry</u> class action suit, *or during GM's bankruptcy*." SMF ¶ 42, Ex. 12.[9] The MDA was part of Delphi's bankruptcy; the Keep Sites MOU was part of Old GM's bankruptcy. SMF ¶¶ 30, 56, Ex. 31-3. By the UAW's admission, this argument must fail.

*Fifth,* in any event, neither Delphi's Modified Plan (including the MDA) nor the Keep Sites MOU purported to modify the 2007 MOU's terms. Despite its conclusory assertions of "conformation" or "modification," the UAW does not—and cannot—cite a single provision of those agreements purporting to modify the 2007 MOU's terms, an agreement the UAW describes as the "cornerstone of Delphi's emergence from bankruptcy." SMF ¶ 42, Ex. 12. What is more, the UAW admits that *nothing* in the Keep Sites MOU changed the preconditions for the $450M Payment. SMF ¶ 73. Each of the above-listed inconsistencies between the Modified Plan and the 2007 MOU, therefore, is itself fatal to the UAW's claim.

---

[9] Messrs. Gettelfinger, Sherrick, and Rapson (all formerly of the UAW) uniformly admit that the October 29 letter is true and accurate and presented the UAW's position. SMF ¶ 74.

(b)     The Modified Plan Was Not Consistent With All Of The
        Terms Of The Comprehensive Settlement Agreement.

Delphi's Modified Plan also did not incorporate or approve, but in fact was inconsistent

with, the comprehensive settlement agreement between Old GM and Delphi. The UAW baldly

asserts that the comprehensive settlement agreement referenced in the preconditions of the 2007

MOU must be the Amended GSA "as modified by the [MDA]." UAW Brief at 25.[10] But a court

must evaluate the plain language of an agreement to determine the "intent of the *parties*."

*Armistead,* 944 F.2d at 1293 (emphasis added). The UAW was not a party to the GSA, Amended

GSA, or MDA. SMF ¶¶ 8, 20, 29, Exs. 3, 5, 8.

In fact, the UAW already has conceded to this Court that the "*comprehensive settlement*

*agreement* previously [was] entered into by Delphi and Old GM *in September 2008* that resolved

the financial, commercial, and other matters between them." Dkt. No. 13 (UAW Memorandum),

at 11 (emphases added). That referenced agreement is the Amended GSA, entered into in

September 2008, not the MDA, which was not executed until almost a year later, in July 2009.

This admission is binding on the UAW.[11]

---

[10] The UAW also conflates the distinct concepts of modification and waiver, *e.g.*, arguing
that the MDA modified the Amended GSA because Old GM agreed to waive certain rights.
However, "[m]odification and waiver are different legal concepts. . . . Waiver is the surrender of
a right . . . . Modification is the changing of the terms of the agreement . . . as distinguished from
the mere surrender of a right . . . ." *Green Constr. Co. v. First Indem. of Am. Ins. Co.* , 735 F.
Supp. 1254, 1261 n.5 (D.N.J. 1990) (Ackerman, J.) (internal quotation marks omitted). The
UAW in fact concedes that there was no waiver of any precondition to make the $450M Payment.
SMF ¶ 73.

[11] *See* 30B Federal Practice & Procedure § 7023 n.14 (2d ed. 2012) ("If an attorney is
employed to manage a party's conduct of a lawsuit[,] the attorney has *prima facie* authority to
make relevant judicial admissions by pleadings . . . , which unless allowed to be withdrawn are

28

In any event, the plain language of the GSA and Amended GSA reflects Old GM's and Delphi's election to call each a "settlement agreement," explicitly stating that the Amended GSA "amended and restated" the GSA. SMF ¶ 20, Ex. 5 at p. 5. There is no comparable language in the MDA—and the UAW does not and cannot identify any—because the MDA was not meant to be a settlement agreement as contemplated by the 2007 MOU.

Rather, the MDA was the complete abandonment of the deal for a restructured and operational Delphi as set forth in the Amended GSA. In the Amended GSA (like the GSA), the parties (*i.e.*, Old GM and Delphi) expressly stated that they had entered into certain "Labor MOUs," *e.g.*, the 2007 MOU, "[t]o help facilitate the Debtors' business, financial and operational restructuring," recognizing that these commitments by Old GM were meant to "assist Delphi in its continued transformation to more competitive wage and benefit levels, to address capacity, divestiture, work rules, and staffing level issues, and to better position Delphi to retain existing business and attract new business." SMF ¶ 20, Ex. 5 at § 2.01 and Article III opening paragraph. Conversely, the MDA provided that Delphi would sell all its UAW facilities, no longer be an employer of UAW-represented employees, and in fact no longer be an operational entity. SMF ¶ 29, Ex. 8 at § 9.19.2.

Finally, the Modified Plan did not "incorporate" and "approve," and was not "consistent with," all of the terms of the Amended GSA. In addition to the fact that the Modified Plan liquidated Delphi (as described), under the Amended GSA, Old GM was to receive a $2.055

---

(continued…)

conclusive in the case." (internal quotation marks omitted)); *United States v. Johnson*, 752 F.2d 206, 210–11 (6th Cir. 1985) (holding that "statements made by [an] attorney . . . were admissions binding on the client").

billion "administrative expense claim" against the debtors. SMF ¶ 20, Ex. 5 at § 4.04(a); *see also id.* § 5.04 (stating that "[a]ny Delphi Plan shall . . . provide for . . . the consideration to be received by GM as set forth in section 4.04 hereof [*i.e.*, the section discussing, among other things, the $2.055 billion administrative-expense claim])." The Amended GSA/MRA further provided that, under "[a]ny" Delphi bankruptcy plan, Old GM would receive a subordinated "general unsecured claim in the amount of $2.5 billion" against the debtors. *See id.* §§ 4.04(b), 5.04. The Modified Plan, however, eliminated both the administrative claim and the $2.5 billion claim, *i.e.*, over $4.5 billion was never paid to either Old GM or New GM. Every one of these inconsistencies between the Modified Plan and the Amended GSA is fatal to the UAW's claim.

CONCLUSION

For the above reasons, New GM respectfully requests that the Court grant its motion for summary judgment and deny the UAW's motion for summary judgment.

Dated December 17, 2012                    Respectfully submitted,


                                           /s/ Johanna Fabrizio Parker
                                           _____
Edward W. Risko (P 36699)                  Robert S. Walker (Ohio Bar No. 0005840)
Edward.w.risko@gm.com                      rswalker@jonesday.com
General Motors LLC                         Johanna Fabrizio Parker (Ohio Bar No. 0071236)
300 Renaissance Center                     jfparker@jonesday.com
Detroit, Michigan  48265-3000              Jones Day
Telephone: 313-665-4920                    North Point, 901 Lakeside Avenue
Facsimile:  248-267-4268                   Cleveland, Ohio 44114
                                           Telephone: 216-586-3939
                                           Facsimile: 216-579-0212

                                           *Counsel for Defendant General Motors, LLC*

30

CERTIFICATE OF SERVICE

I hereby certify that, on December 17, 2012, I electronically filed the foregoing

Defendant General Motors LLC's Memorandum of Law in Opposition to Plaintiff UAW's

Motion for Summary Judgment and in Support of General Motors LLC's Motion for Summary

Judgment with the Clerk of the Court using the ECF system, which will send notification of such

filing to the following: W. Gary Kohlman, Andrew D. Roth, and Ramya Ravindran, Bredhoff &

Kaiser P.L.L.C., 805 15th Street N.W., Suite 1000, Washington, D.C. 20005; and Jeffrey D.

Sodko, UAW Legal Department, 8000 E. Jefferson Ave., Detroit, Michigan 48214.


/s/ Johanna Fabrizio Parker
*Counsel for Defendant General Motors LLC*

31