# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| **INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,**<br><br>             Plaintiff,<br><br>     v.<br><br>**GENERAL MOTORS LLC,**<br><br>             Defendant. | 2:10-cv-11366-AC-MJH<br><br>**Honorable Avern Cohn**<br>**Magistrate Judge Michael Hluchaniuk** |

### PLAINTIFF UAW's REPLY MEMORANDUM IN SUPPORT OF
### ITS MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO
### DEFENDANT GENERAL MOTORS LLC's MOTION FOR SUMMARY JUDGMENT

Jeffrey D. Sodko (P65076)
jsodko@uaw.net
Associate General Counsel,
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214
Telephone: (313) 926-5216
Facsimile: (313) 926-5240

Andrew D. Roth (DC Bar 414038)
aroth@bredhoff.com
Ramya Ravindran (DC Bar 980728)
rravindran@bredhoff.com
W. Gary Kohlman (DC Bar 177527)
gkohlman@bredhoff.com
BREDHOFF & KAISER, PLLC
805 Fifteenth Street, N.W., Suite 1000
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (202) 842-1888

*Counsel for Plaintiff UAW*

# TABLE OF CONTENTS

I. GM's "EXTINGUISHMENT" DEFENSE FAILS AS A MATTER OF LAW ...........1

   A. The True "Context" Surrounding The 2009 RSA................................................1

   B. The 2009 RSA Contains *No* Language That Can Be Read To Mean That GM's $450 Million Payment Obligation To The DC VEBA Is "Extinguished," And GM's "Extinguishment" Defense Thus Fails As A Matter Of Law ...........................3

   C. The Conclusion That GM's "Extinguishment" Defense Fails As A Matter Of Law Is Confirmed By Extrinsic Evidence Properly Considered By This Court .................8

   D. GM's Reliance On Extrinsic Evidence Of Its Own Is Unavailing ....................10

II. ALL CONDITIONS TO GM's PAYMENT OBLIGATION HAVE BEEN SATISFIED ................................................................................................................12

# TABLE OF AUTHORITIES

## CASES

In re DPH Holdings, 437 B.R. 88 (S.D.N.Y. 2010) ................................................................ 14

In re Kattouah, 452 B.R. 604 (E.D. Mich. 2011) .................................................................. 15

MacDonald v. General Motors Corp., 110 F.3d 337 (6th Cir. 1997) .................................... 15

O'Brien v. Miller, 168 U.S. 287 (1897) .................................................................................... 5

Roger Miller Music, Inc. v. Sony/ATV Publ'g, 477 F.3d 383 (6th Cir. 2007) ....................... 15

Skycom Corp. v. Telstar Corp., 813 F.2d 810 (7th Cir. 1987) .............................................. 12

TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574 (6th Cir. 2010) ........................................ 10

Witmer v. Acument Global Techs., Inc., 694 F.3d 774 (6th Cir. 2012) ............................ 8, 12

## STATUTES

11 U.S.C. § 1129 ..................................................................................................................... 13

11 U.S.C. § 1141(d)(3) ........................................................................................................... 13

## MISCELLANEOUS

Restatement (Second) of Contracts § 202, cmt. d (1981) ........................................................ 5

I. **GM's "EXTINGUISHMENT" DEFENSE FAILS AS A MATTER OF LAW**

    A.    The True "Context" Surrounding The 2009 RSA

In a "PRELIMINARY STATEMENT" aimed at laying the groundwork for GM's lead contention in this case that its $450 million payment obligation to the DC VEBA has been "extinguished" by the "express terms" of the "2009 RSA"—and in an argumentative statement of the "ISSUE[ ] PRESENTED" by that 2009 settlement agreement between the parties—GM purports to provide "[s]ome context" surrounding that agreement. See GM Br. at 1.[1] But that "context" is a gross distortion of reality in important respects; so much so that the UAW feels compelled to set the record straight on these "context[ual]" points at the very outset.

    1.    First, GM asserts that the 2009 RSA's purpose and function was to "set up" a "New Plan and New VEBA" to provide retiree healthcare for UAW retirees of Old GM and Delphi, see GM Br. at ii, and to establish—through certain contract language that forms the basis of GM's "extinguishment" defense—the basic "feature[s]" of that New Plan and New VEBA, see id. at 1-2. And, GM further asserts that this contract language was negotiated on the eve of GM's 2009 bankruptcy as an "essential" means of "achiev[ing]" "government assistance" and putting GM "on a path toward long-term viability." See id. at 2. These assertions are inaccurate.

In point of fact, it was *not* the 2009 RSA that "set up" the New Plan and New VEBA; rather, the New VEBA was set up, and the New Plan was provided for in concept, "pursuant to the [2008] Henry II Settlement"—as recognized by the definitional provisions and Section 4 of the 2009 RSA itself. And, it was *not* the 2009 RSA that established the basic "feature[s]" of the New Plan and New VEBA, but rather the 2008 Henry II Settlement that did so—using contract language that is *identical* in *every* respect to the contract language that forms the basis of GM's

---

[1] In our Opening Brief, we referred to this agreement as the "2009 UAW Retiree Settlement Agreement," but for clarity's sake we now adopt and use GM's shorthand "2009 RSA" acronym.

1

"extinguishment" defense. Compare Ex. 4, Henry II Settlement, Introduction & §§ 2, 5, 8, 14, 25.C & 32.C with Ex. 9, 2009 RSA, Introduction & §§ 2, 5, 8, 14, 25.C & 32.C.

Moreover, because the contract language relied on by GM had its genesis in the 2008 Henry II Settlement and was simply carried over in haec verba into the 2009 RSA along with numerous other Henry II Settlement provisions that were not modified during GM's 2009 bankruptcy, see SMF ¶ 33, there is no reality to GM's further assertion that that contract language was negotiated on the eve of GM's bankruptcy as an "essential" means of "achiev[ing]" "government assistance" and putting GM "on a path toward long-term viability."[2]

These inaccurate assertions do not seem inadvertent. The extrinsic evidence of record establishes that the 2008 Henry II Settlement *did not*, through *any* contract language therein, have the effect of "extinguishing" the $450 million payment obligation to the DC VEBA. See UAW Br. at 20-21; infra pp. 8-10. That being so, there is advantage to be had in obscuring the true "context[ual]" point that the contract language in the 2009 RSA that forms the basis of GM's "extinguishment" defense was *not* newly-negotiated contract language essential to the success of GM's 2009 bankruptcy proceeding, but rather previously-negotiated contract language taken verbatim from the 2008 Henry II Settlement. For that true "context[ual]" point exposes the reality that GM's "extinguishment" defense rests on the untenable proposition that contract language in the 2008 Henry II Settlement that *did not* have the effect of "extinguishing" the $450 million payment obligation *did* have such an "extinguishing" effect when that contract

---

[2] The contract language that *was* negotiated on the eve of GM's bankruptcy as an "essential" means of "achiev[ing]" "government assistance" and putting GM "on a path toward long-term viability" was language converting roughly half of Old GM's $20 billion cash contribution obligation to the New VEBA under the 2008 Henry II Settlement into an equity stake in GM. Compare Ex. 4, Henry II Settlement, § 8 with Ex. 9, 2009 RSA, § 8; see also Ex. 61, Affidavit of Frederick A. Henderson, In re General Motors Corp. et al. (Bankr. S.D.N.Y.), at ¶¶ 31, 57(v). Yet incredibly, GM treats this one truly "essential" modification of the 2008 Henry II Settlement agreed to by the UAW in 2009 as just "another feature" of the 2009 RSA.

2

language was simply carried over in haec verba into the 2009 RSA.

2. On a related note, GM goes on to assert in its "PRELIMINARY STATEMENT" that "[t]he 2009 RSA was a cornerstone of a plan to give New GM a fresh start" through "the bankruptcy process"; and that, accordingly, to reject GM's "extinguishment" defense based on the 2009 RSA would be to undermine that "fresh start" objective of "the bankruptcy process." See GM Br. at 2. Here again, GM's "context[ual]" point is inaccurate.

GM made this same assertion in seeking to persuade the GM bankruptcy court to take jurisdiction over the instant dispute and uphold GM's "extinguishment" defense, see Ex. 23 at ¶¶ 22, 24, and the bankruptcy court was singularly unimpressed, making these salient points: (a) far from being a cornerstone of a plan to give GM a fresh start, the 2009 RSA "was barely mentioned in the proceedings before me," Ex. 24 at 21-22, and indeed "was never [even] offered into evidence," id. at 26; (b) the issue of whether the 2009 RSA left intact or "extinguished" the $450 million payment obligation is *not* a "bankruptcy issue[ ] at all," but "[r]ather" a "garden-variety contractual interpretation" issue, id. at 22; and (c) thus, "determination of this controversy" would *not* "bear on objectives to be achieved in Old GM's chapter 11 case, or otherwise advance bankruptcy needs and concerns," id. at 27.[3]

Without further ado, then, we turn to the various arguments made by GM in its Opposition Brief on the "garden-variety contractual interpretation" issue presented here.

    B.    The 2009 RSA Contains *No* Language That Can Be Read To Mean That GM's $450 Million Payment Obligation To The DC VEBA Is "Extinguished," And GM's "Extinguishment" Defense Thus Fails As A Matter Of Law

---

[3] In this regard, it is important to note that the "fresh start" given to New GM in the GM bankruptcy proceeding was not intended to accomplish and did not accomplish an "extinguishment" of *all* of Old GM's liabilities—as GM itself acknowledges later in its Brief. See GM Br. at 8 ("Treasury demanded a 'fresh start for New GM—free from *many* of Old GM's liabilities . . . .") (emphasis added).

1.In its Motion to Enforce in the bankruptcy court, GM firmly grounded its "extinguishment" defense on contract language appearing in both the Introduction (subparagraph x) and Section 8 of the 2009 RSA stating that GM's "obligation to pay into the New VEBA" is "fixed and capped" at the level specified in the 2009 RSA.  Indeed, at the outset of its Motion, GM described this "'fixed and capped'" language as a "singular component" of the 2009 RSA, see Ex. 23, and GM then proceeded to build a monument to that language by reciting it like a mantra throughout its Motion, see id. ¶¶ 4, 24, 26, 27, 28, 29, 36, 41, 47.

But in its Opposition Brief herein, GM pays little more than lip service to this "fixed and capped" language, and for good reason:  On its face, that language "fixes and caps" GM's payment obligations to *the New VEBA* at the level specified in the 2009 RSA, and does *not* deal in *any* way with GM's pre-existing $450 million payment obligation to *the DC VEBA* under the 2007 MOU—much less purport to "extinguish" that payment obligation.  See UAW Br. at 15-16 (exposing this fatal flaw in GM's reliance on the "fixed and capped" language).[4]

Instead, GM shifts gears in its Opposition Brief and places its most heavy reliance on certain language in Section 5.D of the 2009 RSA—quoted and discussed extensively in GM Br. at 12-14 & 17-18—that GM triumphantly notes stands in sharp contrast to the "fixed and capped" language in one important respect:  "That [Section 5.D] language does not speak in terms of the DC VEBA or New VEBA."  See GM Br. at 18.  To be sure, given that contrast, GM's reliance on this Section 5.D language does not suffer from the same fatal flaw as GM's reliance on the "fixed and capped" language.  But as we now show, GM's reliance on this Section 5.D language *does* suffer from a different, but equally fatal, flaw:  to wit, GM has quoted

---

[4] GM's reliance on language in both Section 2 and Section 5.B of the 2009 RSA stating that GM's "sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement," see GM Br. at 11-12, suffers from the same fatal flaw, inasmuch as that language is silent with respect to GM's pre-existing payment obligation to *the DC VEBA*.

4

that Section 5.D language entirely out of context, and when that language is considered in its full and proper context, it is abundantly clear that that language has nothing whatsoever to do with GM's contractual *payment* obligations to *either* the New VEBA *or* the DC VEBA.[5]

Needless to say, the payment of monies by an employer to fund retiree medical benefits through a vehicle such as a VEBA, and *the provision of* those medical benefits by that vehicle in accordance with the terms of the insurance plan specifying the type and level of medical benefits to which the retirees are entitled, are two very different subject matters. Taken in context, Section 5.D, which references the parties' "fundamental understanding that all [GM] obligations regarding Retiree Medical Benefits for the Class and the Covered Group are terminated, as set forth in this Settlement Agreement," deals with the subject matter of GM's obligation *to provide* retiree medical benefits, and *not* the separate subject matter of GM's obligation to pay money to fund those benefits (which is dealt with in Article 8 of the 2009 RSA).

Specifically, the Introduction (subparagraph viii), definitional provisions and Section 2 of the 2009 RSA contain language explicitly stating that "the purpose" of the "New Plan" and "New VEBA" is to "provid[e]" a defined set of "Retiree Medical Benefits" (viz., "hospital surgical medical, prescription drug, vision, dental, hearing aid and the $76.20 Special Benefit related to Medicare"), and to thereby relieve GM of any and all obligations it previously had to "provid[e]" such benefits. This language elsewhere in the 2009 RSA makes it plain that the "fundamental understanding" referenced in Section 5.D, taken in context, does *not* concern GM's obligation to pay money that would be used to fund the cost of providing medical benefits,

---

[5] Context is of course critical in construing contract language. *See* Restatement (Second) of Contracts § 202, cmt. d (1981) ("Meaning is inevitably dependent on context. A word changes meaning when it becomes part of a sentence, the sentence when it becomes part of a paragraph. A longer writing similarly affects the paragraph . . . and the circumstances affect the whole."); O'Brien v. Miller, 168 U.S. 287, 297 (1897) (it is an "elementary canon of interpretation" that the "particular words" of a contract may not be "isolatedly considered").

but rather concerns *the provision of those medical benefits themselves*.[6] And, it is equally plain when read in context that the Section 5.D language stating that all prior "collective bargaining agreements, contracts, letters and understandings in any way related to Retiree Medical Benefits for the Class and the Covered Group are terminated on the Implementation Date, or otherwise amended so as to be consistent with" this "fundamental understanding," means that all prior agreements that could be read to impose an obligation on GM *to provide* medical benefits to UAW retirees of Old GM and Delphi (and to do so on certain terms and at a certain level) are superseded by the 2009 RSA. At the same time, that Section 5.D language cannot possibly be taken to mean that a prior agreement (the 2007 MOU) dealing with a separate subject matter altogether—viz., GM's $450 million *payment* obligation to the DC VEBA—is also superseded.

  2. GM's reliance on certain other 2009 RSA contract language fares no better.

    a. First, GM relies on a sentence in Section 14 that bars the UAW from "seek[ing] to obligate" GM to make any additional payments to the New VEBA or any other payments for the purpose of providing Retiree Medical Benefits. See GM Br. at 14-15. Even read in isolation, that sentence in Section 14 provides no support for GM's claim that the 2009 RSA "extinguished" GM's *pre-existing* $450 million payment obligation to the DC VEBA under a *prior* agreement between the parties, inasmuch as the words "seek to obligate" as used in that sentence are words that plainly connote a bar on the UAW's *solicitation of future agreements*

---

[6] This plain reading is confirmed by: (a) the preceding language in section 5.B stating that "[w]ith respect to claims incurred after the Implementation Date, the New Plan and the New VEBA shall have sole responsibility for and be the exclusive source of funds *to provide* Retiree Medical Benefits for the Class and the Covered Group. . ." (emphasis added), and further stating that "[n]either [GM], the [GM] Plan . . ., nor any other [GM] person, entity, or benefit plan shall have any responsibility or liability for [those] Retiree Medical Benefits . . ."; and (b) the sentence in Section 5.D that immediately follows the Section 5.D language relied on by GM, which states: "Summary Plan Descriptions of the [GM] Plan shall reflect the termination of the responsibilities of [GM] and the [GM] Plan for Retiree Medical Benefits for the Class and the Covered Group for claims incurred after the Implementation Date, as set forth herein."

6

*with GM* on the subject of additional funding of Retiree Medical Benefits.  But that conclusion is confirmed by the remaining language in Section 14 omitted by GM that puts the words "seek to obligate" in their full and proper context, to wit:  (i) Article 14's first sentence, stating that "[t]he UAW, the Class and the Covered Group *may not negotiate* any increase of [GM's] funding or payment obligations set out herein"; and (ii) Article 14's proviso, stating that "the UAW *may propose* that [GM] Active Employees be permitted to make contributions to the New VEBA of amounts otherwise payable in profit sharing, COLA, wages and/or signing bonuses, if not prohibited by law."  (Emphasis added).

        b.      Second, GM relies on language in Section 25.C which it inaccurately paraphrases as stating that the UAW waives and releases all claims against GM "concerning Retiree Medical Benefits."  See GM Br. at 15.  What Section 25.C *actually says* is that the UAW waives and releases all claims against GM "concerning *the provision of* Retiree Medical Benefits."  See Ex. 9, at pp. 23-24 (emphasis added).  In its actual wording, this language has no more of an "extinguishing" effect on GM's $450 million *payment* obligation to the DC VEBA under the 2007 MOU than the analogous language in Section 5.D.  See supra pp. 4-6.

        c.      Finally, GM relies on language in Section 32.C stating that the 2009 RSA constitutes the entire agreement between the parties regarding "the matters set forth [t]herein" and supersedes all prior agreements between the parties regarding those "matters."  See GM Br. at 15-16.  This reliance is misplaced because, as we have shown, the 2009 RSA does *not* deal in *any* way with the "matter[ ]" of GM's $450 million payment obligation to the DC VEBA under the 2007 MOU.  Indeed, the 2009 RSA does not make any mention of that $450 million payment obligation to the DC VEBA at all.  See UAW Br. at 14-15.

        \*        \*        \*        \*

In sum, try as it might, GM can point to *no* language in the 2009 RSA that can be read to

mean that GM's $450 million payment obligation to the DC VEBA is "extinguished," and GM's "extinguishment" defense thus fails as a matter of law.

      C.      The Conclusion That GM's "Extinguishment" Defense Fails As A Matter Of Law Is Confirmed By Extrinsic Evidence Properly Considered By This Court

GM takes issue with the UAW's statement of the legal principle that a court may consider extrinsic evidence in construing an unambiguous contract for the limited purpose of *confirming* the legal conclusion to be drawn from that contract's unambiguous language, see GM Br. at 19, but that legal principle is firmly rooted in the case law cited in UAW Br. at 18.[7]

Here, the extrinsic evidence offered by the UAW is extrinsic evidence of the most powerful, confirmatory kind. That is so because:

● Each and every snippet of 2009 RSA contract language that forms the basis of GM's "extinguishment" defense had its genesis in the 2008 Henry II Settlement and was simply carried over in haec verba into the 2009 RSA, see supra pp. 1-2;

● The three items of evidence discussed in UAW Br. at 20-21 establish that the 2008 Henry II Settlement *did not*, through *any* language therein, have the effect of "extinguishing" the $450 million payment obligation to the DC VEBA;

● The proposition that contract language in the 2008 Henry II Settlement that *did not* have the effect of "extinguishing" the $450 million payment obligation to the DC VEBA *did* have such an "extinguishing" effect when that contract language was simply carried over in haec verba into the 2009 RSA is, in a word, untenable.

Tacitly recognizing the force of the UAW's confirmatory extrinsic evidence, GM does

---

[7] Moreover, contrary to GM's suggestion, see GM Br. at 19, this narrow exception does not swallow the rule stated in Witmer v. Acument Global Techs., Inc., 694 F.3d 774 (6th Cir. 2012) that extrinsic evidence cannot be used in an effort to "*alter*"—as opposed to *confirm*—"the straightforward meaning" of contract language, see id. at 778 (emphasis added).

8

headstands in an effort to undermine the assertion in the second bullet point above, to no avail.

1. With regard to the UAW's first item of evidence, GM does *not* dispute that both parties to the 2008 Henry II Settlement proceeded on the understanding that the $450 million payment to the DC VEBA provided for in the 2007 MOU *would be made* upon the anticipated satisfaction of the conditions precedent to that payment obligation, but objects that the UAW's factual statement to that effect is "incomplete" because it fails to add that both parties anticipated that Delphi's emergence from bankruptcy was imminent and that the $450 million payment would thus be made "long before" the process of judicial approval of the 2008 Henry II Settlement had run its course. See GM Response to UAW SMF ¶ 17. This objection is a non sequitur. The significance of this item of extrinsic evidence lies in the fact that the mutual understanding of the parties to the 2008 Henry II Settlement that the $450 million payment to the DC VEBA *would be made* utterly belies any mutual intention on their part to "extinguish" that payment obligation. The contracting parties' expectations regarding *when* that $450 million payment to the DC VEBA would be made is, in this respect, completely irrelevant.

2. With regard to the UAW's second item of evidence, GM argues that ¶ 6 of the September 2008 Implementation Agreement cannot properly be read as a post-Henry II Settlement reaffirmation of the continued existence of the $450 million payment obligation imposed by the 2007 MOU, but is instead properly read as a "reestablish[ment]" of a new, freestanding $450 million payment obligation to replace a previously "extinguished" obligation. See GM Br. at 21 n.6. The short answer to this argument is that it cannot be squared with the plain language of ¶ 6, which provides that the $450 million payment obligation imposed by the 2007 MOU "*shall remain payable as set forth in* the [2007] MOU." See UAW Br. at 7-8, 20-21 (emphasis added). On its face, the phrase "*shall remain payable as set forth in* the [2007] MOU"

9

clearly connotes a reaffirmation of the $450 million payment obligation imposed by the 2007 MOU, as opposed to a "reestablish[ment]" of a new, freestanding $450 million payment obligation to replace a previously "extinguished" obligation.[8]

    3.    Finally, with regard to the UAW's third item of evidence—GM lead negotiator Fritz Henderson's deposition testimony about the 2008 Henry II Settlement—GM does nothing more than change the subject to Mr. Henderson's deposition testimony about the 2009 RSA. See GM Br. at 21-22. We address that latter deposition testimony about the 2009 RSA below, and show that it does nothing to advance GM's cause here. For present purposes, it suffices to note that GM's changing of the subject does nothing to blunt the force of Mr. Henderson's frank concession that the 2008 Henry II Settlement *did not* "extinguish" the $450 million payment obligation to the DC VEBA imposed by the 2007 MOU. See UAW Br. at 21.

    D.    <u>GM's Reliance On Extrinsic Evidence Of Its Own Is Unavailing</u>

In an effort to prop up its "extinguishment" defense, GM relies on certain extrinsic evidence of its own pertaining to the negotiation of the 2009 RSA, also to no avail.

In particular, GM points to evidence of discussions between the parties to the 2009 RSA in May of 2009 "in the presence of Treasury officials" which, according to GM, show that the parties reached an understanding to "extinguish" the $450 million payment obligation to the DC VEBA. See GM Br. at 4 n.2 & 20-22. But GM's reliance on this evidence is doubly flawed.

First, GM does not contend, and cannot show, that this supposed understanding between the parties to "extinguish" the $450 million payment obligation was memorialized *in the 2009*

---

[8] GM's point that there was no need for the UAW to insist on the language in ¶ 6 explicitly reaffirming the $450 million payment obligation imposed by the 2007 MOU in light of other, more general language in the Implementation Agreement reaffirming that obligation, see GM Br. at 21 n.6, ignores both the virtue of explicitness in this context and the fact that contracting parties often employ a "belt and suspenders" approach to avoid potential contractual ambiguity, see <u>TMW Enters., Inc. v. Fed. Ins. Co.</u>, 619 F.3d 574, 577 (6th Cir. 2010).

*RSA itself* through *any* language designed and intended by the parties to give contractual life to this supposed understanding.  Rather, stripped to its essence, it is GM's contention in this case that the $450 million payment obligation was "extinguished" by *pre-existing* contract language *taken verbatim* from the 2008 Henry II Settlement that, as we have shown, most certainly *did not* have such an "extinguishing" effect.  Against this backdrop, it is plain that it is GM, and not the UAW, that is attempting to "rewrite" or augment the 2009 RSA through the use of extrinsic evidence in a manner that is "impermissible" under Sixth Circuit case law.  See GM Br. at 19.

      Second, it is unsurprising that GM cannot point to any language in the 2009 RSA giving contractual life to this supposed understanding to "extinguish" the $450 million payment obligation, inasmuch as no such understanding was ever reached.  Indeed, in positing such an understanding, GM omits crucial facts necessary to put the May of 2009 discussions in their proper context.  The full story—set out in UAW Response to SMF ¶¶ 54, 80-84—is this:  By May of 2009, Delphi had not emerged from bankruptcy as anticipated, and its future emergence from bankruptcy was in doubt—thus raising a doubt as to whether the conditions precedent to GM's $450 million payment obligation stated in the 2007 MOU would be satisfied.  Against this background, the UAW proposed that those conditions be waived, and that the $450 million payment be included as part of GM's contribution obligations under the 2009 RSA without regard to satisfaction of those conditions.  GM rejected this UAW proposal, and the UAW did not press the matter further, the end result being that the "status quo" with respect to the $450 million payment obligation was maintained—i.e., the $450 million payment *remained payable*, subject to the conditions stated in the 2007 MOU.  The UAW could live with that "status quo," because if Delphi did emerge from bankruptcy on terms that satisfied the 2007 MOU conditions, GM would be required to honor its pre-existing contractual obligation to make the $450 million

11

payment, and the UAW could sue to enforce that obligation if necessary.[9]

\*　　　　\*　　　　\*　　　　\*

In the end, GM's position—epitomized by the Henderson testimony cited in GM Br. at 21-22—is that GM "wanted to deal with everything" pertaining to retiree health benefits in the 2009 RSA, and thus "wanted" to extinguish its $450 million payment obligation in the 2009 RSA rather than take the risk that Delphi would emerge from bankruptcy on terms triggering that obligation. The fatal problem for GM is that "hopes and wishes count for nothing" in construing a contract. Skycom Corp. v. Telstar Corp., 813 F.2d 810, 814 (7th Cir. 1987). Subject to the narrow exception for *confirmatory* extrinsic evidence, see UAW Br. at 18, the meaning of an unambiguous contract is to be gleaned from "the language found within [its] four corners." Witmer, 694 F.3d at 778. And, as we have shown, there is *no* language within the 2009 RSA's four corners that can be read to accomplish the "extinguishing" result that GM says it "wanted."

## II. ALL CONDITIONS TO GM's PAYMENT OBLIGATION HAVE BEEN SATISFIED

GM's further contention is that the conditions precedent to GM's $450 million payment obligation "have not been and cannot be fulfilled," GM Br. at 22, but that simply is not so.

**A.** GM's first affirmative argument to this effect—that Delphi's modified "Plan of Reorganization" was not "really" a "reorganization" plan at all, but rather a "liquidating" plan, see GM Br. at 23-24 & GM Response to SMF ¶ 36—is doubly flawed.

First, the conditions precedent stated in the 2007 MOU require, inter alia, a "plan of reorganization" proposed by Delphi, confirmed by the bankruptcy court, and substantially consummated. It is indisputable that each of these stated conditions was fulfilled. See Exs. 18-20 (confirmation and substantial consummation of modified "Plan of Reorganization" proposed

---

[9] The other extrinsic evidence touted in GM Br. at 5 is an amalgam of further distortions of the record, or misleading half-truths, as shown in UAW Response to SMF ¶¶ 49, 55-56, 59.

12

by Delphi). GM's after-the-fact claim (which is squarely at odds with its contemporaneous public pronouncement, see infra) that the "Plan of Reorganization" proposed by Delphi and approved by the bankruptcy court was not "really" what it purports to be and was taken to be by the bankruptcy court is, on its face, an improper effort to re-write the conditions stated in the 2007 MOU to include the additional condition that the "plan of reorganization" proposed by Delphi and approved by the bankruptcy court have certain attributes that the contracting parties did not bother to specify.

Second, GM's after-the-fact claim that Delphi's plan was not "really" a "reorganization" plan but rather a "liquidating" plan fails on its own terms. Delphi's plan tracks the elements of a Chapter 11 reorganization plan, see 11 U.S.C. § 1129, by providing, inter alia, for the continued existence and management of the debtor post-confirmation, Ex. 18 at §§ 7.1, 7.4, 7.5, and for a discharge of the debtor notwithstanding the provisions of 11 U.S.C. § 1141(d)(3), id. at § 11.2.[10] Moreover, in its approval order, the Delphi bankruptcy court expressly found that plan confirmation "is not likely to be followed by the liquidation" of either "the Debtors or the Reorganized Debtors." Ex. 19 at pp.29-30 ¶ V. Unsurprisingly against this background, GM itself issued a press release contemporaneously with plan consummation on October 6, 2009 applauding the fact that, under an agreement incorporated in the plan, Delphi was emerging from bankruptcy as a new (and leaner) operating entity. See Ex. 57 ("wish[ing] the newly emerged Delphi success," and stating that the restructuring transactions provided for by the plan will "allow" this "newly emerged Delphi" "to effectively serve its customers by focusing on its core business"); see also Ex. 60, Delphi's Motion to Approve Modified Plan of Reorganization, at

---

[10] Under § 1141(d)(3), plan confirmation "does not discharge a debtor" if "(A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title."

13

¶¶ 7, 14 (stating that plan approval "will enable the Debtors to emerge from chapter 11 and will allow the Debtors to continue to deliver high-quality products to their customers with the support of their supply base," and that the alternative to plan approval is "liquidation").[11]

    **B.**    GM's second affirmative argument—laced with factual misstatements, see UAW Response to SMF ¶¶ 64-65, 67-70—is that Delphi's plan of reorganization is inconsistent with the provision in the original 2007 MOU providing for Delphi's ownership and operation of four "Keep Sites" and with several other provisions in the original 2007 MOU tied to this provision (e.g., provisions relating to Delphi investments in the Keep Sites). See GM Br. at 25-26. Even on its own factually-inaccurate terms, this argument is a non sequitur, in that it fails to meet the showing in UAW Br. at 9-10 & 26 that the Keep Sites provisions in the original 2007 MOU were modified and rendered inoperative by the May 2009 "Keep Sites MOU" between GM and the UAW so as to enable GM to consummate its agreement with Delphi to take back the Keep Sites, and that Delphi's plan of reorganization is fully consistent with the 2007 MOU *as so modified*.[12]

    **C.**    GM's third and final affirmative argument is that Delphi's plan of reorganization is inconsistent with certain highly-desirable (to GM) terms of the September 2008 Amended

---

[11] GM's reliance on a reference in a 2010 district court decision to Delphi's plan as a "liquidating" plan is misplaced, inasmuch as it was, in context, a reference to the fact that the old Delphi estate that was left behind upon the new Delphi's emergence from bankruptcy in October of 2009 was being "liquidated" in a post-confirmation claims process, thus giving the Delphi bankruptcy court jurisdiction over a post-confirmation dispute relating to the "distribution of th[at] estate." See In re DPH Holdings, 437 B.R. 88, 98 (S.D.N.Y. 2010).

[12] To be sure, GM does make two rebuttal arguments in an effort to meet this UAW showing, but neither rebuttal argument is a serious one. GM's lead rebuttal argument—that the UAW has in an October 29, 2009 letter "concede[d]…to New GM and this Court" that the 2007 MOU was never modified in any way, see GM Br. at 26-27—rests on a misreading of the UAW's letter and a misleading, out-of-context reference to the "express[] incorporat[ion]" of that letter in the UAW's Complaint. See UAW Response to SMF ¶ 74. And, GM's other rebuttal argument—that the May 2009 Keep Sites MOU does not contain "a single provision" expressly stating that the Keep Sites provisions in the 2007 MOU are being "modif[ied]," see GM Br. at 27—elevates form over substance to say the very least.

14

GSA between Old GM and Delphi.  See GM Br. at 28-30.  This argument also is a <u>non</u> <u>sequitur</u>, in that it fails to meet the showing in UAW Br. at 8-10, 25 & 26-28 that GM agreed to modify these terms of the September 2008 Amended GSA in the 2009 Master Disposition Agreement, and that the Delphi plan of reorganization is fully consistent with the September 2008 Amended GSA *as so modified*.[13]

                Respectfully submitted,

| | |
|---|---|
| Jeffrey D. Sodko (P65076) | /s/ ANDREW D. ROTH |
| jsodko@uaw.net | Andrew D. Roth (DC Bar 414038) |
| Associate General Counsel, | aroth@bredhoff.com |
| International Union, UAW | BREDHOFF & KAISER, PLLC |
| 8000 East Jefferson Avenue | 805 Fifteenth Street, N.W., Suite 1000 |
| Detroit, Michigan 48214 | Washington, D.C. 20005 |
| | |
| Dated:  January 15, 2013 | *Counsel for Plaintiff UAW* |

---

[13] To be sure, in this instance as well, GM makes two rebuttal arguments in an effort to meet the UAW's showing, but here again, neither rebuttal argument is a serious one.

 GM's lead rebuttal argument—that a statement in a prior UAW brief to this Court is a binding judicial admission that the pertinent "comprehensive settlement agreement between Delphi and GM" in this case is the September 2008 Amended GSA rather than the September 2008 Amended GSA as modified by the 2009 Master Disposition Agreement, <u>see</u> GM Br. at 28—fails to take note of the controlling Sixth Circuit case law on binding judicial admissions. Under that case law, a statement by counsel may be treated as a binding judicial admission only if that statement is a "deliberate" (rather than "inadvertent") statement of an underlying "fact" (rather than a "legal conclusion[ ]").  <u>MacDonald v. General Motors Corp.</u>, 110 F.3d 337, 339-41 (6th Cir. 1997); <u>accord</u> <u>Roger Miller Music, Inc. v. Sony/ATV Publ'g</u>, 477 F.3d 383, 394-95 (6th Cir. 2007); <u>In re Kattouah</u>, 452 B.R. 604, 608-09 (E.D. Mich. 2011).  The statement latched onto by GM here plainly does not fit this bill.  On its face, the statement is an "inadvertent" misstatement of an allegation in the UAW's Complaint.  <u>See</u> UAW Response to SMF ¶ 75. Equally to the point, whether the pertinent "comprehensive settlement agreement between Delphi and GM" in this case is the September 2008 Amended GSA or the September 2008 Amended GSA as modified by the 2009 Master Disposition Agreement is a "legal conclusion[ ]" and not an underlying "fact."

 GM's other rebuttal argument—that the 2009 Master Disposition Agreement, in contrast to the September 2008 Amended GSA, is not "call[ed]" a "settlement agreement" and thus cannot properly be deemed part of the "comprehensive settlement agreement between Delphi and GM" required by the 2007 MOU as a condition precedent to GM's $450 million payment obligation, <u>see</u> GM Br. at 29—elevates form over substance in the same way as GM's analogous argument regarding the modification of the 2007 MOU by the May 2009 Keep Sites MOU.

15

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2013, I electronically filed the foregoing UAW's Reply Memorandum in Support of Its Motion for Summary Judgment and in Response to Defendant General Motors LLC's Motion for Summary Judgment with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Robert S. Walker
Email: rswalker@jonesday.com
Jones Day
North Point,   901 Lakeside Avenue
Cleveland, Ohio 44114

Johanna F. Parker
Email: jfparker@jonesday.com
Jones Day
North Point, 901 Lakeside Avenue
Cleveland, OH 44114-1190

Edward W. Risko
Email: edward.w.risko@gm.com
General Motors Corporation
Legal Staff
300 Renaissance Center
Suite MC 482-C24-C66
Detroit, MI 48265-3000


/s/ ANDREW D. ROTH
Andrew D. Roth (DC Bar 414038)
**Bredhoff & Kaiser, PLLC**
805 Fifteenth Street, N.W., Suite 1000
Washington, DC 20005
(202) 842-2600
Email: aroth@bredhoff.com