Hearing Date And Time: TBD<br>
Objection Deadline: TBD

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
    In re                       :      Chapter 11
                            :
DELPHI CORPORATION, et al.,      :      Case No. 05-44481 (RDD)
                            :
                Debtors.  :      (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

(A) SUPPLEMENT TO MOTION FOR ORDER (I) APPROVING MODIFICATIONS TO DEBTORS'
FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND RELATED
DISCLOSURES AND VOTING PROCEDURES AND (II) SETTING FINAL HEARING DATE TO
CONSIDER MODIFICATIONS TO CONFIRMED FIRST AMENDED PLAN OF
REORGANIZATION AND (B) REQUEST TO SET ADMINISTRATIVE EXPENSE CLAIMS BAR
<u>DATE AND ALTERNATIVE SALE HEARING DATE</u>

("SUPPLEMENT TO PLAN MODIFICATION APPROVAL MOTION")



0544481090601000000000001

Preliminary Statement

1. Delphi is on the brink of emergence from chapter 11. The Debtors have accomplished their stated reorganization goals, maintained their business despite a global economic recession and the failed promises of would-be investors, and persevered in the face of unprecedented challenges that have flooded the automotive industry. The relief that Delphi now seeks – an expedited hearing for the Court to approve this Motion Supplement to modify the Confirmed Plan – will enable the Debtors to complete the final phase of their reorganization. Due to the nature of this transaction, there is no time to spare. The Debtors need to act now to effectuate the Modified Plan and the transactions incorporated therein to allow them to maximize value to their stakeholders. Without the requested relief, Delphi would be unable to effectuate a plan of reorganization.

2. In March 2006, approximately six months after the commencement of these chapter 11 cases, the Debtors announced the five key tenets of their transformation plan that they believed would enable them to return to stable, profitable business operations. Thereafter, over the next 18 months, the Debtors worked diligently with their stakeholders to achieve these goals. By September 2007, the Debtors had negotiated an investment agreement with a group of plan investors and had filed a plan of reorganization designed to allow Delphi to emerge from chapter 11 as a viable entity with significant recoveries for its stakeholders. Although the plan of reorganization and investment agreement were ultimately amended, in January 2008, this Court approved the Confirmed Plan and the Debtors' hope for emergence from chapter 11 was within reach.

3. During February and March 2008, the Debtors succeeded in obtaining $6.1 billion in exit financing commitments and by April 4, 2008 the Debtors had satisfied the conditions required to substantially consummate the Confirmed Plan. The plan investors,

5

however, refused to participate in the closing and refused to fund their investment agreement with Delphi. This devastating move by the plan investors precluded the Debtors from emerging from chapter 11, and Delphi was required to reevaluate and retool its business plan and emergence strategy.

4. Over the next six months, the Debtors revised their go-forward business plan and developed certain modifications to the Confirmed Plan so that Delphi could emerge on an standalone basis, without plan investor support. The lack of the plan investors' $2.5 billion investment, together with the overall economic decline, particularly in the automotive industry, and the total collapse of the credit markets in the later half of 2008 significantly reduced the Debtors' enterprise value. In addition, the Debtors were unable to secure necessary exit financing, forcing the Debtors to remain in chapter 11. Despite these challenges, on October 3, 2008, the Debtors filed certain proposed modifications to the Confirmed Plan that incorporated a significantly lower enterprise value and recoveries to creditors that were lower than those approved by the Court in the Confirmed Plan. As a result of the lack of available credit in the credit markets, the Debtors were unable to secure necessary emergence capital and thus were not able to obtain approval of the modifications to the Confirmed Plan.

5. Their unexpected prolonged stay in chapter 11 posed yet another challenge to the Debtors because their DIP credit facility was set to mature on December 31, 2008. Because of the collapse of the credit markets, the Debtors were unable to extend the maturity date of their DIP credit facility on reasonably acceptable terms. Accordingly, in December 2008, the Debtors and their debtor-in-possession lenders (the "DIP Lenders") entered into an accommodation agreement, as subsequently amended, to allow the Debtors, among other things, to continue using certain of the proceeds of the DIP credit facility through June 30, 2009. In

addition, and in connection with certain amendments to the accommodation agreement with the DIP Lenders, General Motors Corporation ("GM") agreed to provide the Debtors with additional liquidity and to accelerate payment of certain receivables to allow the Debtors to maintain ongoing operations in this challenging economic environment.

6. In the interim, the U.S. government's well-publicized involvement with the U.S. automotive industry and the Treasury Department's infusion of billions of dollars into the automotive industry, including GM, added yet another layer of complexity to the Debtors' emergence plan. Indeed, in March 2009, in connection with a proposed amendment to the accommodation agreement with the DIP Lenders, GM was to provide the Debtors with an additional $150 million in liquidity under an amendment to the previously-approved liquidity arrangement between Delphi and GM. The Treasury Department, however, acting pursuant to its authority under GM's loan agreement with the U.S. government, notified the Debtors and GM that it objected to the parties' seeking approval of these amendments and requested additional time to consider these agreements and various alternatives with respect to the Debtors' emergence from chapter 11. Since that time, the Debtors, GM, and the Treasury Department have been working on and negotiating a global solution to allow the Debtors to emerge from chapter 11. As part of that solution, the Treasury Department has now agreed to allow GM to provide up to an additional $250 million to support Delphi as it seeks approval of its Modified Plan and emergence from chapter 11.

7. ==This process has resulted in agreements with necessary parties that will enable the Debtors to emerge from chapter 11 and will allow the Debtors to continue to deliver high-quality products to their customers with the support of their supply base.== The Debtors have reached an agreement with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum

7

Capital Equity Partners, L.P., and, with support from the Treasury Department, GM Components Holding, LLC ("GM Components"), an affiliate of GM, whereby the Debtors would sell certain of their North American assets to GM Components and contemporaneously effectuate transactions through which Parnassus would operate certain of Delphi's U.S. and non-U.S. businesses going forward with emergence capital commitments of approximately $3.6 billion and without the legacy costs associated with the North American sites that are being acquired by GM Components together with Delphi's global Steering business. The Debtors must proceed on an expedited basis to solicit votes on the Modified Plan. Failure to move forward now on this accelerated time frame could seriously jeopardize the Debtors' ability to emerge from chapter 11.

Summary Of Proposed Modifications To The Confirmed Plan

8. Section 14.3 of the Confirmed Plan, to which no party objected and which was approved by a substantial majority of creditors who voted on the Confirmed Plan, remains in effect and provides that only the Debtors may seek modifications of the Confirmed Plan pursuant to section 1127(b) of the Bankruptcy Code. Moreover, the Debtors previously obtained an extension, subject to certain exceptions described below, of their exclusive right under section 1121 of the Bankruptcy Code to file one or more reorganization plans until 30 days after substantial consummation of the Confirmed Plan or any modified plan and the exclusive right to solicit and obtain acceptances for such plans until 90 days after substantial consummation of the Confirmed Plan or any modified plan.[4] The Debtors' exclusive right to file a plan, solely as between the Debtors and the official committee of unsecured creditors (the "Creditors' Committee") (the "Plan Proposal Period"), has been extended through and including July 31,

---

[4] See Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483) (the "Postconfirmation Exclusivity Order").

A. <u>Prior Approval Of Disclosure Statement And Procedures For Soliciting Votes On Plan</u>

14. In connection with the solicitation of votes on the Modified Plan, the Debtors propose to adopt substantially the same procedures as those previously approved by this Court in the December 10 Solicitation Procedures Order, with limited appropriate modifications. The resolicitation timeline contemplated herein satisfies applicable procedural rules while acknowledging that the Debtors' current liquidity constraints require them to emerge from reorganization as soon as possible. ==Any delay in this expedited process could result in a liquidation as contemplated by the Debtors' hypothetical liquidation analysis.==

B. <u>Adoption Of Previously Approved Procedures And Documents For Soliciting Votes On Modified Plan With Certain Modifications</u>

15. The December 10 Solicitation Procedures Order approved procedures for the Debtors, through Kurtzman Carson Consultants, LLC ("KCC") and Financial Balloting Group, LLC (together with KCC, the "Voting Agents"), to transmit various solicitation materials to the classes of claims and interest holders entitled to vote on the December 10 Plan, as well as more limited documents to be sent to those not entitled to vote on the December 10 Plan. In addition, the December 10 Solicitation Procedures Order approved certain forms of ballots to be used to solicit votes, established procedures in connection with the tabulation of votes, and approved certain other procedures to facilitate and streamline the solicitation process. The procedures and documents approved in the December 10 Solicitation Procedures Order allowed the Debtors to efficiently and effectively solicit the votes of, and provide notice to, more than 500,000 parties-in-interest.

16. The Debtors propose to utilize the same procedures and the same documents that were previously approved by this Court in the December 10 Solicitation Procedures Order in connection with the solicitation of votes on, and the provision of notice

15

WHEREFORE the Debtors respectfully request that the Court enter an order (a) approving the Supplement and certain modifications to the Confirmed Plan and notices for resoliciting votes of affected classes on the Modified Plan, (b) setting a final hearing date on approval of the Debtors' proposed Modified Plan, (c) setting a bar date for filing proofs of claims for administrative expense for postpetition claims arising prior to June 1, 2009, (d) setting a sale hearing date for July 23, 2009, only if necessary, to consider the sale of substantially all the Debtors' assets if the Court does not approve the Debtors' proposed plan modifications on that date, and (e) granting them such other and further relief as is just.

Dated: New York, New York
June 1, 2009

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr.
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By: /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti
Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession