**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                 :

In re                              :          Chapter 11 Case No.
                                 :

**GENERAL MOTORS CORP.,** *et al.*,   :      **09-** _____ (   )
                                 :

          **Debtors.**             :          **(Jointly Administered)**
                                 :

-------------------------------------------------------------x

**AFFIDAVIT OF FREDERICK A. HENDERSON**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

STATE OF NEW YORK         )
                            )    ss:
COUNTY OF NEW YORK     )

        Frederick A. Henderson, being duly sworn, hereby deposes and says:

        1.      I am the President, Chief Executive Officer, and a Director of General

Motors Corporation, a Delaware corporation ("GM"), which together with its wholly-owned

direct subsidiaries, Chevrolet-Saturn of Harlem, Inc. ("Chevrolet-Saturn") and Saturn, LLC

("Saturn"), and GM's wholly-owned indirect subsidiary Saturn Distribution Corporation

("Saturn Distribution"), are the debtors in the above-captioned chapter 11 cases (collectively, the

"Debtors").  I submit this affidavit (the "Affidavit") pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules") to assist the Court

and other parties in interest in understanding the circumstances that compelled the

commencement of these chapter 11 cases and in support of (i) the Debtors' petitions for relief

under chapter 11 of title 11, United States Code (the "Bankruptcy Code"), filed on the date

hereof (the "Commencement Date"), (ii) the relief requested in the motions and applications that

the Debtors have filed with the Court, including, but not limited to, the "first day motions," and

(iii) the motion (the "363 Motion") pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code to approve, among other things, the sale of substantially all the Debtors' assets and the assumption and assignment of certain executory contracts and unexpired leases of personal property and nonresidential real property (collectively, the "Leases") to Vehicle Acquisition Holdings LLC (the "363 Transaction").

       2.     I have been employed by GM (or one of its affiliates) for nearly 25 years. I joined GM as a senior analyst in 1984 in the Treasurer's Office after receiving my B.B.A. from the University of Michigan, my CPA license, and my M.B.A. from Harvard Business School. Since that time, I have held positions of increasing and significant financial and operational responsibility in GM's domestic and international operations. As a result, I have first-hand experience and insight regarding the entire GM enterprise, the many issues now confronting GM, and the urgent relief that is now requested to save GM.

       3.     In 1989, I became GM's Director of Mortgage Banking and, thereafter, from 1992 to 1994, I was GMAC Group Vice President of Finance. From 1994 to 1996, I was Executive in Charge of Operations for the former Automotive Components Group in Pontiac, Michigan. Subsequently, in 1996, I became GM's Vice President and General Manager of Delphi Saginaw and continued in that position until 1997, when I was appointed GM's Vice President and Managing Director of GM do Brazil, with responsibilities for GM's operations in Brazil, Argentina, Paraguay, and Uruguay. In June 2000, I was appointed Group Vice President and President of GM Latin America, Africa and Middle East (LAAM). From January 2002 to early 2004, I was President of GM Asia Pacific. In 2004, I assumed responsibility for GM's European operations as GM's Group Vice President and Chairman of GM Europe. In January 2006, I was appointed GM's Vice Chairman and Chief Financial Officer, and in March 2008, I

was appointed GM's President and Chief Operating Officer, which position I held until being appointed to my current position. I am familiar with and involved in the day-to-day operations, businesses, and financial affairs of the Debtors.

        4.    Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my discussions with other members of GM's senior management, my review of relevant documents, or my opinion based upon my extensive personal experience, knowledge, and information concerning GM's worldwide operations and financial affairs and the automotive industry. If called upon to testify, I would testify competently to the facts set forth in this Affidavit. I am authorized to submit this Affidavit on behalf of GM.

        5.    The Debtors have filed the 363 Motion because there simply is *no* viable alternative to the 363 Transaction to preserve the going concern value of the GM business and the employment opportunities and related benefits of that business. There is no other sale, or even other potential purchasers, present or on the horizon. There is no other source for debtor in possession ("DIP") financing even under the expedited process that is a condition to the instant proposal, let alone under a traditional chapter 11 process. In the face of the global meltdown of the financial markets, and a liquidity crisis unprecedented in GM's 100 year history, there is only one way to maximize the value and permit the survival of GM's business and save hundreds of thousands of jobs associated with not only GM, but also its vast supplier and dealer networks: these chapter 11 cases and the prompt approval of the 363 Transaction. The only other alternative is the liquidation of the Debtors' assets that would (i) substantially diminish the value of GM's business and assets, (ii) throw hundreds of thousands of persons out of work and cause the termination of health benefits and jeopardize retirement benefits for current and former employees and their families; (iii) benefit no interested economic stakeholder, and (iv) yield

noteholders and other unsecured creditors no recovery.  Approval of the 363 Transaction must be prompt in order to accomplish its goals – to sell substantially all the assets of the Debtors as a going concern to a purchaser sponsored by the United States Department of the Treasury (the "U.S. Treasury") that will assure the ongoing operation of a competitive and profitable automotive company.

6.      Sections I through IV of this Affidavit describe the nature of GM's business; the events that led to the commencement of these chapter 11 cases; the rationale for and structure of the proposed 363 Transaction (including the urgent need for its expeditious consummation); and the capital structure of the Debtors.  Section V identifies the attached schedules of information required by Local Bankruptcy Rule 1007-2.

# I.

## Overview

7.      For over one hundred years, GM and its approximately 463 direct and indirect wholly-owned subsidiaries (collectively, the "Company"), have been a major component of the United States manufacturing and industrial base, as well as the market leader in the United States automotive industry.  GM has employed -- and provided health and retirement benefits to -- millions of dedicated workers over the years.  Both directly and as a customer of literally thousands of businesses that supply GM, the Company played a significant role in the development of a strong middle class in the United States.  The Company has been a source of pride for generations of American workers whose hard work and creativity helped fuel GM's global expansion as a full line manufacturer of cars, trucks, and related products.  GM has also been instrumental in the United States becoming the world's major economic force.

8.　　　William C. Durant founded General Motors in 1908 to implement his vision of one company growing through the creation and management of multiple automotive brands.  GM began as a holding company for Buick Motor Company and, by 1916, the Company's brands included Chevrolet, Pontiac (then known as Oakland), GMC, Oldsmobile, and Cadillac.  Under Mr. Durant's successor, Alfred P. Sloan, Jr., GM adopted the groundbreaking strategy of "a car for every purse and purpose," which revolutionized the automotive market by dividing it into distinct price segments, ranging from low-priced to luxury automobiles.

9.　　　Over the past century, the Company grew into a worldwide leader in products and services related to the development, manufacture, and marketing of cars and trucks under various brands, including:  Buick, Cadillac, Chevrolet, Daewoo, GMC, Holden, HUMMER, Opel, Pontiac, Saab,[1] Saturn, Vauxhall, and Wuling.  The Company has produced nearly 450 million vehicles globally and operates in virtually every country in the world.

10.　　　Recent events, however -- including both international competitive forces and the worldwide recession that has resulted in an economic contraction and dislocation not seen since the 1930s -- have led to the dramatic financial distress of the world's largest automotive company.  GM's shares of common stock have declined from $93.62 per share as of April 28, 2000 to $1.09 per share as of May 15, 2009, resulting in a dramatic decrease in market capitalization by approximately $59.5 billion.  Sales of GM's products have dropped as its market share in the largest single market for the Company's products -- the United States -- has steadily declined as the automobile market was flooded with imports from foreign Original Equipment Manufactures ("OEMs") with far lower cost structures and dramatically lower legacy

---

[1]  As a result of the global economic crisis and its effect on the automotive industry, Saab commenced reorganization proceedings in Sweden in February 2009.

benefit obligations.  For example, GM's United States market share fell from 45% in 1980 to 22% in 2008, and its market share forecast for 2009 is 19.5%.

11.     Most recently, GM's sales have been materially affected by the overall decline in domestic automobile sales, which continued unabated given the deteriorating economy and financial markets.  The Seasonally Adjusted Annual Rate ("SAAR") of automobile sales for the United States industry declined from 15.6 million units in January 2008 to 9.8 million units in January 2009, which is the lowest level since 1982.  This affected all domestic OEMs, but GM in particular.  For the fourth quarter of 2008, GM's domestic automobile sales were down 36% compared to the corresponding period in 2007.  For the first quarter of 2009, GM's domestic automobile sales dropped by 49% compared to the corresponding period in 2008.

12.     By the fall of 2008, the Company was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more uncertain with each passing day.  The Company previously had recognized the need for bold action to modify and transform its operations and balance sheet to create a leaner, more efficient, productive, and profitable business; and it had expended a tremendous amount of resources and effort, on operational, strategic partnering, and financial fronts, to accomplish this task.  Unfortunately, because of the continuing and deepening recession, aggravated by the collapse of Lehman Brothers Holdings Inc. ("Lehman") on September 15, 2008, GM was not able to achieve its objective.

13.     As a result of the economic crisis, in November 2008, the Company was compelled to seek financial assistance from the Federal Government.  The government understood the draconian consequences of a failure and of a GM collapse.  The government also recognized the likelihood of systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy from the loss of hundreds of thousands of jobs

and the sequential shutdown of hundreds of ancillary businesses if GM had to cease operations. The U.S. Treasury, in late December 2008, provided the necessary financing to temporarily sustain the Company's operations. The U.S. Treasury, however, provided such financing on the express condition that the Company develop a business plan that would fundamentally transform GM (operationally and financially) into a viable and profitable American OEM capable of meeting the competitive and environmental challenges of the 21st century. Thereafter, in March 2009, the U.S. Treasury indicated that, if the Company was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive viability plan under an expedited Court-supervised process to avoid erosion of asset value.

14. After exploring numerous options, including seeking out potential sources of financing (both public and private) and strategic alliances, it became evident that, in light of the ongoing economic crisis, the Company would not be able to achieve an effective out-of-court restructuring and the only viable option was the 363 Transaction. The Debtors' precarious financial and operational condition has been widely reported in the media on a daily basis for the past few months. It has been widely known, as well, that assets and businesses of the Company have been available for sale, yet no offers have been received at a level necessary to sustain the Company's operations and assure it viability, other than the U.S. Treasury-sponsored 363 Transaction. Indeed, in light of the Company's substantial secured indebtedness totaling approximately $27 billion, the only entity that has the financial wherewithal and is qualified to purchase the assets -- and the only entity that has stepped forward to make such a purchase -- is the U.S. Treasury-sponsored Purchaser. That Purchaser is only willing to proceed in the context of an expedited sale process authorized and approved under the Bankruptcy Code.

15. Equally important, in the context of the 363 Transaction, the U.S. Treasury is willing to provide DIP financing. There are *no* other sources with either the financial wherewithal or willingness to provide such financing. The U.S. Government has stated it will not provide DIP financing absent the 363 Transaction. Without such financing, these cases quickly will plunge into a liquidation, with the concomitant loss of value, employment, and systemic failure necessarily attendant thereto.

16. For these reasons, the 363 Transaction, as embodied in the proposed Master Sale and Purchase Agreement among GM and its Debtor subsidiaries (the "Sellers") and Vehicle Acquisition Holdings LLC (the "Purchaser"), a purchaser sponsored by the U.S. Treasury, dated as of June 1, 2009 (the "MPA"), reflects the good faith business judgment of GM's Board that the 363 Transaction is the best, indeed, the only, viable means to save and carry forward GM's business in a new enterprise ("New GM") that will maximize and realize the going concern value of the Company's assets. The MPA is the product of intense negotiations among the Debtors, the U.S. Government, the Debtors' largest secured creditor, and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") (on behalf of current and retired employees) -- each of which recognizes the need to maximize the value of the Debtors' operating assets and provide for the continuation of the business. Each of the U.S. Government and the UAW has made significant concessions to enable the sale and to support the viability of the Purchaser. The 363 Transaction: (i) accomplishes the goals of the Company; (ii) prevents the inevitable meltdown of the domestic automotive industry; and (iii) creates an enterprise that will be competitive and profitable. In addition, both the Government of Canada and the Government of Ontario, through Export Development Canada ("EDC"), Canada's export trading agency, have recognized the urgent

need to facilitate the 363 Transaction and have agreed to provide approximately $9 billion in financing to support the long-term viability of GM's North American operations. The 363 Transaction will alleviate consumers' concerns about residual value, replacement parts, warranty obligations, and maintenance of GM products that are critical to the preservation of the value of the assets. The task is a large one. GM is committed to getting it done, but it must be *expeditiously* accomplished.

17.     As part of the 363 Transaction, the Purchaser, and the UAW have reached a resolution addressing the ongoing provision of certain employee and retiree benefits. Under the "UAW Retiree Settlement Agreement," the Purchaser has agreed to provide, among other things: (i) shares of common stock of the Purchaser representing 17.5% of the Purchaser's total outstanding common stock, (ii) a note of the Purchaser in the principal amount of $2.5 billion, (iii) shares of cumulative perpetual preferred stock of the Purchaser in the amount of $6.5 billion, (iv) warrants to acquire 2.5% of the Purchaser's equity, and (v) the assets held in a voluntary employees' beneficiary association trust sponsored by the Sellers and to be transferred to the Purchaser as part of the 363 Transaction, in each case to a new voluntary employees' beneficiary association sponsored by an employees beneficiary association (the "New VEBA"), which will have the obligation to fund certain retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "UAW-Represented Retirees").

18.     In connection with the foregoing, the UAW has agreed to be the authorized representative for UAW-Represented Retirees for purposes of section 1114 of the Bankruptcy Code and will enter into the UAW Retiree Settlement Agreement effective upon the closing of the 363 Transaction. The class representatives on behalf of the class members, by and through class counsel in certain class actions previously filed against GM on behalf of UAW-

Represented Retirees regarding retiree health care benefits (the "Class Representatives") have acknowledged and confirmed the UAW Retiree Settlement Agreement. As part of the 363 Transaction, the Purchaser also will assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW (the "UAW CBA Assignment").

19.     These chapter 11 cases were initiated to preserve the going concern value of the Company's assets and provide for the sale of such assets to the Purchaser to be the anchor for a new era of American automotive innovation and growth. The 363 Transaction will enable New GM to become an engine of opportunity and prosperity for countless Americans. The prompt approval and execution of the 363 Transaction is consistent with President Obama's observation that use of the bankruptcy laws may be the "best chance to make sure that the cars of the future are built where they've always been built -- in Detroit and across the Midwest -- to make America's auto industry in the 21st century what it was in the 20th century -- unsurpassed around the world." Barack H. Obama, U.S. President, Remarks on the American Automotive Industry at 7 (Mar. 30, 2009) [hereinafter *Presidential Remarks*].

## II.

## The Businesses of General Motors

### A.      Overview of GM's Business Operations

20.     The Company is primarily engaged in the worldwide development, production and marketing of cars, trucks, and parts through four automotive segments: GM North America, GM Europe, GM Latin America/Africa/Mid-East, and GM Asia Pacific. For many years, GM supplied at least one in five vehicles sold in the U.S. It is the largest OEM in the U.S. and the second largest in the world. With global revenues of approximately $181.1

billion in 2007, GM ranked ninth on the 2008 Fortune Global 500 list.[2]  In addition, GM's

highly-skilled engineering and development personnel designed and manufactured some true

automotive icons, including the Corvette, the Camaro, the NorthStar engine, and even the first

lunar roving vehicle driven on the moon.  GM continues as a leading global technology

innovator.  Currently, it is setting the automotive industry standard for "green" manufacturing

methods and products, flexible fuels, and multimode hybrid systems.

21.     GM maintains its executive offices in Detroit, Michigan, and its major

financial and treasury operations in New York, New York.

22.     Substantially all of GM's worldwide car and truck deliveries (totaling 8.4

million vehicles in 2008) are marketed through independent retail dealers or distributors.  In

addition to the products sold to dealers for consumer retail sales, GM sells cars and trucks to fleet

customers, including rental car companies, commercial fleet companies, leasing companies, and

governmental units.

23.     As of March 31, 2009, GM employed approximately 235,000 employees

worldwide, of whom 163,000 (69%) were hourly employees and 72,000 (31%) were salaried

employees.  Approximately 62,000 (68%) of GM's total of approximately 91,000 U.S.

employees were represented by unions as of March 31, 2009.  The UAW represents the largest

portion of GM's U.S. unionized employees, totaling approximately 61,000 employees.

**B.      GM's Dealer Network**

24.     GM relies heavily on its relationships with dealers, as substantially all

retail sales are through its unique network of independent retail dealers and distributors.  As of

April 30, 2009, there were 6,099 GM vehicle dealers throughout the United States.  These

---

[2]      Global 500, Fortune, 2008, *available at* http://money.cnn.com/magazines/fortune/global500/2008/.

dealers maintain the primary sales and service interface with consumers of GM's products. As discussed below, the 363 Transaction will allow a substantial majority of the GM dealerships to continue operations while providing a significant "wind-down" period for terminated and discontinued dealers. Dealers represent the "face" of GM to its consumers -- not only selling new cars, but also providing service and parts for vehicle maintenance and a market for trade-ins of used vehicles in connection with new vehicle purchases. Continuation of quality dealers is an essential element of the 363 Transaction and of the preservation and viability of the Company's business.

### C.     GM's Suppliers

25.     As the nation's largest automobile manufacturer, GM uses the services of thousands of suppliers resulting in approximately $50 billion in annual supplier payments. In North America alone, GM uses a network of approximately 11,500 suppliers. In addition, there are over 600 suppliers whose sales to GM represent over 30% of their annual revenues. As such, it cannot be overstated that many automotive parts suppliers depend -- either in whole or in part -- on GM for survival.

26.     Of equal importance is the Company's reliance on its suppliers. Approximately 75 to 85% of every GM automobile consists of components made by companies other than GM. Any interruption of the flow of such components -- even a temporary one -- would be devastating to the Company. Consistent with industry practice, GM operates on a "just-in-time" inventory delivery system. Component parts from numerous suppliers typically are assembled onto vehicles within a few hours of the delivery of the parts and components to GM assembly facilities. Consequently, if even one supplier were to cease shipping production parts and components to GM, the GM plants relying on such shipments would be materially and

adversely affected and may be forced to shut down. Moreover, as explained below, there would be no way to obtain replacement parts within a reasonable time period.

27.     Specifically, most parts that a given supplier manufactures for GM are not readily available from alternate sources because of, among other things, (i) capacity constraints within the automotive parts supply industry (including the practice of "sole source suppliers" of many parts and components), (ii) the significant length of time (up to 36 months) it takes to validate safety and environmental regulatory compliance of a new supplier's parts, and (iii) the lead time required to develop and build tools for manufacture of particular parts. As an example, Delphi Corporation ("Delphi"), which is struggling as a debtor in possession in a chapter 11 case pending in this Court, currently provides over 60% of GM's North American steering columns -- almost three million per year. That volume simply cannot be replaced quickly as there is not currently enough excess capacity to accommodate GM's needs or time to validate the parts. The Delphi situation confirms the critical implications to the Debtors of a shutdown of a major supplier.

         D.      **GM Is at the Forefront in Technology and Environmental Advances**

28.     Energy diversity and fuel economy leadership are material elements of GM's overall business plan. The Company's historic success has been enhanced by its innovative approach to developing an alternative propulsion strategy. From developing plug-in hybrids, lithium-ion battery technology, and clean burning alternative diesel fuels to stability control and the OnStar in-vehicle safety, security, navigation, and communication system, GM has been, and continues to be, in the forefront of the technology revolution. It is one of the largest and most successful investors in automotive research and development in the United States. The Company has a variety of innovations on the path to commercialization that are directly relevant to national goals of energy efficiency, energy independence, and safety. GM is

a world leader in flex fuel technology, with more than 5 million biofuel capable vehicles on the road today.  It is working hard to develop next-generation biofuels, such as cellulosic ethanol and biodiesel, which can be sustainably produced.  GM has introduced a number of hybrid vehicles that meet a variety of consumer needs in terms of fuel efficiency and performance.  Indeed, GM offers twenty models which achieve thirty miles per gallon or more on the highway -- more than any other manufacturer.  In addition, GM is fully committed to improving vehicle fuel economy and lowering greenhouse gas emissions consistent with the new Corporate Average Fleet Economy standards announced by President Obama on May 19, 2009.

### E.    GM's Relationship with the UAW

29.    The Company has tried to reduce the costs of healthcare benefits for its employees, but these costs continue to substantially escalate.  The Company has used trusts qualified as voluntary employee beneficiary associations under section 501(c)(9) of the Internal Revenue Code of 1986, as amended, and sponsored by the Company or a union (each, a "VEBA"), as a funding vehicle to hold reserves to meet its future obligations to provide healthcare and life insurance benefits ("OPEB") under certain benefit plans to its salaried and hourly employees upon retirement.

30.    To restructure its retiree healthcare liability, in 2006 GM negotiated a settlement of a legal dispute regarding retiree medical benefits with the UAW and the Class Representatives  (the "2006 UAW Settlement Agreement"), under which the Company significantly  reduced its OPEB liabilities for healthcare benefits for existing UAW retirees but agreed to continue to provide benefits under an amended GM sponsored retiree health care benefit plan (the "2005 Benefit Plan").  Under the 2006 UAW Settlement Agreement, the Company also agreed to mitigate the cost to retirees of the 2005 Benefit Plan by funding  a new,

independent VEBA (the "2005 UAW VEBA") through three $1 billion contributions to be made by the Company into the 2005 UAW VEBA.

31.     In 2007, the Debtors entered into a memorandum of understanding with the UAW, which was superseded by a settlement agreement entered into in February 2008 between GM, the UAW and the Class Representatives (the "2008 UAW Settlement Agreement"), which provided that responsibility for providing retiree healthcare would permanently shift from GM to a new plan that was independent of GM, established and maintained by an employees beneficiary association (the "New Plan") and funded by a VEBA trust established by the 2008 Settlement Agreement (the "VEBA Trust").  Under the 2008 UAW Settlement, the Company will transfer, as of January 1, 2010, its liabilities for healthcare benefits for existing and certain future UAW retirees to the New Plan in exchange for specified contributions aggregating approximately $20.56 billion[3] to be made by the Company into the VEBA Trust (the "2008 UAW VEBA Contribution").  The 2008 UAW Settlement Agreement, therefore, fixed and capped the Company's obligations.  Under the 2008 UAW Settlement Agreement, the Company is not responsible for, and does not guarantee, (i) the payment of future benefits to plan participants, (ii) the asset returns of the funds in the VEBA Trust, or (iii) the sufficiency of assets in the VEBA Trust to fully pay the obligations of the New Plan.  If the assets of the VEBA Trust are not sufficient to fully fund the obligations of the New Plan, the New Plan will be required to reduce benefits to plan participants.

32.     As described below, in the context of the 363 Transaction, New GM will make contributions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits.

---

[3]  This liability is estimated as the net present value at a 9% discount rate of future contributions, as of January 1, 2009, and excludes approximately $9.4 billion corresponding to the GM Internal VEBA.

F.    **Financing Services and GMAC**

33.    GMAC LLC ("<u>GMAC</u>") is a global financial company that provides a range of financial services, including consumer vehicle financing to the Company's customers and automotive dealerships and other commercial financing to the Company's dealers. Historically, GMAC has served as an important source of financing for the Company, its dealers and customers.  Related thereto, GM and GMAC are parties to dozens of agreements that govern their longstanding financing and operating relationship.  Recently, GMAC accomplished several actions to improve its capital position and access to liquidity, including additional capital investments by the U.S. Treasury.  Based on the current economic downturn, crisis in the credit markets and the critical role GMAC plays in GM's vehicle financing activities, the Debtors have an urgent and immediate need to continue their financing and operating agreements and arrangements with GMAC.  No alternative source of wholesale dealer financing or retail financing is available to the Debtors to replace, at the levels required, the critical and necessary financing provided by GMAC.

### III.

### Events Leading to the Commencement
### Of These Chapter 11 Cases and the 363 Transaction

A.    **GM's Revenues Erode as Its Market Share Declines**

34.    Historically, GM has been one of the best performing OEMs in the U.S. market.  However, as a result of the development and expansion of strong global competitors with disparate and, often, significantly lower operating and legacy (including retiree) cost structures, the Company's leadership position in the U.S. began to decline.  While foreign OEMs enjoyed, among other advantages, lower wages and far lower annual healthcare and benefit costs, the Company's obligation to support pension benefits and provide healthcare and life insurance

benefits (OPEB) for its former employees increased exponentially, even as its revenues eroded because of a drop in market share and the downturn in the national and global economy.

35.     In the wake of this increasing competitive pressure, for approximately the past five years, GM has been engaged in an effort to realign its business operations and practices to: (i) improve the consumer appeal, quality, safety, and fuel efficiency of its cars and trucks; (ii) achieve cost competitiveness and advantages in labor, manufacturing, product development, procurement, and staff functions; and (iii) address GM's huge legacy cost burden (which has cost GM $103 billion in value over the last fifteen years). For example, beginning in 2005, GM initiated and accomplished, among other things, a reduction of its North American annual structural costs by approximately $9 billion, a considerable reduction of its North American capacity and its hourly and salaried workforce, and a modification of its collective bargaining agreements with various labor unions, significantly reducing its OPEB obligations.

### B.     Several Strategic Initiatives and Alliances Were Explored

36.     At the same time it was realigning its business and operating costs, GM also was exploring strategic third-party alliances and transactions to reduce its cost structure and broaden its product base and geographic reach. For the reasons discussed above, these efforts were brought into even sharper focus in recent years -- beginning with GM's consideration during the summer of 2006 of a partnership with Renault-Nissan. However, the parties were unable to reach agreement on acceptable terms.

37.     In the spring of 2007, GM entered into high-level discussions with DaimlerChrysler AG ("Daimler") regarding the potential acquisition of Chrysler. GM viewed Chrysler, much like Renault-Nissan, as having the potential to create significant synergies, the present value of which was estimated to be significantly greater than the equity value of either of the parties at the time, as well as an opportunity to reduce costs. A transaction with Chrysler was

also viewed as a potential catalyst for obtaining significant incremental financing from GM and Chrysler's existing lenders, several of which were common to both companies.  GM ultimately concluded, however, that a GM/Chrysler combination would only exacerbate GM's exposure to a dwindling U.S. automotive market with mounting costs and supplier concerns and, accordingly, the discussions were terminated.

38.     GM nevertheless revisited a potential acquisition of Chrysler beginning in August 2008.  Soon thereafter, however, as discussed below, the financial markets and operating conditions for GM and Chrysler sharply and rapidly deteriorated.  By early November 2008, it became clear to GM that Chrysler's lenders would not be willing to provide incremental liquidity to a merged company.  As a result, in early November, the parties suspended discussions.

39.     Other recent efforts -- including discussions regarding potential equity investments (both local and global in scope) by various foreign entities and sovereign wealth funds -- also failed to materialize because of, among other things, the Company's uncertain financial condition and prospects.  These same concerns also have hindered the Company's ability to (i) obtain additional Energy Independence and Security Act (EISA) loan funding (in the amount of approximately $7.7 billion), as the United States Department of Energy has deferred decision on the Company's application until the U.S. Treasury accepts the Company's plan for long-term viability, and (ii) sell discrete assets that otherwise would have had substantial value under normal market conditions, such as interdependent assets like ACDelco, that are simply not viable without the Company's support, including as a high volume customer.

C.     **The Worldwide Financial Crisis Propels GM into a Liquidity Crisis**

*The Dramatic Increase in Fuel Prices*

40.     Notwithstanding significant progress in cost reduction and increased efficiency, competitive pressure on GM was exacerbated by (i) substantial increases in the price

of crude oil to nearly $150 per barrel during 2008, which precipitated a sharp downturn in driving and sales in the large vehicle segments in which GM was dominant and most profitable and (ii) a sharp decline in the global economy, including substantial increases in unemployment and a freeze-up of consumer and business lending. The resulting drop in new vehicle sales led to a steep erosion in GM revenues and, in turn, significant operating losses. As a result, between the beginning of May and the middle of June of 2008, GM's common stock price declined from over $23 per share to under $15 per share and its long-term bonds traded down from the mid-70s to the high 60s.

### *Instability in the Financial Markets*

41.     Even as fuel prices stabilized and moderated to some degree during the fall of 2008, the Company faced sharply deteriorating economic conditions during the second half of 2008 and the first quarter of 2009, which can only be characterized as the worst economic downturn and credit market environment since the Great Depression. Significant failures occurred in America's financial sector -- including the forced sale or liquidation of two of America's five largest investment banks, the crippling of the nation's largest insurance company, the conservatorships of both Freddie Mac and Fannie Mae, and the financial distress of two of the nation's ten largest banks. The financial market crisis not only affected large institutions, but also affected consumers, as both income and financing for buyers and lessees of automobiles evaporated.

42.     As the economy continued to deteriorate, GM explored programs to conserve and raise cash through various capital markets actions. For example, correctly anticipating a liquidity crunch, in the Summer of 2008, the Company explored raising as much as $3 billion through a public offering of common and mandatory convertible preferred stock.

Given the rapidly and severely contracting markets, however, the prospects for an equity offering faded by June 2008. As it became increasingly clear that an equity offering or any unsecured debt offering was not feasible because of market conditions, the Company's Treasury Office began working with outside financial advisors on a variety of alternative strategies, including a liquidity preservation plan and the possible issuance of secured debt.

43. GM's financial advisors indicated that the market capacity for such a financing as of July 2008 was approximately $2 to $4 billion. GM's ability to raise additional secured borrowing, however, was constrained by its existing secured facilities and restrictive provisions in its various bond indentures. The Company nevertheless attempted to pursue the proposed secured financing until early September 2008.

44. On September 15, 2008, Lehman commenced a chapter 11 case. In the weeks that followed, it became clear that there were no prospects for the Company to launch any debt offering, even on a secured basis.

45. Throughout the summer of 2008, even as it was engaged in a concerted effort to raise capital and cut costs, GM also explored the sales of a variety of core and non-core assets. As of June 27, 2008, the Company had received indications that OnStar might realize approximately $2 to $4 billion; HUMMER might realize $ 500 million or more; ACDelco might realize approximately $1 to $2 billion; and GM Strasbourg might realize approximately $200 to $300 million. The Company also believed that it might be able to sell or securitize certain of its real estate assets to generate proceeds of approximately $1.2 to $1.4 billion. None of the foregoing was able to be consummated on reasonable terms given the contracting credit markets, the continuing recession, and concerns about GM.

46.     Thus, the combination of the sharp run-up of gasoline prices with its direct impact on the Company's most profitable vehicle segments, rapid declines in the housing/mortgage/credit sectors, the freeze-up of equity and debt capital markets, and the lowest levels of consumer confidence in nearly thirty years, had an unprecedented effect on the automotive industry generally and GM in particular.  As the economic crisis intensified, new vehicle sales fell to their lowest per-capita levels in half a century (including, by way of example, a decline in just the last year alone of approximately one million global vehicle sales), putting automakers under enormous financial stress.  By late September 2008, based on operating results through the end of August 2008, GM was projecting that its Automotive Adjusted EBT for 2008 would fall to negative $10.1 billion.  Conditions only worsened after that, with new vehicle sales in the United States during October 2008 totaling just 861,000 units, a SAAR of 10.9 million units, which was the lowest level for the period since 1982.

47.     Under these extraordinary conditions, the Company's liquidity rapidly eroded to a level below what was necessary to operate the business.  Consequently, GM had no choice but to reach out to the U.S. Government for financial assistance.

**D.      GM Seeks Financial Assistance from the U.S. Government**

48.     President Barack Obama has described the domestic automotive industry as a basic component of the national industrial complex and economy.  The automotive industry employs one in ten domestic workers and directly provides and supports more than 4.7 million jobs.  It is one of the largest purchasers of domestically manufactured steel, aluminum, iron, copper, plastics, rubber, and electronic and computer chips.  Almost 4% of the U.S. gross domestic product, and almost 10% of U.S. industrial production by value, is related to the automotive industry.  In addition, currently, GM is one of the largest private providers of healthcare in this country.  The survival and future success of the Company is, therefore,

essential not only for the immediate stakeholders and constituents of GM, but also for the well-being of the economy and the public interest. Indeed, the U.S. Government views the survival of the Company as necessary to avoid a far broader systemic failure that would severely disadvantage the nation and the millions of people who are employed in or dependent on the automotive sector.

### *Viability Plan I*

49. In November 2008, it had become increasingly clear that the Company would only be able to obtain sufficient funds and liquidity to avoid near-term bankruptcy through a loan from the U.S. Government. The Company's existing debt load was likely to be unsustainable and would need to be restructured to permit long-term viability. Accordingly, with the credit markets frozen and consumer confidence at an all time low, on or about November 12, 2008, GM was compelled to seek financial assistance from the U.S. Treasury.

50. On November 21, 2008, the Speaker of the House of Representatives, Nancy Pelosi, and the Senate Majority Leader, Harry Reid, released a letter to the chief executive officers of GM, Chrysler, and Ford outlining a framework for the domestic OEMs to request government loans, including submission of additional information for future economic viability.

51. In response to this letter, on December 2, 2008, GM submitted to the Senate Banking Committee and the House of Representatives Financial Services Committee a proposed viability plan ("Viability Plan I"). Under Viability Plan I, the Company committed to using the proposed government funding exclusively to sustain and restructure its operations in the United States and aggressively retool its product mix. Key elements of Viability Plan I included:

- a dramatic shift in the company's U.S. vehicle offering portfolio, with 22 of 24 new vehicle launches in 2009-2012 consisting of more fuel-efficient cars and crossovers;

- full compliance with the 2007 Energy Independence and Security Act, and extensive investment in a wide array of advanced propulsion technologies;

- reduction in brands, nameplates, and retail outlets to focus available resources and growth strategies on the Company's profitable operations;

- full labor cost competitiveness with foreign manufacturers in the United States by no later than 2012; and

- further manufacturing and structural cost reductions through increased productivity and employment reductions; and balance sheet restructuring and enhanced liquidity via temporary federal assistance.

52.     In addition, Viability Plan I requested an immediate loan of $4 billion from the U.S. Government to insure minimum liquidity through the end of 2008, a second $4 billion draw in January 2009, a third draw of $2 billion in February 2009, and a fourth draw, also of $2 billion, at an unstated date in 2009, for a total government term loan of $12 billion.  In addition, GM sought access to an incremental $6 billion line of credit, for a total of $18 billion in projected government loans.

53.     Notwithstanding the critical need for emergency funding by domestic OEMs, Congress did not act, and GM was compelled to seek immediate financial support from the U.S. Treasury or confront the suspension of operations.

### *The U.S. Treasury Facility*

54.     On December 19, 2008, former President George W. Bush announced that the outgoing administration would make short-term, emergency funding available to GM and Chrysler under the Troubled Asset Relief Program ("TARP") to prevent both companies from commencing immediate bankruptcy cases.  GM immediately intensified negotiations with the U.S. Treasury regarding the terms of a government loan, and, on December 31, 2008, GM and

the U.S. Treasury entered into an agreement (the "U.S. Treasury Loan Agreement") that provided GM with emergency financing of up to an initial $13.4 billion pursuant to a secured term loan facility (the "U.S. Treasury Facility"). GM borrowed $4.0 billion under the U.S. Treasury Facility on December 31, 2008 and an additional $5.4 billion on January 21, 2009. The remaining $4.0 billion was borrowed on February 17, 2009. The loan bears an interest rate per annum equal to the three-month LIBOR rate (which shall be no less than 2.0%) plus 3.0%.

55.     A number of the Company's domestic subsidiaries jointly and severally guaranteed GM's obligations under the U.S. Treasury Facility pursuant to a guarantee and security agreement entered into concurrently with the U.S. Treasury Facility. The U.S. Treasury Facility is secured by a first priority lien on and security interest in substantially all the unencumbered assets of GM and the guarantors, as well as a junior lien on encumbered assets, subject to certain exceptions. The U.S. Treasury Facility is also secured by a pledge of the equity interests held by GM and the guarantors in certain foreign subsidiaries, also subject to certain exceptions.

56.     As part of the compensation for the loans provided under the U.S. Treasury Loan Agreement, GM issued to the U.S. Treasury (i) a warrant to purchase up to 122,035,597 shares of GM common stock (subject to adjustment); and (ii) a related promissory note in a principal amount of approximately $749 million, due on December 30, 2011, and bearing interest, payable quarterly, at a rate per annum equal to the three-month LIBOR rate (which shall be no less than 2.0%) plus 3.0% (together with other similar notes, the "Warrant Notes").

57.     The U.S. Treasury Loan Agreement required, among other things, that GM (i) reduce its approximately $27 billion outstanding unsecured public debt by no less than

two-thirds; (ii) reduce its total compensation to U.S. employees so that by no later than

December 31, 2009, such compensation is competitive with Nissan, Toyota, or Honda in the

United States; (iii) eliminate compensation or benefits to employees who have been discharged,

furloughed, or idled, other than customary severance pay; (iv) apply, by December 31, 2009,

work rules for U.S. employees in a manner that is competitive with the work rules for employees

of Nissan, Toyota, or Honda in the United States; and ==(v) convert at least one-half of the value of==

==the required $20 billion UAW VEBA Contribution to common stock rather than a cash payment.==

58.     The U.S. Treasury Loan Agreement provided that, if, by March 31, 2009

(the "Certification Deadline"), the President's designee had not issued a certification that GM

had taken all steps necessary to achieve and sustain GM's long-term viability, international

competitiveness, and energy efficiency in accordance with its viability plan, then the loans and

other obligations under the U.S. Treasury Loan Agreement would become due and payable on

the 30th day after the Certification Deadline.

### E.    The U.S. Treasury Conditions Any Future Financing On GM's Demonstrating Viability (Viability Plan II)

59.     The U.S. Treasury Facility required that the Company develop a proposal

to transform its business and demonstrate future viability.  However, subsequent to December 2,

2008, when GM submitted Viability Plan I, economic conditions continued to worsen globally.

This development, combined with public speculation about GM's future and survival, further

reduced the Company's sales volume, revenue, and cash flow.

60.     On February 17, 2009, GM submitted to the automobile industry task

force appointed by President Obama (the "Presidential Task Force")[4] its business plan to achieve

---

[4]  The members of the Presidential Task Force are:  the Secretary of the U.S. Department of the Treasury, Timothy
F. Geithner; the Director of the National Economic Council, Lawrence H. Summers; the secretaries of
Transportation, Commerce, Labor, and Energy; the Chair of the President's Council of Economic Advisers; the

and sustain GM's long-term viability, international competitiveness, and energy efficiency, including a description of specific actions intended to result in (i) the repayment of the loans provided by the U.S. Treasury; (ii) compliance with federal fuel efficiency and emissions requirements and the commencement of domestic manufacturing of advanced technology vehicles; (iii) the achievement of a positive net present value as determined in plan; (iv) rationalization of costs, capitalization, and capacity with respect to GM's manufacturing workforce, suppliers, and dealerships; and (v) a product mix and cost structure that is competitive in the U.S. marketplace ("Viability Plan II").   The revised viability plan comprehensively addressed, among other things, GM's revenues, costs, and balance sheet for its U.S. and foreign operations, as well as GM's plan to reduce petroleum dependency and greenhouse gas emissions.

61.     Specifically, Viability Plan II proposed to transform the Company's business in the United States by (i) concentrating on GM's strongest brands (Chevrolet, Cadillac, Buick, and GMC), phasing out most of the other brands (e.g., HUMMER, Saab,[5] and Saturn by 2011), and transforming Pontiac into a niche brand; (ii) transforming the retail distribution channel to achieve a stronger, more effective dealer network while preserving GM's historical strength in rural areas; and (iii) continuing to take advantage of highly efficient manufacturing and product development operations.  Viability Plan II also proposed to accelerate GM's transformation or restructuring of its Canadian, European, and certain Asian-Pacific operations.[6]

---

Director of the Office of Management and Budget; the Environmental Protection Agency Administrator; and the Director of the White House Office of Energy and Climate Change.  The Presidential Task Force advisors include Ron Bloom, Senior Advisor to the U.S. Treasury; and Steven L. Rattner, Counselor to the U.S. Treasury.

[5] Soon after Viability Plan II was submitted to the U.S. Treasury and Presidential Task Force, Saab filed for reorganization in Sweden.

[6] At the same time it submitted Viability Plan II, GM was also engaged in discussions with the German and Swedish governments for funding support for the Opel and Saab brands, respectively.

F. **The Rejection of Viability Plan II**
   **And the Extension of the Certification Date to June 1, 2009**

62. On March 30, 2009, President Obama announced that Viability Plan II was not satisfactory and did not justify a substantial new investment of taxpayer dollars. The President outlined a series of actions that GM needed to take to receive additional federal assistance, including reaching an agreement with the UAW, the Company's bondholders and the VEBA Trust regarding debt reduction, and the submission of a revised business plan that was more aggressive in terms of scope and timing.

63. The President indicated that the U.S. Treasury would extend to the Company adequate working capital for a period of another sixty days to enable it to continue operations and, as the Company's largest secured creditor, would negotiate with the Company to develop and implement a more aggressive and comprehensive viability plan that would include a "credible model for how not only to survive, but to succeed in this competitive global market." *Presidential Remarks* at 4. The President also stated that the Company needed a "fresh start to implement the restructuring plan," which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." *Id.* at 5. President Obama explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors . . . to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.
>
> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.*

*Id.* at 5-6 (emphasis added).

64.     Also on March 30, 2009, the U.S. Government set a deadline of June 1, 2009 for the Company to demonstrate that its viability plan would fundamentally transform the Company's operations into a profitable and competitive American car company.  Thereafter, the Company immediately began a deeper, more surgical analysis of its businesses and operations in an effort to develop a viability plan that would accommodate the needs of its secured creditors and other stakeholders by quickly achieving (i) sustainable profitability, (ii) a healthy balance sheet, (iii) a more aggressive operational restructuring, and (d) technology leadership.  GM also began to negotiate additional modifications to the terms of the VEBA Trust, and conducted extensive discussions with the U.S. Treasury regarding a potential restructuring of the debt obligations owed under the U.S. Treasury Loan Agreement.

65.     On April 22, 2009, the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $2 billion to $15.4 billion.  GM borrowed the additional $2 billion of secured working capital loans on April 24, 2009.

66.     As part of the Company's efforts to rationalize its business, on April 24, 2009, the Company announced that it would temporarily shut down certain production facilities starting in May 2009 -- not for the usual two-week mid-year period, and instead, for a period not to exceed eleven weeks (the "Temporary Shutdown").  The Temporary Shutdown enables a balancing of inventories at dealers and reduces cash erosion (albeit not in the very near term, as supplier payments must still be made in accordance with the Company's typical payment terms, but without offsetting revenue from new car production).  The Temporary Shutdown is not a long-term solution, as it threatens GM's position in the market and the viability of its suppliers and dealers.  As of the Commencement Date, certain of the Company's assembly facilities remain operating, while other assembly facilities continue to be shut down.  A number of the

assembly facilities that remain shut down are expected to resume operations by July 13, 2009 if the 363 Transaction is approved.

### G. GM's First Quarter 2009 Results

67.    On May 8, 2009, GM announced its first quarter 2009 results.  GM's total net revenue decreased by $20 billion (or 47.1%) in the first three months of 2009 as compared to the corresponding period in 2008.  Operating losses increased by $5.1 billion from the prior quarter.  More importantly, during this same period, GM had negative cash usage of $9.4 billion and available liquidity deteriorated by $2.6 billion due, in large part, to lower sales volumes. Sales by our dealers in the United States fell to approximately 413,000 vehicles in the three months ended March 31, 2009, a decline of approximately 49% compared to the corresponding period in 2008.

68.    On May 20, 2009 the U.S. Treasury Loan Agreement was amended to increase the U.S. Treasury Facility by $4 billion.  GM borrowed additional $4 billion of secured working capital loans on May 22, 2009.  In consideration of such additional extensions of credit under the U.S. Treasury Facility, GM issued the requisite secured promissory notes for the amounts borrowed in accordance with TARP legislation.

69.    On March 30, 2009, the U.S. Government announced that it would establish a warranty program pursuant to which a separate account would be created and funded with cash contributed by GM and a loan from the U.S. Treasury to ensure the payment for repairs covered by our limited warranty obligations.  On May 27, 2009 the U.S. Treasury Loan Agreement was further amended to increase the U.S. Treasury Facility by $360,624,198 and on May 29, 2009 GM borrowed that amount (the "Warranty Program Advance") and funded the separate account with those funds. GM's obligations under the Warranty Program Advance are only guaranteed by, and secured by the assets of, the subsidiary of GM that was formed to own

the separate account. The loan under the Warranty Program Advance bears an interest rate per annum equal to the three-month LIBOR rate plus 3.5%.

70.     In consideration of the Warranty Program Advance, GM issued an additional promissory note in an aggregate principal amount of approximately $24.1 million to the U.S. Treasury.  The note is due on December 30, 2011, and bears interest, payable quarterly, at a rate per annum equal to the three-month LIBOR rate plus 3.0%.

**H.     GM's Bond Exchange Offer Fails**

71.     At the same time the Company was preparing Viability Plan II for submission to the U.S. Government, it was also preparing for the launch of an out-of-court bond exchange offer.  On April 27, 2009, as part of the continued effort to achieve long-term viability and avoid bankruptcy, GM launched a public exchange offer for the approximately $27 billion of its unsecured bonds (the "Exchange Offer").  The Company viewed the Exchange Offer as a means to continue operations and avoid the precipitous decline in revenues that would result from a prolonged bankruptcy case.  At the time the Exchange Offer was announced, the Company also disclosed that, if it did not receive enough tenders to consummate the Exchange Offer, GM would expect to commence a bankruptcy case to preserve the going concern value of its business.

72.     The terms of the Exchange Offer were the subject of extensive negotiations between the Company and the U.S. Treasury, as consummation of the Exchange Offer required the satisfaction or waiver of several conditions imposed by the U.S. Treasury as the largest secured creditor and potential contributor to the Company's deleveraging.  Among such conditions, the results of the Exchange Offer had to be acceptable to the U.S. Treasury, including the overall level of participation by bondholders in the Exchange Offer and the level of participation by holders of the Company's Series D notes due June 1, 2009 ("Series D Notes").

When the Exchange Offer was launched, GM understood that at least 90% of the aggregate principal amount of the outstanding bonds, including at least 90% of the aggregate principal amount of the outstanding Series D Notes, were required to be tendered in the Exchange Offer in order to achieve a sufficient level of debt reduction to meet the viability requirement. Consummation of the Exchange Offer was also conditioned on, among other things, the conversion to equity of (i) at least 50% of GM's outstanding U.S. Treasury debt at June 1, 2009 (approximately $10 billion) and (ii) at least 50% (or approximately $10 billion) of GM's future financial obligations to the New VEBA, for a total projected additional debt reduction of approximately $20 billion.

73.     The Exchange Offer expired on May 26, 2009 without achieving the threshold of required tendered acceptances.

## I.     The 363 Transaction and the MPA

74.     In connection with providing financing, the U.S. Treasury advised the Company that, if an out-of-court restructuring was not possible, the Company should consider pursuing the bankruptcy process to implement a transaction under which substantially all the assets of the Company would be purchased by a U.S. Treasury-sponsored purchaser (subject to any higher or better offer) in an expedited process under section 363 of the Bankruptcy Code. Under this scenario, the Purchaser would acquire the purchased assets, create a New GM, and operate New GM free of any entanglement with the bankruptcy cases, and thereby preserve the going concern value, avoid systemic failure, provide employment, protect the many communities dependent upon the continuation of the business, and restore consumer confidence.

75.     To facilitate this process, the U.S. Treasury agreed that it would provide DIP financing for the Company through the chapter 11 process -- but *only* if the sale of the purchased assets occurred on an *expedited* basis.  Notably, both the Government of Canada and

the Government of Ontario, through the EDC, have agreed to participate in the DIP financing to assure the long-term viability of GM's North American enterprise, to (i) preserve value of the business and restore consumer confidence, and mitigate the devastating damage that GM itself, and the industry, would suffer if GM's major business operations were to remain in bankruptcy; and (ii) avoid the enormous costs of financing a lengthy chapter 11 case. The extent of the Canadian participation will be approximately $9.1 billion. The U.S. Treasury also agreed that it would provide New GM with adequate post-acquisition financing that would further GM's long-term viability. A fundamental premise of the U.S. Treasury program is to revive consumer confidence in GM products and services for the benefit of the Company's employees, its extended supplier and dealer network, and the families and communities that depend on GM operations. In the end, a New GM will emerge that will be viable, competitive, reliable, and a standard bearer for a basic U.S. industry. Importantly, the DIP financing to be furnished by the U.S. Treasury is the only financing that is available to the Company. The U.S. Treasury is the *only* entity that is willing to extend DIP financing to the Company. Other efforts to obtain such financing were unsuccessful. Absent adequate DIP financing, the Company will have no choice but to liquidate.[7]

76.     The purchase and transfer of the Purchased Assets under the MPA is a material element of the U.S. Treasury program to revitalize the domestic automotive industry and is the product of intense negotiations between the Debtors and their key stakeholders, including the U.S. Treasury and the UAW. The 363 Transaction, as embodied in the MPA,

---

[7] The terms and conditions of the DIP financing are set forth in the Debtors' Motion for For Entry Of An Order Pursuant To 11 U.S.C. §§ 361, 362, 363, and 364 (A) Authorizing The Debtors To (I) Obtain Postpetition Financing, Including On An Immediate, Interim Basis Pursuant To Bankruptcy Rule 6003; (II) Grant Adequate Protection To The DIP Lenders; (III) Utilize Cash Collateral Of The U.S. Treasury; (IV) Use Estate Property To Repay Certain Secured Obligations In Full Within 45 Days Of The Commencement Date, And (V) Provide Adequate Protection To The U.S. Treasury, And (B) Scheduling a Final Hearing Pursuant To Bankruptcy Rule 4001, filed contemporaneously herewith and incorporated herein as if fully set forth herein.

contemplates that substantially all of GM's core operating assets -- assets that are essential for

New GM to be a profitable and competitive operating entity (including the capital stock of the

majority of its subsidiaries) -- will be sold and transferred to the Purchaser, which can

immediately begin operations. Knowing that the Company's business will exist and be

supported in the form of New GM, consumers can have confidence that if they buy a GM car,

there will be a dealer network and U.S. Government support to assure parts, warranty service,

and a market for future used GM vehicle trade-ins. Indeed, a viable company will help preserve

and support jobs and benefits, not only for the Company's employees, but also for GM's supplier

and dealer employees, all of which will help support the market for GM vehicles.

77.    The purchase price for the Purchased Assets is equal to the sum of:

- a section 363(k) credit bid in an amount equal to the amount of indebtedness owed to the Purchaser as of the closing pursuant to the UST Credit Facilities (as defined in the MPA) and the DIP Facility, less approximately $7.7 billion of indebtedness under the DIP Facility (estimated to be $48.7 billion at July 31, 2009);

- the warrant previously issued by GM to the U.S. Treasury;

- the issuance by the Purchaser to the Debtors of 10% of the common stock of the Purchaser as of the closing;

- Warrants to purchase up to 15% of the shares of common stock of the Purchaser, with the initial exercise prices for equal amounts of the warrants based on $15 billion and $30 billion equity values of the Purchaser. The warrants will be exercisable through the seventh and tenth anniversaries of issuance, respectively, and GM can elect partial and cashless exercises; and

- the assumption by the Purchaser of the Assumed Liabilities.

In addition, in the event the Bankruptcy Court determines that the estimated amount of allowed prepetition general unsecured claims against the Debtors exceeds $35 billion, then the Purchaser will issue an additional 2% of the outstanding common stock of Purchaser as of the closing.

78.    In negotiating the 363 Transaction, GM implemented a bottoms-up, "clean

sheet" approach to determine the assets to be sold to New GM and the obligations that had to be

assumed as necessary to maximize the value and viability of New GM for the benefit of its economic stakeholders. For example, it is imperative to the success of New GM that consumers have confidence in its products. As such, liabilities such as warranties, customer incentive contracts, and necessary supplier contracts are being assumed by New GM as part of the 363 Transaction.

79. Any payments that are made to the Debtors' creditors in connection with the 363 Transaction (other than payments of Cure Amounts in connection with the assumption and assignment of Purchased Contracts) will be voluntarily made by New GM.

80. The assets excluded from the sale -- as well as the proceeds of the sale, such as 10% of the equity interests in New GM -- will be administered in the chapter 11 cases to support the liquidation of assets, wind-down, or other disposition of the Debtors' chapter 11 cases. After the closing, the Purchaser or one or more of its subsidiaries will provide the Debtors and any retained subsidiaries with transition services as described in the MPA to help liquidate and wind down or otherwise dispose of the assets that are not sold to the Purchaser.

81. Finally, as part of the 363 Transaction, and as described below, the Purchaser will make contributions to the New VEBA that will provide retiree health and welfare benefits to former UAW employees and their spouses. Also, as part of the 363 Transaction, the Purchaser will be the assignee of revised collective bargaining agreements with the UAW, the terms of which were recently ratified.

**J.    Expedited Approval of the 363 Transaction Is Essential**

82. The need for speed in approving and consummating the 363 Transaction is critical for several reasons. Most obvious -- the U.S. Treasury has made very clear that it will sponsor New GM as the purchaser and fund the chapter 11 cases only if the 363 Transaction is approved by July 10, 2009. As explained below, the assets that will be sold -- that is, not merely

the physical assets, but the value of and consumer confidence in the GM brand and its products and support systems (including parts, warranty service, and a market for used vehicles) -- are fragile and will be subject to significant value erosion unless they are expeditiously transferred to New GM and its operations start free from the stigma of bankruptcy. Any delay will result in irretrievable revenue perishability and loss of market share to the detriment of all economic interests. It will exacerbate and entrench consumer resistance to General Motors' products. *There is no other alternative.* No other DIP financing source. No other buyer for the business.

### *Consumers*

83. New GM needs to sell cars and trucks. Consumers must have confidence that, in buying a GM car or truck, they will receive not only value and reliability, but also warranty protection and future parts and servicing through an integrated dealer system. The purchase or lease of a new car or truck represents the second largest expenditure (after a home purchase) of a typical American household. Buying a car is a major, and often discretionary, economic and emotional event for a customer -- but once a consumer buys a vehicle and is satisfied, including if it involves a change in brand, the consumer's brand loyalty shifts as well, and can be expected to continue for years or even decades. The significance of consumer perception cannot be overstated, particularly in light of the crisis of confidence that has permeated the economy, and with particular impact on GM and Chrysler, since September 2008. Uncertainty about the future success of New GM, therefore, must be dissipated quickly. But it will be aggravated, not dissipated, if GM's business and future must continue in the limbo of a prolonged chapter 11.

84. The risks to GM of a prolonged chapter 11 process are patent. Information compiled by, or at the direction of, the Company confirms that the mere threat of a

bankruptcy filing has depressed GM's sales and that, in an extended period of a bankruptcy case, the sales reductions and customer defections can be expected to be even more significant. Indeed, in the days and months following the announcement of the U.S. Treasury Loan Agreement, GM immediately began to suffer a sharp reduction in market share.

85.     In short, restoring and maintaining consumer confidence in both the Company and its products is a necessary catalyst to viability and success.  Absent prompt approval of the 363 Transaction, resistance to the Company's products may ultimately prove fatal to the U.S. automotive industry.

*The Supply Chain*

86.     An expeditious approval of the 363 Transaction, including the assumption of supplier contracts and subsequent assignment to New GM (and the satisfaction of payables owed to such suppliers, either as cure payments or by voluntary satisfaction provided by New GM, in its business judgment) is also necessary to address the tenuous financial condition of, and maintain the availability of product from, the Company's suppliers.  As discussed below, the deepening economic crisis has affected not only GM, but also the thousands of direct and indirect suppliers and vendors that provide components, products, and material to the Company. In light of the credit crisis and the rapid decline in automobile sales, many of the Company's suppliers are unable to access credit and are facing growing and serious uncertainty about the prospects for their businesses.  This, in turn, threatens the employment and income of hundreds of thousands of employees of such vendors.  According to the Center for Automotive Research, should one or more of the Detroit Three fail in 2009, the U.S. economy would lose nearly 2.5

million jobs -- comprised of nearly 240,000 jobs at the Detroit Three, nearly 800,000

indirect/supplier jobs, and over 1.4 million spin-off or expenditure-induced jobs.[8]

      87.    Automotive parts suppliers generally operate on very narrow margins, and

any imbalance between revenues and expenses can be detrimental -- and potentially fatal -- to the

suppliers' liquidity and ability to secure capital, including maintaining credit lines. As such,

prompt approval of the 363 Transaction is critical to restore purchases and payments, and to

maintain the flow of parts and components. Any involuntary stop in such production will have a

devastating consequence on GM's significant suppliers' -- and in turn, GM's -- economic

viability.

      88.    In this regard, it is crucial to recognize that under standard payment terms,

GM's suppliers are not paid immediately upon the Company's receipt of their products or

services. Instead, suppliers generally are paid on the second business day of the second month

following receipt of goods or services, which means that suppliers are typically paid

approximately 45 days after GM's receipt of goods or services. If GM were to cease operations

for an extended period and then New GM sought to start operations, the suppliers would need to

manufacture parts without having received payments for prior deliveries and without receiving

revenue for the first 45 days of new production. Thus, suppliers would need to purchase

materials, pay operating costs, and provide employee wages without the stable revenue flow

typically relied upon to cover these expenses. Many suppliers may be forced out of business,

thereby threatening the viability of New GM, as well as an already fragile automotive industry.

---

[8] David Cole, Sean McAlinden, Kristin Dziczek & Debra Maranger, Center for Automotive Research, *The Impact on the U.S. Economy of a Major Contraction of the Detroit Three Automakers*, Nov. 4, 2008, *available at* http://www.cargroup.org/documents/FINALDetroitThreeContractionImpact_3__002.pdf.

89.     Heightening the threat to these parts suppliers' viability is the almost
nonexistent credit market.  Temporary financial relief through additional financing simply is not
a realistic option for many parts suppliers.  Rather, suppliers lacking liquidity increasingly are
being downgraded by ratings agencies to below-grade investment ratings.  For some suppliers,
the downgrade triggers a breach in loan covenants, thereby allowing lenders to almost
immediately terminate the suppliers' revolving credit facility.  Termination of a supplier's
revolver without replacement capital would immediately shut down a supplier's operations and,
in turn, the OEM's plants.

90.     Recognizing the importance of maintaining the flow of parts, OEMs,
notwithstanding their own liquidity problems, have in the past stepped in as replacement lenders.
But given market conditions, this option has curtailed dramatically.  It certainly would not be
available from GM if it commenced a bankruptcy case without the support of the U.S. Treasury
as DIP lender.  Notably, following Chrysler's chapter 11 case, a number of banks no longer
extended financing to suppliers based on their Chrysler receivables.  There can be no doubt that
the same fate will be suffered by GM's suppliers following the commencement of these chapter
11 cases.  As such, the liquidity of GM's suppliers will be further crippled.  The swift emergence
of New GM from the bankruptcy process pursuant to the 363 Transaction is, therefore, necessary
to re-establish lender confidence and maintain suppliers' access to capital and their viability as
suppliers for New GM.

91.     Given their substantial dependence on GM, many of GM's suppliers are
awaiting the outcome of the proposed 363 Transaction with the knowledge that their existence is
at stake.  If New GM is not able to promptly commence operations, these suppliers will face
liquidity crises that will endanger not only New GM, but also the entire automotive industry.  As

observed in the Report to Congressional Committees prepared by the United States Government Accountability Office:

> More than 500,000 workers are employed by companies in the United States that manufacture parts and components used by automakers -- both domestic automakers and transplants. According to the Motor and Equipment Manufacturers Association, many suppliers are in severe financial distress, with a number having filed for bankruptcy in 2008. Some members of our panel said that because many of these suppliers have relatively high costs and depend on the business of the Detroit 3, some of them may not have enough revenue to survive if one of the automakers were to cease production. This, in turn, could affect the automakers' ability to obtain parts needed to manufacture vehicles. *This dynamic has the potential to affect all automakers with production facilities in the United States, regardless of home country.*

U.S. Govt. Accountability Office, Report to Congressional Comm.: Auto Industry: Summary of Government Efforts and Automakers' Restructuring to Date at 6 (Apr. 2009) [hereinafter *US GAO Report*].

### *The Dealership Network*

92. The 363 Transaction contemplates the assumption by the Company and the assignment to New GM of dealer franchise agreements relating to approximately 4,100 dealerships. The transfer of such agreements is essential to the viability of New GM because an automotive manufacturer simply cannot survive without a dealer network. Dealers not only sell cars, but also provide warranty and other services on a front-line basis with consumers, thereby fostering familiarity and trust on a community and individual customer level. By accepting trade-ins, the Company's dealers create and maintain a viable business in used cars, which gives consumers confidence in the long-term value of the Company's products and, in turn, its overall business, as well as provide "currency" towards the purchase of a new car.

93.     The Company, however, is not assuming and assigning to New GM all of
its existing dealer franchise agreements.  The Company's vast dealer network, consisting of
approximately 6,000 dealerships, developed over an extended time period in which the
Company's market share was growing and was far greater than it is now, and when there was far
less, or even no meaningful foreign competition.  Consequently, and precisely because there are
now far more dealerships than the Company's market share can support, including, in some
cases, multiple dealers in a single contracting community and dealerships that have become
poorly situated as a result of changing demographics, the Purchaser is not willing to continue all
dealerships.  Among the dealerships the Purchaser is not willing to continue, for example, are
those approximately 400 dealers who sell fewer than fifty cars per year, and those approximately
250 dealers who sell fewer than 100 cars per year.  Approximately 630 other dealerships are not
being continued because they are dealers who, in whole or substantial part, sell brands that are
being discontinued.

94.     Notwithstanding the foregoing, the 363 Transaction does not contemplate
an abrupt cutoff of nonretained dealerships.  In pursuit of the maximization of New GM's ability
to, among other things, maintain consumer confidence and goodwill, provide ongoing warranty
and other services, and preserve resale and trade-in values, the Company not only is giving
approximately 17 months notice, but also will offer to enter into, and New GM will assume
"deferred termination agreements" with most of the dealers whose franchise agreements are not
being assumed, which should have the additional benefit of easing the hardships attendant to the
dealership closings.

95.     The Company is fully cognizant of the effects of the contraction of the
number of dealers, but it must be balanced with the fact that the 363 Transaction will permit

thousands of dealerships to survive, while providing for an orderly wind-down of those dealerships not being retained. The alternative to the exercise of sound business judgment is that the Company would liquidate – and *all* dealerships would cease to be GM dealerships, including the approximately 4,000 dealerships that otherwise are contemplated to continue to operate under New GM.

96. The major predicate for the 363 Transaction, including, most importantly, the U.S. Treasury's willingness to continue financing the Company's operations during and after the sale and transfer of the Purchased Assets, is dependent upon the expeditious approval of the Sale Motion. It is the *sine qua non* of protecting the Company's market share brand credibility and to avoid further consumer support erosion. Delay will result in additional dealership closings well beyond those currently envisioned. More than half of the Company's entire dealership network may be undercapitalized because of the significant recent decline in sales and revenue as the shadow of bankruptcy loomed large over GM. The 363 Transaction will enable alleviation of that condition.

### K. The 363 Transaction Is the Only Credible Alternative To a Liquidation of the Company

97. The 363 Transaction is the only remaining alternative to save the Company's operations and prevent the immediate liquidation of GM and the catastrophic impact on the economy that will result from the loss of hundreds of thousands of jobs if the GM assets and business are not sold and transferred as proposed. No other potential buyer of GM's business has come forward. No entity other than the U.S. Government has the wherewithal to provide the billions of dollars needed for DIP financing and the financing of New GM.

98. The only alternative to the 363 Transaction is a liquidation of the Debtors' assets -- a process that will severely reduce the value of the Company's assets to the prejudice of

its employees and all economic stakeholders. A liquidation will cause not only hundreds of thousands of jobs to be lost, but also a worldwide shutdown of GM's suppliers and dealers.

## IV.

### Capital Structure

99.     GM is a public reporting company under Section 12(b) of the Securities and Exchange Act of 1934. Its shares of common stock, par value $1-2/3 (defined above as "Common Stock") are publicly traded under the symbol "GM" on the New York Stock Exchange, the Bourse de Bruxelles (Brussels, Belgium), and the Euronext Paris (Paris, France). As of March 31, 2009, there were 610,505,273 shares of Common Stock outstanding.

100.    GM is the direct parent company of Chevrolet-Saturn and Saturn, and the indirect parent company of Saturn Distribution. GM owns 100% of the issued and outstanding stock of Chevrolet-Saturn, a Delaware corporation, which is an automotive dealership, and 100% of the membership interests in Saturn, a Delaware limited liability company, which distributes Saturn-branded motor vehicles. Saturn owns 100% of the issued and outstanding stock of Saturn Distribution, a Delaware corporation, which is in the business of the distribution of Saturn's vehicles.

101.    As of March 31, 2009, GM had consolidated reported global assets and liabilities of approximately $82,290,000,000 and $172,810,000,000, respectively. The significant prepetition indebtedness of GM consists primarily of the following:

*The U.S. Treasury Facility*

102.    As of the Commencement Date, GM and certain of its non-Debtor affiliates were parties to the U.S. Treasury Loan Agreement, dated as of December 31, 2008, by GM, as borrower, the U.S. Treasury, as lender, and Argonaut Holdings, Inc., General Motors

Asia, Inc., General Motors Asia Pacific Holdings, LLC, General Motors Overseas Corporation,

General Motors Overseas Distribution Corporation, General Motors Product Services, Inc.,

General Motors Research Corporation, GM APO Holdings, LLC, GM Eurometals, Inc., GM

Finance Co. Holdings LLC, GM GEFS L.P., GM Global Technology Operations, Inc., GM

Global Tooling Company, Inc., GM LAAM Holdings, LLC, GM Preferred Finance Co. Holdings

LLC, GM Technologies, LLC, GM-DI Leasing Corporation, GMOC Administrative Services

Corporation, Onstar, LLC, Riverfront Holdings, Inc., Saturn Corporation, and Saturn

Distribution Corporation, as guarantors.

   103. The U.S. Treasury Facility provides for an approximately $19.4 billion

secured term loan facility scheduled to mature on December 31, 2011, and accruing interest at a

rate per annum equal to the three-month LIBOR rate (which shall be no less than 2.0%) plus

3.0%, subject to certain exception.  The U.S. Treasury Facility is secured by assets that were not

previously encumbered, including (i) GM's and the guarantors' equity interests in most of their

domestic subsidiaries and certain of their foreign subsidiaries (limited in most cases to 65% of

the equity interests of the pledged foreign subsidiaries), (ii) intellectual property, (iii) real estate

(other than manufacturing plants or facilities), (iv) inventory that was not pledged to other

lenders, and (v) cash and cash equivalents in the U.S., in each case of above, subject to certain

exclusions.  The U.S. Treasury Facility is also secured by a third lien on the assets securing

GM's obligations under the Prepetition Revolving Credit Agreement (as defined below) and a

second line on the assets securing the obligations under the GELCO Agreement (as defined

below).

   104. GM's obligations with respect to the Warranty Program Advance made

under the U.S. Treasury Facility are only guaranteed by, and secured by the assets of, the

subsidiary of GM that was formed to own the separate account. The loan under the Warranty Program Advance bears an interest rate per annum equal to the three-month LIBOR rate plus 3.5%.

105.     As of the Commencement Date, the amount outstanding under the U.S. Treasury Facility was approximately $19.4 billion in principal amount, plus approximately $1.2 billion of Warrant Notes.

*Revolving Credit Facility*

106.     As of the Commencement Date, certain of the Debtors were parties to that certain Amended and Restated Credit Agreement (the "Prepetition Revolving Credit Agreement"), dated as of July 20, 2006, by and among GM and General Motors of Canada Limited ("GM Canada"), as borrowers, Saturn and GM, as guarantors, various financial institutions and other persons from time to time as lenders thereunder (collectively, the "Prepetition Revolving Credit Lenders"), JP Morgan Chase Bank, N.A., as syndication agent, and Citicorp USA, Inc., as administrative agent.

107.     The Prepetition Revolving Credit Agreement provides for (i) a U.S. revolving credit facility in the maximum aggregate principal amount of $2,463,200,000 and (ii) a Canadian/U.S. revolving credit facility and letters of credit in the maximum aggregate principal amount of $1,864,800,000.[9]  Obligations of GM arising under the Prepetition Revolving Credit Agreement (the "US Obligations") are direct obligations of GM, and obligations of GM Canada arising under the Prepetition Revolving Credit Agreement (the "Canadian Obligations," and together with the US Obligations, the "Revolving Credit Obligations") are direct obligations of GM Canada.  Borrowings under the Prepetition Revolving Credit Agreement accrue annual

---

[9]  The Prepetition Revolving Credit Agreement also provided for an unsecured revolving credit facility in the maximum aggregate principal amount of $152,000,000, which expired on June 16, 2008.

interest at varying rates keyed to the prime rate, the federal funds effective rate, or LIBOR, as in effect at the time each such loan is made. In addition, the Revolving Credit Obligations are also secured by a junior lien on the assets securing the U.S. Treasury Facility.

108.     Under the Prepetition Revolving Credit Agreement, the US Obligations are guaranteed by Saturn and the Canadian Obligations are guaranteed by GM and Saturn.  GM and Saturn have also guaranteed the obligations of GM and each of its subsidiaries under (i) certain scheduled lines of credit, letters of credit (other than any letters of credit issued under the Prepetition Revolving Credit Agreement), and automated clearing house and overdraft arrangements, in each case, provided by any Prepetition Revolving Credit Lender (or any affiliate thereof) to the extent such lender remains a Prepetition Revolving Credit Lender (the "Non-Loan Exposure") and (ii) any non-speculative hedging arrangements provided by any Prepetition Revolving Credit Lender (or an affiliate thereof), involving certain debt instruments, interest rates, currencies or commodities and any extensions or replacements thereof (the "Hedging Obligations").

109.     Pursuant to that certain U.S. Security Agreement, dated as of July 20, 2006, as security for the US Obligations and the U.S.-related Non-Loan Exposure, GM and Saturn granted to the administrative agent, Citicorp USA, Inc., first priority liens against and security interests in certain inventory, receivables, 65% of the outstanding stock of Controladora General Motors, S.A. de C.V., documents, general intangibles, books and records, and proceeds of the foregoing.  As security for certain Hedging Obligations, pursuant to that certain Second Priority US Security Agreement, dated as of July 20, 2006, GM and Saturn granted to Citicorp USA, Inc., the administrative agent to the Revolving Credit Facility, second priority liens against and security interests in the collateral granted to secure the US Obligations. In addition, the

Hedging Obligations are also secured by a junior lien on the assets securing the U.S. Treasury Facility.

110.    As security for the Canadian Obligations and the Canadian-related Non-Loan Exposure, pursuant to that certain General Security Agreement (Canadian Borrower), dated as of July 20, 2006, GM Canada granted to the administrative agent, first priority liens against and security interests in certain inventory, equipment, machinery, books, accounts, notes, proceeds of the foregoing, and real property.

111.    As of the Commencement Date, approximately $3.87 billion in principal amount (excluding approximately $600 million in Canadian Obligations) is outstanding under the Prepetition Revolving Credit Agreement.

*Term Loan*

112.    Pursuant to a term loan agreement, dated as of November 29, 2006 (the "Term Loan Agreement") between GM as borrower, JP Morgan Chase Bank, N.A. as agent, various institutions as lenders and agents, and Saturn as guarantor, GM obtained a $1.5 billion seven-year term loan.  Borrowings under the Term Loan Agreement accrue annual interest at the prime rate, the federal funds rate or LIBOR, plus a specified margin, and are guaranteed by Saturn.

113.    Additionally, to secure these obligations, pursuant to a collateral agreement, also dated as of November 29, 2006, among GM, Saturn, and the agent, GM and Saturn granted to JP Morgan Chase Bank, N.A., as agent to the Term Loan, a first priority security interest in certain equipment, fixtures, documents, general intangibles, all books and records, and their proceeds.

114.     As of the Commencement Date, the Debtors' obligations under the Term Loan Agreement aggregated approximately $1.46 billion, in principal amount.

*GELCO Loan and Security Agreement*

115.     As of the Commencement Date, GM was party to a $150,000,000 Loan and Security Agreement, dated as of October 2, 2006, as amended between GELCO Corporation, as lender, and GM, as borrower (the "GELCO Agreement").  Interest on borrowings under the GELCO Agreement accrues at a rate per annum equal to the three-month LIBOR rate plus 3.0%.  To secure GM's obligations under the GELCO Agreement, which provides financing for certain vehicles in GM's "Company Car Program," GM granted to the lender a security interest in the following collateral:  (i) Michigan titled program vehicles; (ii) program vehicle inventory; (iii) accounts, chattel paper or general intangibles arising from the sale or disposition of Michigan titled program vehicles or program vehicle inventory; (iv) collection accounts; (v) books and records relating to the foregoing; and (vi) proceeds of the foregoing, including insurance proceeds.

116.     As of the Commencement Date, the amount outstanding under the GELCO Agreement was approximately $125 million.

*Guarantor of EDC Loan Agreement*

117.     GM, as well as certain non-Debtor subsidiaries of GMCL (the "Subsidiary Guarantors"), are guarantors of a Loan Agreement among GMCL and EDC and other loan parties, dated April 29, 2009 (the "EDC Loan Agreement").  The EDC Loan Agreement provided GMCL with up to C$3 billion in a three year term loan, to be drawn in C$500 million increments.  With certain exceptions, GMCL's obligations under the EDC Loan Agreement are secured by a first lien on substantially all of its unencumbered assets, a second lien on certain of

its assets previously pledged as collateral under the Prepetition Revolving Credit Agreement (as discussed above), and a first lien on its ownership interest in the Subsidiary Guarantors and in the 11% ownership interest of GMCL in General Motors Product Services Inc. (89% of which is owned by GM and is pledged to the U.S. Treasury under the U.S. Treasury Facility). GM's guarantee of GMCL's obligations under the EDC Loan Agreement is secured by a lien on the equity of GMCL. Because 65% of GM's ownership interest in GMCL was previously pledged to the U.S. Treasury under the U.S. Treasury Loan Facility, EDC received a second lien on that 65% of GM's equity interest in GMCL, and a first lien on the previously unencumbered 35%. The Subsidiary Guarantors pledged their respective assets to secure their guarantee of the EDC Loan Agreement.

118. As of the Commencement Date, the amount outstanding under the EDC Loan Agreement was, in U.S. dollars, approximately $400 million.

*Debentures*

119. As of the Commencement Date, GM, as issuer, and Wilmington Trust Company, as successor indenture trustee, were parties to (i) a Senior Indenture, dated as of December 7, 1995, as amended, and (ii) a Senior Indenture, dated as of November 15, 1990, pursuant to which GM issued senior unsecured debt securities. Such securities were issued in twenty-four tranches, bearing annual interest ranging from 1.5% to 9.45% and maturing from June 1, 2009 to February 15, 2052.

120. As of the Commencement Date, approximately $22.88 billion in principal amount of the debentures remained outstanding.

*UAW VEBA Obligations*

121.    As discussed above, under the terms of the 2008 UAW Settlement Agreement, General Motors was required to contribute approximately $34 billion into the VEBA Trust.  In addition, if annual cash flow projections reflect that the UAW VEBA will become insolvent on a rolling 25-year basis, GM would have been required to contribute $165 million annually, limited to a maximum of 20 payments.

122.    As of the Commencement Date, the Company's 2005 UAW VEBA-related obligations aggregated approximately $20.56 billion,[10] in principal amount.

*Prepetition Fiscal and Paying Agency Agreement*

123.    As of the Commencement Date, GM was party to a Fiscal and Paying Agency Agreement (the "Fiscal and Paying Agency Agreement"), dated as of July 3, 2003, by and between GM, as issuer, Deutsche Bank AG London as fiscal agent and Bank Général du Luxembourg S.A. as paying agent.

124.    Under the Fiscal and Paying Agency Agreement, GM issued €1,000,000,000 of 7.5% unsecured notes due 2013 and €1,500,000,000 of 8.375% unsecured notes due 2033.  As of the Commencement Date, the total amount outstanding under the Fiscal and Paying Agency Agreement was, in U.S. dollars, approximately $3.30 billion.

*Nova Scotia Fiscal and Paying Agency Agreement*

125.    As of the Commencement Date, GM was party to a Fiscal and Paying Agency Agreement (the "Nova Scotia Fiscal and Paying Agency Agreement"), dated as of July 10, 2003, by and between nondebtor General Motors Nova Scotia Finance Company ("GM Nova

---

[10]  This liability is estimated as the net present value at a 9% discount rate of future contributions, as of January 1, 2009, and excludes approximately $9.4 billion corresponding to the GM Internal VEBA.

Scotia") as issuer, GM, as guarantor, Deutsche Bank Luxembourg S.A. as fiscal agent and Bank Général du Luxembourg S.A. as paying agent.

126. Under the Nova Scotia Fiscal and Paying Agency Agreement, GM guaranteed the payment by GM Nova Scotia of principal and interest on the £350,000,000 of 8.375% unsecured notes due 2015 and £250,000,000 of 8.875% unsecured notes due 2023 issued by GM Nova Scotia.

127. As of the Commencement Date, the total amount outstanding under the Nova Scotia Fiscal and Paying Agency Agreement is, in U.S. dollars, approximately $853 million.

### The Supplier Receivables Facility

128. The Debtors are participants in a supplier receivable facility that the U.S. Treasury created to provide financial security to automobile suppliers in March 2009. The facility is similar to a factoring arrangement whereby suppliers may accelerate payment of receivables or guarantee of payment at maturity for certain fees. To facilitate the facility, GM is obligated to make equity contributions to an SPE that will purchase supplier receivables. GM has pledged its equity interest in the SPE to the U.S. Treasury as additional security for the SPE's performance of its obligations in connection with this program.

129. As of the Commencement Date, GM has contributed approximately $35 million in equity contributions to the SPE. The U.S. Treasury has advanced approximately $700 million in principal amount to the SPE.

### Other Indebtedness

130. GM is also a party to various third party financing arrangements, including leveraged leases for equipment, synthetic leases, arrangements related to the financing of central

utilities complexes, and several industrial revenue bond obligations with various local governments.

131.    As of the Commencement Date, the Debtors had trade payables of approximately $5.40 billion.

# V.

## <u>Conclusion</u>

132.    The 363 Transaction is the only credible alternative that preserves any value for the Debtors, their employees, and their principal economic stakeholders.  Without expeditious approval of the 363 Transaction, the Debtors will have no choice but to cease operations and liquidate their assets with the concomitant draconian impact on the automotive parts suppliers, jobs, dealers, and other interests, causing further deepening of the downturn of the U.S. economy.  The 363 Transaction is a critical element of the U.S. Government's plan to revitalize the U.S. automotive industry.  The U.S. Government, as GM's largest secured lender, has bargained in good faith with GM to develop and implement the 363 Transaction to create a better, more efficient, innovative manufacturing company that will be a well-regarded major employer and member of the national economic community.  It is critical that New GM be able to commence bankruptcy-free operations immediately to salvage the automotive industry and become a major factor in reviving the overall economy.  Many consumers will not consider purchasing a vehicle from a manufacturer whose future is uncertain and entangled in an extended bankruptcy process.  Any delay in New GM's commencing operations will therefore result in irreversible revenue perishability and loss of market share to the detriment of the Debtors and all economic stakeholders.  Indeed, even a short delay would have a prejudicial impact, particularly on GM's suppliers and their employees.  The future of New GM as a thriving business must be

established clearly and quickly.  The expeditious approval of the 363 Transaction and the DIP financing will make that future a reality.

133.    The vicious cycle of frozen credit markets, growing supplier uncertainty and lack of consumer confidence has the potential to unravel the automotive industry and short circuit the creation of New GM as the anchor of that industry.  It is, therefore, self-evident that the only means of protecting the U.S. automotive industry is by approval of the 363 Transaction that will permit the Purchased Assets to achieve maximum value and use.

134.    As President Obama observed,

> I'm confident that if  . . . all of us are doing our part, then this restructuring, as painful as it will be in the short term, will mark not an end, but a new beginning for a great American industry – an auto industry that is once more out-competing the world; a 21st century auto industry that is creating new jobs, unleashing new prosperity, and manufacturing the fuel-efficient cars and trucks that will carry us towards an energy-independent future.  I am absolutely committed to working with Congress and the auto companies to meet one goal:  The United States of America will lead the world in building the next generation of clean cars.

*Presidential Remarks* at 3.

## VI.

### Information Required by Local Rule 1007-2

135.    Local Rule 1007-2 requires certain information related to GM, which is set forth below.

136.    Pursuant to Local Rule 1007(a)(3), Schedule 1 hereto lists the names and addresses of the members of the Ad Hoc Committee and its attorneys, and provides a brief description of the circumstances surrounding the formation of the Ad Hoc Committee and the date of its formation.

137.     Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto lists the following information with respect to each of the holders of the Debtors' 50 largest unsecured claims on a consolidated basis, excluding claims of insiders:  the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

138.     Pursuant to Local Rule 1007-2(a)(5), Schedule 3 hereto provides the following information with respect to each of the holders of the five largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral, and whether the claim or lien is disputed.

139.     Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the Debtors' assets and liabilities.

140.     Pursuant to Local Rule 1007-2(a)(7), Schedule 5 hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of General Motors that are publicly held and the number of record holders thereof; the number and classes of shares of stock, debentures and other securities of General Motors that are held by the Debtors' directors and officers, and the amounts so held.

141.     Pursuant to Local Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of GM's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name,

address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

142. Pursuant to Local Rule 1007-2(a)(9), Schedule 7 hereto provides a list of the premises owned, leased, or held under other arrangement from which GM operates its businesses.

143. Pursuant to Local Rule 1007-2(a)(10), Schedule 8 hereto provides the location of GM's substantial assets, the location of its books and records, and the nature, location, and value of any assets held by GM outside the territorial limits of the United States.

144. Pursuant to Local Rule 1007-2(a)(11), Schedule 9 hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property.

145. Pursuant to Local Rule 1007-2(a)(12), Schedule 10 hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

146. Pursuant to Local Rule 1007-2(b)(1)-(2)(A), Schedule 11 hereto provides the estimated amount of weekly payroll to GM's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by GM, for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions.

147. Pursuant to Local Rule 1007-2(b)(3), Schedule 12 hereto provides, for the thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

The foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ Frederick A. Henderson
Frederick A. Henderson
President and Chief Executive Officer of
General Motors Corporation

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 1st day of June, 2009.

/s/ Kathleen Anne Lee
Notary Public

KATHLEEN ANNE LEE
Notary Public, State of New York
No. 01LE6119251
Qualified in New York County
Commission Expired November 29, 2012