UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,<br><br>        Plaintiff,<br>    v.<br><br>GENERAL MOTORS LLC,<br><br>        Defendant. | 2:10-cv-11366-AC-MJH<br><br><br><br><br><br>Honorable Avern Cohn |

**DEFENDANT GENERAL MOTORS LLC'S REPLY MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF UAW'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF GENERAL MOTORS LLC'S MOTION FOR SUMMARY JUDGMENT**

Robert S. Walker (Ohio Bar No. 0005840)
(Admitted E.D. Mich. 8/18/93)
rswalker@jonesday.com
Johanna Fabrizio Parker (Ohio Bar No. 0071236)
(Admitted E.D. Mich. 9/20/12)
jfparker@jonesday.com
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone: 216-586-3939
Facsimile: 216-579-0212

Edward W. Risko (P 36699)
edward.w.risko@gm.com
300 Renaissance Center
Detroit, Michigan 48265-3000
Telephone: 313-665-4920
Facsimile: 248-267-4268

*Counsel for Defendant General Motors LLC*

TABLE OF CONTENTS

I. THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION. ................................................................................................ 2

    A. The 2009 RSA Repeatedly Makes Clear That New GM Has No Obligation To Make The $450M Payment. ............................................... 2

    B. The UAW's Extrinsic Evidence Is Inadmissible And, In Any Event, Confirms That The 2009 RSA Extinguished New GM's $450M Payment Obligation. ...................................................................... 7

II. THE UAW CANNOT CARRY ITS BURDEN OF PROVING THAT ALL CONDITIONS PRECEDENT TO THE MAKING OF THE $450M PAYMENT HAVE BEEN SATISFIED. ............................................... 10

CONCLUSION ................................................................................................ 15

## TABLE OF AUTHORITIES

Page

CASES

*Children's Legal Servs. PLLC v. Kresch*,
    545 F. Supp. 2d 653 (E.D. Mich. 2008) ...................................................................13

*Ciao Cucina Corp. v. The Glazier Group, Inc.*,
    92 Fed. App'x 213 (6th Cir. 2004) ...........................................................................15

*Cottage Inn Carryout & Delivery, Inc. v. True Freedom Invs.*,
    No. 10-12833, 2010 WL 4188311 (E.D. Mich. Oct. 20, 2010) ...............................10

*Erie County v. Morton Salt*,
    __ F.3d __, 2012 WL 6581676 (6th Cir. Dec. 18, 2012)..........................................13

*Green Constr. Co. v. First Indem. of Am. Ins. Co.*,
    735 F. Supp. 1254 (D.N.J. 1990) .............................................................................11

*In re Kattouah*,
    452 B.R. 604 (E.D. Mich. 2011)...............................................................................14

*Ludwig v. Twp. of Van Buren*,
    681 F. Supp. 2d 848 (E.D. Mich. 2010) ..................................................................12

*Neely v. Good Samaritan Hosp.*,
    345 Fed. App'x 39 (6th Cir. 2009) ...........................................................................10

*Owhor v. Providence Hosp. & Med. Ctrs., Inc.*,
    No. 09-11257, 2010 WL 3070106 (E.D. Mich. Aug. 4, 2010) ....................2, 12, 15

*United States v. Johnson*,
    752 F.2d 206 (6th Cir. 1985) ....................................................................................13

*Witmer v. Acument Global Tech., Inc.*,
    694 F.3d 774 (6th Cir. 2012) .....................................................................................8

After nearly three years of litigation, extensive discovery, and multiple rounds of briefing, the parties agree on four important and ultimately dispositive facts:

(1) if it exists, New GM's obligation to make the $450M Payment relates to the funding of retiree medical benefits (*see* SMF ¶ 50; UAW Response to SMF ¶ 50 & Ex. 11 ¶ 4 (the $450M Payment "was intended to address additional participants in the DC VEBA" and "[t]he purpose of the DC VEBA was to help fund retiree health benefits by," among other things, "mitigating the costs . . . for retiree medical coverage" (internal quotation marks and emphasis omitted));

(2) the "subject matter of GM's obligation to pay money to fund those benefits [*i.e.*, retiree medical benefits] . . . is dealt with in . . . the 2009 RSA" (Dkt. No. 52, UAW Reply at 5);

(3) the unambiguous 2009 RSA "constitutes the entire agreement between the parties regarding the matters set forth [t]herein" and "supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth [therein]" (SMF ¶¶ 48 and 32, Ex. 9 § 32.C); and

(4) "the $450M Payment is not mentioned in the 2009 RSA" (SMF ¶ 52), though the parties agree that it was discussed as part of the negotiations of the 2009 RSA (SMF ¶¶ 80–82).

In view of these undisputed facts—in particular, that the "subject matter of GM's obligation to pay money to fund [retiree medical] benefits" is "dealt with" in the 2009 RSA (Dkt. No. 52, UAW Reply at 5)—the Court cannot read into that fully integrated agreement an additional $450M obligation concerning that very "subject matter." This Court need look no further than these undisputed facts and the 2009 RSA's plain language to reach the conclusion that New GM has no obligation to make the $450M cash windfall payment, and should order summary judgment for New GM.

The UAW attempts to divert the Court's attention away from the plain text of the 2009 RSA by focusing on inadmissible extrinsic evidence, including especially the irrelevant, superseded Henry II Agreement. The Court should see through this smokescreen. This is a simple case involving unambiguous contractual provisions and established legal principles that demand summary judgment for New GM.

Also unavailing is the UAW's fainthearted attempt to respond to New GM's indisputable evidence establishing that the conditions precedent to the making of the $450M Payment have not been, and cannot be, satisfied. Resorting to bald assertions and flippant responses—and attempting to escape its binding admissions—the UAW falls well short of establishing the existence of a genuine issue for trial, let alone carrying its undisputed burden of showing that "no reasonable trier of fact could find other than for the [UAW]." *Owhor v. Providence Hosp. & Med. Ctrs., Inc.*, No. 09-11257, 2010 WL 3070106, at *5 (E.D. Mich. Aug. 4, 2010) (Cohn, J.) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). New GM, therefore, is entitled to summary judgment on this separate ground as well. *Id.* ("As the Supreme Court has explained, 'the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986))).

I. THE 2009 RSA EXTINGUISHED NEW GM'S $450M PAYMENT OBLIGATION.

    A. The 2009 RSA Repeatedly Makes Clear That New GM Has No Obligation To Make The $450M Payment.

As explained in New GM's opening brief, multiple provisions of the 2009 RSA establish that New GM has no obligation to make the $450M Payment. For starters, the Introduction and

2

Sections 2, 5.B, and 8 of the 2009 RSA unambiguously state that New GM's "sole obligations" to provide funding for Retiree Medical Benefits are found solely within the fully integrated 2009 RSA, which does not include an obligation to make the $450M Payment. SMF ¶ 32, Ex. 9 §§ 2, 5.B, 8; *see also id.* at Introduction. Additionally, Section 5.D unambiguously states that the 2009 RSA sets forth "all obligations" of New GM "in any way related to Retiree Medical Benefits for the Class and/or the Covered Group"—broad and comprehensive language that includes no words of limitation and that, by exclusion, extinguishes the $450M Payment obligation. *Id.* § 5.D.

Similarly, Section 14's broad language makes clear that, "other than those [payments] specifically required by th[e 2009 RSA]," the UAW may not seek to obligate New GM to "provide any additional payments to the New VEBA" or to "make any other payments for the purpose of providing Retiree Medical Benefits to the Class or the Covered Group." *Id.* § 14; *see also id.* § 25.C. And lastly, the 2009 RSA's integration clause leaves no doubt that the agreement not only "constitutes the entire agreement between the parties regarding the matters set forth [t]herein" but also "supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth [therein]." *Id.* § 32.

Any reasonable reading of these unambiguous provisions (and the 2009 RSA as a whole) compels the conclusion that New GM has no obligation to make the $450M Payment—a payment unquestionably related to retiree medical benefits. Indeed, because the 2009 RSA "dealt with" the very "subject matter" at issue here—that is, "GM's obligation to pay money to fund [retiree medical] benefits," Dkt. No. 52, UAW Reply at 5—the Court need not, and should not, look further than that unambiguous, fully integrated agreement to put the UAW's claim to rest.

The UAW makes disjointed arguments in response. *First*, after recognizing the shortcomings of its New-versus-DC VEBA assertion, *see id.* at 4 (conceding that "GM's reliance

3

on this Section 5.D language does not suffer from the [New-versus-DC] flaw"), the UAW contends that Section 5.D "deals with the subject matter of GM's obligation to *provide* retiree medical benefits, and not the separate subject matter of GM's obligation to pay money to *fund* those benefits (which is dealt with in Article 8 of the 2009 RSA)," *id.* at 5 (emphases added and omitted). The UAW makes this same argument regarding Section 25.C of the 2009 RSA. *See id.* at 7.

This newly minted argument is meritless. For one, the relevant language of Section 5.D does not distinguish between New GM's obligation to provide benefits and New GM's obligation to fund benefits. Rather, it applies broadly to "*all* obligations of [New GM] . . . in *any way related to* Retiree Medical Benefits." SMF ¶ 32, Ex. 9 § 5.D (emphases added). Those terms—"all," "any," and "related to"—are broad and expansive and must be read as such. *See* cases cited in Dkt. No. 40, New GM Op. Br. at 13 n.3.

For another, the UAW's reliance on the provisions surrounding Section 5.D reveals a fundamental misunderstanding of the benefits structure set forth in the 2009 RSA. Under that structure, the New Plan is responsible for "the *provision* of Retiree Medical Benefits to the Class and the Covered Group," and the New VEBA is "the exclusive *funding* mechanism for the New Plan." *See* SMF ¶ 32, Ex. 9 at Introduction (emphases added); *see also id.* § 5.B (referring to the New VEBA as the "exclusive *source of funds* to provide Retiree Medical Benefits" (emphasis added)). Accordingly, when the 2009 RSA refers to New GM's "sole obligations to the New Plan *and* the New VEBA" (as it does in Section 5.B (emphasis added)), it is referring to both New GM's obligation to provide benefits *and* New GM's funding obligations, not just to the former. A contrary interpretation would read the reference to New GM's obligations to the New VEBA in Section 5.B out of the 2009 RSA. Indeed, the reference to New GM's "sole obligations

4

to . . . the New VEBA" at the end of Section 5.B plainly is a reference to New GM's funding obligations, given that the New VEBA is responsible for funding, not for providing, benefits. For that same reason, the subsequent reference in Section 5.D to "*all* obligations of [New GM] . . . in any way related to Retiree Medical Benefits" must encompass New GM's funding obligations. *Id.* § 5.D (emphasis added).

The UAW concedes that the "subject matter of GM's obligation to pay money to *fund* [retiree medical] benefits . . . is dealt with in [Section] 8 of the 2009 RSA." Dkt. No. 52, UAW Reply at 5 (emphasis added). Notably, Section 8 states—in language nearly identical to that in Section 5—that "the New Plan, *funded by the New VEBA*, shall provide Retiree Medical Benefits" and that New GM "shall have the following, and only the following, *obligations to the New VEBA* and the New Plan." SMF ¶ 32, Ex. 9 § 8 (emphases added). The UAW cannot, on the one hand, contend that New GM's "sole obligations to . . . the New VEBA" mentioned in Section 5 refer only to New GM's obligations to provide benefits, while, on the other hand, concede that New GM's "obligations to the New VEBA" mentioned in Section 8 "deal[] with" the "separate subject matter of GM's obligation to pay money to fund those benefits." Simply put, the UAW has no plausible counterargument concerning Section 5.D, which unambiguously encompasses *all* New GM obligations in *any way related to* Retiree Medical Benefits—and thus includes the $450M Payment.

*Second*, recognizing that neither its New-versus-DC VEBA nor its provide-versus-fund theory undermines a plain reading of Section 14, the UAW posits yet another distinct theory regarding that section—namely, that Section 14 addresses the "UAW's solicitation of future agreements with GM," not New GM's contributions for "pre-existing" obligations. Dkt. No. 52, UAW Reply at 6–7 (emphasis omitted). This new theory fares no better. As an initial matter,

Section 14 is entitled "Future *Contributions*," SMF ¶ 32, Ex. 9 § 14 (emphasis added), a title completely at odds with the UAW's contention that the section is applicable only to "future agreements," not to future contributions. Additionally, and confirming its title's clear implication, Section 14's relevant language refers not to the "solicitation of future *agreements*," Dkt. No. 52, UAW Reply at 6 (emphasis added), but rather to the solicitation of "additional *payments*" beyond those set forth in the 2009 RSA and "any other *payments* for the purpose of providing Retiree Medical Benefits," SMF ¶ 32, Ex. 9 § 14 (emphases added).

What is more, the UAW's reliance on Section 14's first sentence is significantly misplaced because Section 14's second sentence—the relevant sentence—imposes an entirely separate prohibition on the UAW. The first sentence prohibits the UAW from "negotiat[ing] any increase of [New GM]'s funding or payment obligations," while the second sentence states that "the UAW . . . *also agrees* not to seek to obligate [New GM] to," among other things, "provide any additional payments" or "make any other payments for the purpose of providing Retiree Medical Benefits." *Id.* (emphasis added). The "negotiat[ing]" language in the first sentence in no way limits the scope of the separate prohibition in the second sentence; to the contrary, the use of the word "also" confirms that the second sentence applies to pre-existing obligations, not to the "solicitation of future agreements" (which is addressed in the first sentence). Section 14's third and final sentence in no way undermines that conclusion; it discusses "contributions" by New GM's "Active Employees," not by New GM. Section 14, in short, is yet another unambiguous section of which the UAW offers no plausible interpretation.

*Third*, the UAW contends that New GM's reliance on the 2009 RSA's integration clause is "misplaced because . . . the 2009 RSA does not deal in any way with the 'matter[]' of" New GM's $450M Payment obligation. Dkt. No. 52, UAW Reply at 7 (emphases omitted) (alteration

6

in original). This contention falls flat. Indeed, as previously discussed, the UAW recognizes in its brief that the 2009 RSA "dealt with" the "subject matter of GM's obligation to pay money to fund [retiree medical] benefits," *id.* at 5—the very subject matter of the $450M Payment. The UAW recognized this same point in its jurisdictional briefing in this matter, and Ronald Gettelfinger, the UAW's former president, made this same point during his deposition. SMF ¶ 50; *see also* UAW Response to SMF ¶ 50 & Ex. 11 (Sherrick Dec.) ¶ 4 (stating that the $450M Payment "was intended to address additional participants in the DC VEBA" and "[t]he purpose of the DC VEBA was to help fund retiree health benefits by," among other things, "mitigating the costs . . . for retiree medical coverage" (internal quotation marks and emphasis omitted)). The integration clause, therefore, encompasses the "matter[] of" New GM's $450M Payment obligation and reflects an intent to extinguish that obligation. Under the 2009 RSA's plain language, New GM is entitled to summary judgment.

> B. The UAW's Extrinsic Evidence Is Inadmissible And, In Any Event, Confirms That The 2009 RSA Extinguished New GM's $450M Payment Obligation.

In its reply, the UAW again attempts to salvage its case by resorting to extrinsic evidence. As explained in New GM's opening brief, however, extrinsic evidence is inadmissible because the 2009 RSA is unambiguous. *See* Dkt. No. 40, New GM Op. Br. at 10, 19 (citing multiple cases). Not dissuaded, the UAW again attempts to evade this rule by contending that a court (under an unsupported yet claimed "firmly rooted" legal principle) may consider extrinsic evidence in construing an unambiguous contract for the limited purpose of confirming its legal conclusion. Dkt. No. 52, UAW Reply at 8. There is no such "firmly rooted" legal principle. Rather, the "firmly rooted" legal principle is that a court cannot consider extrinsic evidence unless there is ambiguity on the face of the contract. *See* Dkt. No. 40, New GM Op. Br. at 10. Not only does the UAW agree that the 2009 RSA is not ambiguous (SMF ¶ 48), the UAW

7

certainly is not offering extrinsic evidence to confirm the 2009 RSA's plain language. It is offering that evidence in the hope that the Court will rewrite the 2009 RSA, a plainly impermissible purpose. *Witmer v. Acument Global Tech., Inc.*, 694 F.3d 774, 778 (6th Cir. 2012).

Beyond its inadmissibility, and the fact that the UAW's extrinsic evidence purports to address the interpretation of an agreement to which New GM was not a party and never assumed, the UAW's underlying premise that the Henry II Agreement did not extinguish the $450M obligation (Dkt. No. 52, UAW Reply at 8) is itself belied by the terms of that agreement. The Henry II Agreement states in no uncertain terms that it "resolves and settles any and all claims for GM contributions to the Existing External VEBA [*i.e.*, the DC VEBA]." SMF ¶ 12, Ex. 4 at Introduction. In view of the UAW's assertion that this case is about New GM's obligation to make a $450M contribution to the DC VEBA, not the New VEBA, the UAW cannot tenably contend that this quoted language (and other relevant provisions of the Henry II Agreement) did not extinguish the $450M Payment obligation. Indeed, were this not the case, there would have been no reason at all to resurrect that obligation in the later Implementation Agreement, entered into just a matter of weeks after the Henry II Agreement took effect.

That is no doubt why the UAW focuses not on the actual terms of the Henry II Agreement but instead on three snippets of evidence related to the Henry II Agreement—in essence, doubly extrinsic evidence. But even that evidence undermines the UAW's position, as explained in New GM's opening brief. *See* Dkt. No. 40, New GM Op. Br. at 20–22. The pre-contractual calculations (and the Bondholders' exhibit) confirm that the parties intended the 2009 RSA to extinguish the $450M Payment obligation—an intention plainly set forth in the 2009 RSA. This intention was entirely rational, given that the Implementation Agreement had revived the $450M Payment obligation (following its extinguishment by the Henry II Agreement). And

8

Fritz Henderson's testimony confirms that, irrespective of the effect of the Henry II Agreement, the 2009 RSA was fully encompassing and extinguished the $450M Payment obligation—an understanding unambiguously reduced to writing in the 2009 RSA. *Id.* at 21–22.

In the end, the UAW's argument illustrates the sound legal justification for the long-standing doctrine that courts must not consider extrinsic evidence to interpret the unambiguous provisions of an integrated contract. The UAW's argument would have this Court investigate, interpret, and divine the intent of multiple provisions in a series of agreements between other parties as colored by non-contractual statements and reports toward the objective of impugning the clear and unambiguous provisions of the only agreement that is relevant in this case. The sole relevant question here is whether the provisions of the 2009 RSA—not the prior Henry II Agreement—mean what they plainly say. There is no reasoned basis for this Court to consider or be distracted by the UAW's irrelevant and inadmissible evidence regarding other agreements between other parties.

Finally, the UAW contends that, in connection with their discussion of the $450M Payment during the 2009 RSA negotiations, the parties decided to maintain the "status quo"—an oral agreement to leave the $450M Payment obligation "subject to the conditions stated in the 2007 MOU." Dkt. No. 52, UAW Reply at 11–12. The parties, to be sure, discussed the $450M Payment during those negotiations. But the notion that, in connection with a government-funded bankruptcy, New GM orally agreed to kick a nearly half-billion-dollar cash obligation down the road strains credulity beyond the breaking point.

That fact amounts to a mere debater's point, however, in comparison to the second problem with the UAW's position: by acknowledging that the $450M Payment obligation was on the table during the 2009 RSA negotiations (*e.g.*, Ex. 56, Gettelfinger at 218:7–8 cited by

9

UAW in response to SMF ¶ 59: "as part of the VEBA discussions, we wanted to make sure that 450 was covered"), the UAW is again conceding that the obligation falls within the same "subject matter" as that "dealt with in . . . the 2009 RSA"—namely, "GM's obligation to pay money to fund [retiree medical] benefits," Dkt. No. 52, UAW Reply at 5. Thus, the UAW is again admitting that the obligation falls within the reach of the 2009 RSA's integration clause. Even if the UAW's imagined oral agreement occurred (which it did not), the 2009 RSA superseded it by its express terms to that effect. Again, disputes like this case are precisely why integration clauses are critical. As this Court has explained, an "integration clause . . . prevent[s] application of the parol evidence rule" and "ma[kes] it unreasonable for [a party] to rely on any representations not included in the . . . agreement." *Cottage Inn Carryout & Delivery, Inc. v. True Freedom Invs.*, No. 10-12833, 2010 WL 4188311, at *3–*4 (E.D. Mich. Oct. 20, 2010) (Cohn, J.) (internal quotation marks omitted) (second omission in original); *accord Neely v. Good Samaritan Hosp.*, 345 Fed. App'x 39, 44–45 (6th Cir. 2009) ("the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document").

II.  THE UAW CANNOT CARRY ITS BURDEN OF PROVING THAT ALL CONDITIONS PRECEDENT TO THE MAKING OF THE $450M PAYMENT HAVE BEEN SATISFIED.

In its reply, the UAW does not dispute that it bears the burden of proving that *all* conditions precedent to New GM's making of the $450M Payment have been satisfied. The UAW also does not dispute that it must prove, per the unambiguous language of the 2007 MOU (SMF ¶ 60), that Delphi's Modified Plan "incorporate[d], approve[d] *and* [wa]s consistent with *all* of the terms of this Agreement [*i.e.*, the 2007 MOU] and the comprehensive settlement agreement between Delphi and GM." SMF ¶ 4, Ex. 2 § K.2 (emphases added). The UAW further does not dispute that the finding of a single inconsistency between either agreements' terms and

10

Delphi's Modified Plan entitles New GM to summary judgment. Lastly, the UAW does not dispute that Delphi's Modified Plan is plainly inconsistent with the terms of the originally executed 2007 MOU and the originally executed Amended GSA. The UAW's sole contention here is that Delphi's Modified Plan is consistent with the terms of the 2007 MOU, *as modified* (allegedly) by the Keep Sites MOU, and the comprehensive settlement agreement (*i.e.*, the Amended GSA), *as modified* (allegedly) by the MDA. There are multiple problems with this contention, each of which demands summary judgment for New GM.

*First*, at the most basic level, it is manifestly wrong. Not a single provision of the Keep Sites MOU or the MDA purports to modify the terms of the 2007 MOU or the Amended GSA. *See Green Constr. Co. v. First Indem. of Am. Ins. Co.*, 735 F. Supp. 1254, 1261 n.5 (D.N.J. 1990) ("Modification is the changing of the terms of the agreement . . . as distinguished from the mere surrender of a right . . . ." (internal quotation marks omitted)). When GM and the UAW intended to modify the terms of the 2007 MOU, they did so expressly, *e.g.*, Ex. 6 ¶ 6 (Implementation Agreement) ("adjust[ing], conform[ing] or modif[ying]" certain terms of the 2007 MOU). Similarly, when GM and Delphi intended to amend their settlement agreement, they also used express language, *see* Ex. 5 at 5 (Amended GSA) ("each Party hereby agrees that the Original Agreement is amended and restated to read as follows"). Notably, the UAW was not even a party to either the MDA or the Amended GSA, undermining any suggestion that it is in a position to argue what the parties to those agreements (GM and Delphi) intended.

*Second*, the UAW offers no evidence in support of the contention. The UAW simply asserts that the terms of the 2007 MOU and the Amended GSA were modified. But the UAW does not (because it cannot) point to a single provision of the Keep Sites MOU or the MDA purporting to modify the 2007 MOU or the Amended GSA. In fact, the UAW admits that

11

nothing in the Keep Sites MOU changed the conditions precedent to the $450M Payment set forth in the 2007 MOU. SMF ¶ 73.

This is not elevating form over substance. The plain and unambiguous language of the relevant agreements, particularly the 2007 MOU's express conditions, is the fundamental expression of the parties' bargain. Read together, the 2007 MOU and the Amended GSA provide for an operational Delphi employing UAW members at plants to be funded and maintained by Delphi pursuant to specific agreed-upon terms. That never happened. According to the UAW, Delphi "successfully" emerged, even though, under the Modified Plan, it sold virtually all of its assets, does not employ any UAW members, and does not operate any of the plants where these UAW employees had worked for Delphi. SMF ¶ 65. Such a plan neither approves nor incorporates, and is plainly inconsistent with, the program for Delphi's rehabilitation as defined in the 2007 MOU and the Amended GSA.

As the party with the burden of proving that all conditions were satisfied, the UAW cannot fend off summary judgment through bald assertions and flippancy. Rather, it "must present significant probative evidence" showing that there is a genuine issue for trial. *Ludwig v. Twp. of Van Buren*, 681 F. Supp. 2d 848, 851 (E.D. Mich. 2010) (Cohn, J.) (internal quotation marks omitted), *aff'd*, 682 F.3d 457 (6th Cir. 2012). And to prevail on its own summary-judgment motion, the UAW's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party [*i.e.*, the UAW]." *Owhor*, 2010 WL 3070106, at *5. The UAW falls woefully short of satisfying the first standard and largely abandons any attempt at satisfying the second.

*Third*, the UAW previously has made binding admissions that directly contradict the contention. In an October 2009 letter to New GM (cross-referenced in ¶ 11 of its Complaint), the

12

UAW admitted that "[t]his agreement [*i.e.*, 2007 MOU] was not amended or modified in any way during Delphi's bankruptcy . . . or during GM's bankruptcy." SMF ¶ 42, Ex. 12 at 2. As well, in a previous pleading filed in this Court, the UAW admitted that the "comprehensive settlement agreement previously [was] entered into by Delphi and Old GM in September 2008"—when the Amended GSA (not as allegedly modified by the MDA) was executed. Dkt. No. 13 (UAW Memorandum) at 11. The UAW is bound by these admissions and cannot now claim that the 2007 MOU was modified by the Keep Sites MOU or that the MDA amended the Amended GSA. *United States v. Johnson*, 752 F.2d 206, 210–11 (6th Cir. 1985) (holding that "statements made by [an] attorney . . . were admissions binding on the client"); *Erie County v. Morton Salt*, __ F.3d __, 2012 WL 6581676, at *11 (6th Cir. Dec. 18, 2012) (holding that a party's concessions, including those set forth in a withdrawn motion, "doom[ed]" its claim). As this Court has explained, "[a] party may not create a factual issue and avoid summary judgment by subsequently filing papers that conflict with admissions contained in the pleadings." *Children's Legal Servs. PLLC v. Kresch*, 545 F. Supp. 2d 653, 661 (E.D. Mich. 2008) (Cohn, J.), *aff'd*, 2009 WL 1868809, No. 08-1677 (6th Cir. June 18, 2009).

The UAW's attempt to escape the reach of these damaging admissions in its reply brief and response to New GM's SMF is weak and ineffective. The UAW's response to SMF ¶ 74 that the "agreement" referenced in its October 2009 letter is not the 2007 MOU, but rather is New GM's commitment to make the $450M Payment, is belied by the very language of the letter. Any reasonable reading of that letter compels the conclusion that the unmodified "agreement" referenced in the letter is the 2007 MOU. The sentence immediately preceding the relevant sentence discusses "the MOU in its entirety," and the sentence immediately after the relevant sentence states that the "agreement was a cornerstone of Delphi['s] emergence from bankruptcy."

13

SMF ¶ 42, Ex. 12. The UAW cannot credibly contend that the $450M Payment obligation was a "cornerstone of Delphi['s] emergence from bankruptcy." Doubtless, the UAW has admitted that the 2007 MOU "was not amended or modified in any way during Delphi's bankruptcy . . . or during GM's bankruptcy"—and thus was not amended or modified by the MDA (which was part of Delphi's bankruptcy) or the Keep Sites MOU (which was part of GM's bankruptcy).

The UAW fares no better with its eleventh-hour contention that it "inadvertent[ly]" or "mistakenly" admitted in its pleading that the MDA did not modify the comprehensive settlement agreement. Dkt. No. 52, UAW Reply at 15 n.13; Response to SMF ¶ 75. Not only does the UAW offer no support for its assertion that the admission is inadvertent "[o]n its face," Dkt. No. 52, UAW Reply at 15 n.13—which it plainly is not—but also there is no internal contradiction within the UAW's pleading (or any other evidence in the record) suggesting inadvertence, *see In re Kattouah*, 452 B.R. 604, 608–09 (E.D. Mich. 2011) (concluding that an admission was inadvertent because an "internal contradiction within a document strongly suggests inadvertence"). Further unavailing is the UAW's contention that its admission is a "legal conclusion," as opposed to a "fact," and thus is not binding. Dkt. No. 52, UAW Reply at 15 n.13. The admission is in the section of the UAW's pleading entitled "Factual Background" (Dkt. No. 13), and with good reason: *when* the comprehensive settlement agreement was entered into—here, September 2008—is a material fact. The UAW cannot escape its binding admissions.

*Fourth*, even if the contention had merit (which it does not), the UAW still loses because it has not addressed all of the evidence offered in New GM's brief, such as the provisions of the 2007 MOU requiring the Delphi-UAW CBAs to continue through September 2011 (as required by Ex. 2, 2007 MOU § A), Delphi's management to have equivalence of sacrifice with UAW-represented employees (as required by Ex. 2, 2007 MOU § I), flowback opportunities (as

14

required by Ex. 2, 2007 MOU § C), and so on. The UAW presents no evidence showing that the Modified Plan was consistent with any of these provisions of the 2007 MOU, saying only that the "operative" CBAs are now between New GM and the UAW (SMF ¶ 69) and effectively conceding that not all Delphi management made equivalent sacrifices (SMF ¶ 70). Particularly in view of the UAW's burden to prove that Delphi's Modified Plan incorporated, approved, and was consistent with *all* of the 2007 MOU's terms, this shortcoming alone entitles New GM to summary judgment. *See Owhor*, 2010 WL 3070106, at *5; *Ciao Cucina Corp. v. The Glazier Group, Inc.*, 92 Fed. App'x 213, 214–15 (6th Cir. 2004).

In the end, the UAW's "as modified" contention not only misses the mark but also falls short. The contention is wrong, unsupported by evidence, and unavailable to the UAW—and, even assuming for argument's sake that it were not, the contention does not prove enough for the UAW. Because the UAW has not carried its burden of establishing a genuine issue for trial, New GM is entitled to summary judgment.

## CONCLUSION

For these reasons and those stated in New GM's opening brief, the Court should grant New GM's motion for summary judgment and deny the UAW's motion for summary judgment.

Dated: January 31, 2013

Respectfully submitted,

/s/ Johanna Fabrizio Parker

Edward W. Risko (P 36699)
Edward.w.risko@gm.com
General Motors LLC
300 Renaissance Center
Detroit, Michigan 48265-3000
Telephone: 313-665-4920
Facsimile: 248-267-4268

Robert S. Walker (Ohio Bar No. 0005840)
rswalker@jonesday.com
Johanna Fabrizio Parker (Ohio Bar No. 0071236)
jfparker@jonesday.com
Jones Day
North Point, 901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: 216-586-3939
Facsimile: 216-579-0212

*Counsel for Defendant General Motors LLC*

CERTIFICATE OF SERVICE

      I hereby certify that, on January 31, 2013, I electronically filed the foregoing Defendant General Motors LLC's Reply Memorandum of Law in Opposition to Plaintiff UAW's Motion for Summary Judgment and in Support of General Motors LLC's Motion for Summary Judgment with the Clerk of the Court using the ECF system, which will send notification of such filing to the following: W. Gary Kohlman, Andrew D. Roth, and Ramya Ravindran, Bredhoff & Kaiser P.L.L.C., 805 15th Street N.W., Suite 1000, Washington, D.C. 20005; and Jeffrey D. Sodko, UAW Legal Department, 8000 E. Jefferson Ave., Detroit, Michigan 48214.

      /s/ Johanna Fabrizio Parker
      *Counsel for Defendant General Motors LLC*