UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL WORKERS OF
AMERICA,

      Plaintiff,                                        Case No. 10-11366

v.                                               HON. AVERN COHN

GENERAL MOTORS, LLC,

      Defendant.

_____/

**DECISION AND ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 43)**
**AND**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. 33)**
**AND**
**DISMISSING CASE**

## TABLE OF CONTENTS

I.      Introduction                                                                          1

II.     Background                                                                            2
        A.      Delphi and Old GM                                                            2
        B.      Agreements Relating to Retiree Benefits                                      3
                1.      The 2007 Delphi Restructuring Memorandum
                        of Understanding (June 2007) (#1)                                    3
                        a.      The 2007 MOU                                                 3
                        b.      Subsequent Developments Pertaining to
                                Old GM's $450 Million Payment Obligation                     5
                2.      The 2007 Global Settlement                                           5
                3.      The 2008 Global Settlement                                           6
                4.      The 2008 UAW Retiree Settlement Agreement
                        (February 2008) (Henry II) (#2)                                      7
                5.      The 2008 Implementation Agreement (September
                        2008) (#3)                                                           8
                6.      Master Disposition Agreement                                         9
                7.      The 2009 UAW Retiree Settlement Agreement
                        (July 2009) (#4)                                                    10
        C.      Background of this Action                                                   11
                1.      Delphi's Emergence from Bankruptcy                                  11
                2.      The UAW Demands Payment                                             12
                3.      The UAW Files Suit                                      12
                4.      Bankruptcy Court Proceedings                                        13
                5.      The Pending Motions                                                 14

III.    Summary Judgment                                                                   14
        A.      Standard                                                                    14
        B.      Important to Summary Judgment in this Action                                16

IV.     The Parties' Framing of the Issues and Summary of Argument                          16
        A.      The UAW                                                                     16
        B.      New GM                                                                      17

V.      Analysis                                                                            18
        A.      New GM's Obligation Begins and Ends with the 2009
                Retiree Settlement Agreement                                                18
                1.      No Mention of the $450 Payment Obligation                           18
                2.      The New VEBA and "fixing and capping" language                      22
        B.      The Supplemental Filings                                                    25
        C.      In Sum                                                                      33

IV.     Conclusion                                                                          34

# I.  Introduction

This is a contract dispute over a $450 million payment for retiree medical benefits.  Plaintiff, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") is suing General Motors, LLC ("New GM") under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  The UAW claims that GM is in breach of an obligation under a June 22, 2007 contract between pre-bankruptcy GM ("Old GM"), the UAW, and Delphi Corporation ("Delphi") to make a $450 million payment to a voluntary employee's beneficiary association known as "DC VEBA."

Before the Court are the parties's cross motions for summary judgment.  The motions have been fully briefed, the Court has heard oral argument, and the parties have filed supplemental papers as directed.  The matter is ready for decision.  A careful review of the record shows that there is no disputed fact as to whether New GM assumed the $450 million payment obligation to the DC VEBA as reflected in the 2007 MOU.  New GM did not assume the obligation.  Rather, the entirety of New GM's obligations to provide for retiree medical benefits are contained in the 2009 Retiree Medical Settlement Agreement which does not contain the $450 million payment obligation.  Accordingly, GM's motion for summary judgment will be granted and the UAW's motion will be denied.

Necessary to an understanding of the Court's decision is the background, which includes an examination of the several agreements involving Old GM, the UAW, Delphi, and New GM relating to retiree medical benefits as well as the procedural history of the present dispute.  The Court's analysis of the issue at hand follows the background

1

discussion.

## II.  Background

### A.  Delphi and Old GM

In 1998, Delphi, an automotive parts manufacturer, was incorporated in Delaware as a wholly-owned subsidiary of Old GM.  In early 1999, Delphi separated from Old GM, and thereafter operated as an independent manufacturer and major supplier to Old GM.

In October 2005, Delphi and certain of its affiliates filed chapter 11 petitions in the Southern District of New York.

In 2006, Old GM, the UAW, and a class of GM retirees entered into a settlement agreement resolving a class action lawsuit (the "Henry I" lawsuit) in the Eastern District of Michigan.  Int'l Union, UAW v. General Motors Corp., case no. 05-73991 (E.D. Mich.)[1] That case was assigned to a different district judge.  Under the settlement agreement, Old GM continued to be obligated to provide medical benefits to its retirees. However, Old GM's retiree medical insurance plan was modified to impose new costs on its retirees.  At the same time, the Henry I settlement agreement provided for the establishment of a trust, known as a "Voluntary Employees' Beneficiary Association" (VEBA), and in particular, a "Defined Contribution" VEBA, to be funded by defined contributions provided for under the settlement, for the purpose of mitigating the additional medical costs of Old GM retirees.

_____

[1]The Sixth Circuit affirmed the district court's decision in Henry I approving the settlement agreement establishing the DC VEBA.  UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007).  In that decision, the Sixth Circuit explained that the acronym "DC VEBA" is shorthand for a trust fund formally known as "the defined contribution Voluntary Employees' Beneficiary Association trust" established by the UAW and Old GM in 2006.  See id. at 624.

With legacy medical expenses going up, Old GM and the UAW negotiated for Old GM to make defined contributions—i.e., to pay fixed amounts—toward retiree medical expenses, in lieu of uncertain, but generally increasing, actual expenses. Because the DC VEBA would be funded with defined contributions, it was referred to as a "Defined Contribution" VEBA, which is known as DC VEBA.

### B.  Agreements Relating to Retiree Benefits

As noted above, the underlying dispute requires some explanation of several agreements.  They are discussed below.

### 1. The 2007 Delphi Restructuring Memorandum of Understanding (June 2007) (#1)

### a.  The 2007 MOU

In June 2007, Delphi, Old GM, and the UAW entered into a tripartite "Memorandum of Understanding."  The document is titled "UAW-DELPHI_GM-MEMORANDUM OF UNDERSTANDING DELPHI RESTRUCTURING.  The parties variously refer to it as an "MOU," the "2007 Memorandum of Understanding" or "the 2007 Delphi Restructuring MOU" or "Restructuring MOU".  The Court refers to it as the "2007 MOU."  The 2007 MUO was intended to resolve a number of labor relations issues that had arisen during the Delphi chapter 11 case.  The 2007 MOU was approved by the bankruptcy court in New York shortly thereafter.  Among other things, the 2007 MOU allocated responsibility between Old GM and spin-off Delphi for UAW-represented Delphi retirees (most of whom were former Old GM employees, having worked for Old GM before the spin-off) with respect to medical benefits. Significant here, the 2007 MOU also provided that Old GM would make a one-time

3

contribution of $450 million to the DC VEBA.  This obligation is set out in section J.2 of

the 2007 MOU, as follows:

> The Parties agree to the following in partial consideration for the UAW
> entering into this Agreement and in consideration for the releases to be
> provided pursuant to Section K.
> . . .
> The UAW has asserted a claim against Delphi in the amount
> of $450 million as a result of the modifications encompassed
> by this Agreement and various other UAW agreements during
> the course of Delphi's bankruptcy.  Although Delphi has not
> acknowledged this claim, **GM has agreed to settle this claim
> by making a payment in the amount of $450 million, which
> the UAW has directed to be paid directly to the DC VEBA**

(emphasis added).

Section K.2 of the 2007 MOU contained specified conditions triggering Old GM's

obligation to make the $450 million payment.  The UAW calls these conditions "events,"

which are set forth in the 2007 MOU as follows:

> (a) execution by Delphi and GM of a comprehensive settlement
> agreement resolving the financial, commercial, and other matters
> between them and (b) the substantial consummation of a plan of
> reorganization proposed by Delphi in its chapter 11 cases and
> confirmed by the Bankruptcy Court which incorporates, approves
> and is consistent with all of the terms of this Agreement and the
> comprehensive settlement agreement between Delphi and GM.

The 2007 MOU also contained an agreement among the parties that Delphi would

continue to own and operate four "Keep Sites" (in Kokomo, Lockport, Rochester, and

Grand Rapids) each of which employed UAW workers.

### b.  Subsequent Developments Pertaining to Old GM's $450 Million Payment

4

**Obligation**

As section K.2 of the 2007 MOU states, it did not address and "resolv[e]" all of "the financial, commercial, and other matters between" Old GM and Delphi raised by Delphi's bankruptcy.  Indeed, section K.2's condition that Old GM's contractual commitment to pay $450 million to the DC VEBA expressly depended on, <u>inter alia</u>, "execution by Delphi and GM of a comprehensive settlement agreement resolving the financial, commercial, and other matters between them," implies that Old GM and Delphi would engage in further negotiations aimed at achieving a global "resol[ution]" of "the financial, commercial, and other matters between them" raised by Delphi's bankruptcy.

According to the parties, these further negotiations took various twists and turns over the course of several years, culminating in a "comprehensive settlement agreement" between Old GM and Delphi that "resol[ved] the financial, commercial, and other matters between them."  That "resol[ution]" was made possible in two key respects by the UAW's agreeing to certain conforming modifications of the terms of the 2007 Delphi Restructuring MOU sought by Old GM and Delphi.  The negotiations culminated in the following agreements.

**2.  The 2007 Global Settlement**

On September 6, 2007, Old GM and Delphi entered into an agreement titled "GLOBAL SETTLEMENT AGREEMENT" ("the 2007 Global Settlement").  This agreement set forth certain Old GM commitments to provide financial support for Delphi's restructuring efforts, as well as approximately $4 billion in cash, stock  and notes that Old GM was to receive from Delphi on the effective date of a Delphi plan of

5

reorganization approved by the Delphi bankruptcy court.

On December 10, 2007, Delphi filed a proposed plan of reorganization with the Delphi bankruptcy court that incorporated and endorsed the terms of the 2007 Global Settlement, but because of deteriorating economic conditions and Delphi's loss of exit financing, this plan was never consummated.

### 3. The 2008 Global Settlement

Further negotiations between Old GM and Delphi over the terms of their financial and commercial relationship then took place, culminating in a superseding, September 12, 2008 agreement between the parties titled "AMENDED AND RESTATED GLOBAL SETTLEMENT AGREEMENT" ("the 2008 Global Settlement" or "Amended and Restated GSA").

Under the terms of the 2008 Global Settlement, which was subject to the approval of the bankruptcy court, Old GM agreed to enhance its financial support for Delphi's restructuring efforts.  In addition, the 2008 Global Settlement modified the compensation that would be received by Old GM from Delphi.  Lastly, under its terms, Old GM was to receive approximately $2 billion in allowed administrative expense claims, as well as an allowed general unsecured claim in the amount of $2.5 billion.

The 2008 Global Settlement was submitted to the Delphi bankruptcy court for approval.  The bankruptcy court approved it on September 26, 2008.  Under the bankruptcy court's order of approval, Delphi was authorized to implement certain provisions of the agreement immediately pursuant to separately-negotiated "implementation agreements" with the unions that represented Delphi workers, including the UAW.

6

**4. The 2008 UAW Retiree Settlement Agreement (February 2008) (Henry II) (#2)**

Meanwhile, in February 2008, Old GM, the UAW, and a class of Delphi and GM retirees entered into a settlement agreement (the "2008 UAW Retiree Settlement Agreement") resolving a second class action lawsuit (the "Henry II" lawsuit), also filed in this district.  Int'l Union, UAW, et. al. v. General Motors Corp., Civil Action No. 07-14074 (E.D. Mich.).

Among other things, the 2008 UAW Retiree Settlement Agreement provided for the establishment of a second VEBA (the "New VEBA"), for the "[p]urpose" of transferring responsibility for GM and Delphi retiree medical benefits from Old GM to the New VEBA.  The 2008 UAW Retiree Settlement Agreement's recitals provided that it "resolves and settles any and all claims for GM contributions to the [DC VEBA], and provides for the termination of the [DC VEBA] and the transfer of all assets and liabilities of the [DC VEBA] to the New VEBA."  Section 8 of the 2008 UAW Retiree Settlement Agreement, captioned "GM Payments to New Plan and New VEBA," provided:

> GM's financial obligation and payments to the New Plan and New VEBA **are fixed and capped** by the terms of this Settlement Agreement.  The timing of all payments to the New VEBA shall be as set forth in Section 12 of this Settlement Agreement; it being agreed and acknowledged that the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for the Class and the Covered Group on and after the Implementation Date, and that all obligations of GM and the GM Plan for Retiree Medical Benefits for the Class and the Covered Group shall terminated as of the Implementation Date, as set forth in this Settlement Agreement.

(emphasis added).  The bold language is referred to as the "2008 Fixed and Capped Language."  As will be explained, this language is distinguished from similar language in a later agreement, the 2009 UAW Retiree Settlement Agreement, discussed infra.

7

Significantly, the 2008 UAW Retiree Settlement Agreement did not make any reference to the $450 million payment obligation provided for in the 2007 MOU. It in fact said nothing about the 2007 MOU.

### 5.  The 2008 Implementation Agreement (September 2008) (#3)

About seven months later, in September 2008 (at which time the Delphi reorganization plan had not yet been approved and Delphi was still in bankruptcy), Delphi, Old GM and the UAW entered into another tripartite agreement (the "2008 Implementation Agreement").  This agreement, among other things, implemented, at least in part, a term sheet that had been entered into between the parties in 2007. Under the  2008 Implementation Agreement (even though the Delphi plan had not yet become effective), the parties agreed to the immediate triggering of some of Old GM's commitments under the 2007 Memorandum of Understanding.

The 2008 Implementation Agreement modified certain obligations arising under the 2007 MOU.  Regarding the $450 million payment obligation provided for in the 2007 MOU (then referred to as the Restructuring MOU"), the 2008 Implementation Agreement stated:

> **The payment required by sections J(2)[16] and K(2)(e)[17] shall remain payable as set forth in the Restructuring MOU.**

(Emphasis added).  Thus, the 2008 Implementation Agreement acknowledged and, in a sense, confirmed Old GM's obligation to make the $450 million payment as described in the 2007 MOU.

### 6.  Master Disposition Agreement

8

After execution of the 2008 Global Settlement and the 2008 Implementation Agreement in the fall of 2008, the economy plunged into one of the deepest recessions since the Great Depression of the 1930s.  These economic circumstances dictated further negotiations between Delphi and Old GM, and ultimately New GM, over the terms of their financial and commercial relationship, culminating in the execution of a "Master Disposition Agreement" between Delphi, Old GM and certain third parties.

The Master Disposition Agreement modified the terms of the 2008 Global Settlement in various respects, including in two respects directly pertinent here:  First, under section 3.1.1(C) of the Master Disposition Agreement, Old GM agreed to waive its rights and claims under the 2008 Global Settlement Agreement to billions of dollars in payments from Delphi.  Second, under section 2.1.3, Old GM agreed to assume ownership of the four Keep Sites (Kokomo, Lockport, Rochester and Grand Rapids) that Delphi was to own and operate under the terms of the 2007 MOU.

With regard to the provision in the Master Disposition Agreement dealing with the Keep Sites, because Delphi's continued ownership and operation of the Keep Sites was a term of the 2007 MOU to which the UAW was a party, Old GM could not properly assume ownership of those Keep Sites without first obtaining the UAW's agreement to adjust or modify the Keep Sites term of the 2007 MOU.  In recognition of this contractual reality, Old GM approached the UAW prior to entering into the Master Disposition Agreement with Delphi seeking an agreement from the UAW.  The UAW agreed in a May 16, 2009 agreement with Old GM titled "Memorandum of Understanding Delphi Keep Sites."

**7.  The 2009 UAW Retiree Settlement Agreement (July 2009) (#4)**

9

On June 1, 2009, Old GM filed for chapter 11 protection.  On the same day, Old GM moved, with the support of the UAW, among others, for approval of a sale of most of its assets in a section 363 sale.[2]  About five weeks later, on June 30 through July 2, 2009, the bankruptcy court held an evidentiary hearing (the "363 Hearing") on the motion.  On July 5, 2009, the bankruptcy court approved the sale which was affirmed on appeal.  In re General Motors Corp., 407 B.R. 463 (Bankr. S.D.N.Y. 2009 appeal dismissed and aff'd, 428 B.R. 43 (S.D.N.Y. 2010) and 430 B.R. 65 (S.D.N.Y. 2010), appeal dismissed sub nom.  The 363 Sale Order, which approved the 363 sale to the entity that became New GM, was entered on July 5, 2009.  After requests for a stay were denied, the sale closed a few days later.

At about the same time, on July 10, 2009, New GM and the UAW entered into a settlement agreement regarding retiree benefits (the "2009 UAW Retiree Settlement Agreement").  Its effect on obligations undertaken or confirmed in the predecessor agreements described above lies at the heart of this dispute.  Many provisions of the 2008 UAW Retiree Settlement Agreement were unchanged, or minimally changed, by the 2009 UAW Retiree Settlement Agreement.

The 2009 UAW Retiree Settlement Agreement, like the 2008 UAW Retiree Settlement Agreement, makes no mention of the $450 million payment referred to in the 2007 MOU and again in the 2008 Implementation Agreement—and the two sides, in their respective arguments, draw diametrically opposite conclusions from that silence.

---

[2]See generally 11 U.S.C. § 363.

10

The 2009 UAW Retiree Settlement Agreement includes language (the "2009 Fixed and Capped Language") identical, in some respects, to the 2008 Fixed and Capped Language set forth above.  The 2009 Fixed and Capped Language states, in relevant part:

> [New Co]'s financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement. The timing of all payments to the New VEBA shall be as set forth in Section 12 of this Settlement Agreement; it being agreed and acknowledged that the New Plan, funded by the New VEBA, shall provide Retiree Medical Benefits for the Class and the Covered Group on and after the Implementation Date, and that all obligations of [New Co] and/or the [New Co] Plan for Retiree Medical Benefits for the Class and the Covered Group shall terminate as of the Implementation Date, as set forth in this Settlement Agreement.

### C.  Background of this Case

### 1.  Delphi's Emergence from Bankruptcy

On October 6, 2009, about 3 months after the closing on Old GM's 363 sale, Delphi substantially consummated its modified plan.  Under the modified plan, Delphi sold substantially all of its core businesses to a third-party and sold its non-core steering business and certain U.S. manufacturing plants to an affiliate of New GM.  Delphi then liquidated, disposing of its remaining assets, and paying its retained liabilities.

### 2.  The UAW Demands Payment

11

In October 2009, the UAW sent a letter to New GM, expressing the UAW's position that now that Delphi had emerged from bankruptcy, New GM was obligated to make the $450 million contribution that had been provided for under the agreements from the summer of 2007, in particular the 2007 MOU. New GM declined to make the $450 million payment, saying in substance that its earlier obligation had come to an end. New GM took the position that none of the conditions triggering the $450 million payment regarding Delphi's emergence from bankruptcy came to fruition. New GM also said that its obligations for payment of retiree medical benefits was found in, and only in, the 2009 Retiree Settlement Agreement, which New GM said did not contain the $450 million payment obligation.

While the UAW continued discussions with New GM regarding its obligations under the 2007 MOU, the New VEBA became operational on January 1, 2010, and the First VEBA transferred its assets into the New VEBA on January 16, 2010.

### 3.  The UAW Files Suit

On April 6, 2010, the UAW filed the complaint which triggered this case against New GM. Under the heading "Claim for Relief," the complaint states that "[New GM's] failure and refusal to make the payment to the DC VEBA specified in Section J.2 of the [2007 Memorandum of Understanding]—as demanded by the UAW in its October 29, 2009 letter—constitutes a breach of the MOU that is remediable in this action . . . ." And in the "Prayer for Relief" section, the UAW asks that the Court "[f]ind and declare that [New GM] is in breach of its contractual obligation under the MOU to make the payment to the DC VEBA specified in Section J.2 of the MOU," and "[o]rder [New GM] to make that contractually required payment forthwith."

12

On October 8, 2010, New GM filed an answer to the complaint, asserting, among other things, an affirmative defense that the bankruptcy court has exclusive jurisdiction over the dispute between the parties.  The UAW then filed a motion to strike this defense.

### 4.  Bankruptcy Court Proceedings

After the UAW filed its motion to strike the affirmative defense, New GM filed a motion before the bankruptcy court to enforce the 363 Sale Order.  After a status conference with the parties, the bankruptcy court determined that it would resolve the question of whether there was jurisdiction over the underlying controversy between the parties, and, if so, whether the bankruptcy court should exercise it.[3]

On August 23, 2011, the bankruptcy court issued a written decision finding that (1) it did have jurisdiction to resolve the dispute but (2) declined to exercise that jurisdiction.  The bankruptcy court explained its decision in part as follows:

> This controversy doesn't involve anything as to which I have any particular knowledge or expertise warranting my exercise of the jurisdiction I retained, such as knowing what I intended to accomplish when I issued the 363 Sale Order. MIn fact, it doesn't involve construction of the 363 Sale Order at all.m It rather involves the construction of a series of agreements I never saw.  A Michigan federal judge could decide this controversy at least as well as I could.

> Nor would determination of this controversy bear on objectives to be achieved in Old GM's chapter 11 case, or otherwise advance bankruptcy needs and concerns.  It doesn't involve Old GM, the debtor in the chapter 11 case on my watch.  And especially since so much has already been accomplished in helping New GM and the UAW get back to business as usual, I think it's better for the New York bankruptcy court to minimize its role in New GM affairs, and to act only with respect to matters where the New York Bankruptcy Court has a

---

[3]Meanwhile, on November 3, 2010, the Court entered an order staying proceedings in this case pending the bankruptcy court's ruling on the jurisdictional questions.  (Doc. 15).

13

significant interest, or that truly involve bankruptcy law or policy.

In re Motors Liquidation Co., 457 B.R. 276, 293 (Bankr. S.D.N.Y. 2011).

That decision brought the case back before the Court.

### 5.  The Pending Motions

Following the bankruptcy court's decision, the Court lifted the stay and the parties

filed cross motions for summary judgment.  (Docs. 33, 43).  The motion papers are

voluminous and consist of the parties' briefs, responses, replies, sur-replies, multiple

statements of material facts, responses and replies thereto, a supplemental statement

of material facts, as well as numerous exhibits.

### III.  Summary Judgment

### A.  Standard

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by

'showing' – that is, pointing out to the district court -- that there is an absence of

evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S.

317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:
>
> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion
> only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot produce

14

admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to

properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly
> address another party's assertion of fact as required by Rule 56(c), the
> court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials –
> including the facts considered undisputed – show that the movant is
> entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may

consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Ultimately a district court must determine whether the record as a whole presents a

genuine issue of material fact, id. at 587, drawing "all justifiable inferences in the light

most favorable to the non-moving party," Hager v. Pike County Bd. Of Education, 286

F.3d 366, 370 (6th Cir. 2002).


**B.  Important to Summary Judgment in this Case**

The parties both believe that the record contains sufficient facts from which a decision in their favor can be made as a matter of law.  In other words, neither party has asserted that there is a factual dispute which would render summary judgment inappropriate.  The Court agrees that the record is complete so as to enable a decision.

### IV.  The Parties' Framing of the Issues and Summary of Argument

### A.  The UAW

The UAW says that the ultimate issue presented by its motion for summary judgment is whether it is entitled to judgment as a matter of law on its claim that New GM is in breach of a contractual $450 million payment obligation to the DC VEBA.

The UAW says the summary judgment on its breach of contract claim turns on the answer to the following two questions:

> 1. Does GM's affirmative defense that its $450 million payment obligation to the DC VEBA has been "extinguished" by the "express terms" of the 2009 UAW Retiree Settlement Agreement fail as a matter of law?
>
> 2.  On the undisputed facts of record, have the conditions precedent to GM's $450 million payment obligation to the DC VEBA been satisfied, such that GM's failure and refusal to make that payment constitutes a breach of contract by GM?

The UAW also says that there is no case law authority directly on point. The most appropriate non-judicial authorities for the relief sought are the two contracts directly at issue in this case:  the 2007 MOU, and the 2009 UAW Retiree Settlement Agreement. The UAW argues that the plain and unambiguous language of these contracts requires, as a matter of law, that the UAW's contract breach claim be upheld, and that New GM's "extinguishment defense" to the UAW's contract breach claim be rejected.  In other

16

words, the UAW says that the obligation of Old GM to make the $450 million payment is now the obligation of New GM.

## B.  New GM

New GM says that in May 2009, Old GM and the UAW negotiated a settlement agreement to address the obligation of New GM to pay for retiree healthcare for UAW retirees of Old GM and Delphi Corporation.  This, New GM says, is the 2009 UAW Retiree Settlement Agreement.  New GM says the language of the 2009 UAW Retiree Settlement Agreement describes all of New GM's obligations for retiree medical benefits for UAW retirees and its obligations do not include the $450 million payment obligation. In support, New GM relies on provisions which state that New GM's "sole" obligations are those in the "fixed and capped" list of "certain obligations" detailed in the agreement, which set up the New Plan and New VEBA to be "exclusively responsible" for "all" Retiree Medical Benefits (i.e., "all postretirement medical benefits"), and which is the "entire agreement," "supersed[ing]" all others.

New GM further says that even if the $450 million payment obligation survives the 2009 UAW Retiree Settlement Agreement, i.e. that the $450 million payment under the 2007 MOU is still viable, the payment was conditional on "all" of the specified events, including "substantial consummation of a plan of reorganization proposed by Delphi in its chapter 11 cases and confirmed by the bankruptcy court which incorporates, approves and is consistent with all of the terms of this Agreement [the 2007 MOU] and the comprehensive settlement agreement between Delphi and GM." New GM says the issue is whether, as a matter of law, all these conditions of the 2007

17

MOU were met.  New GM says they were not.

## V.  Analysis

### A.  New GM's Obligation Begins and Ends with the 2009 Retiree Settlement Agreement

A pure issue of contract interpretation may properly be resolved as a matter of law at the summary judgment stage where the contract's language is clear and unambiguous.  See e.g. United Rentals (N. Am.), Inc. v. Keizer, 355 F.3d 399, 406 (6th Cir.  2004).

### 1.  No Mention of the $450 Payment Obligation

Regarding the merits of the UAW's position, the 2009 UAW Retiree Settlement Agreement between the UAW and GM, does not contain any "express term" which purports to "extinguish" the $450 million payment obligation to the DC VEBA imposed by the 2007 Restructuring MOU.  The bankruptcy court also made this observation, stating that the 2009 UAW Retiree Settlement Agreement  "didn't expressly mention the $450 million obligation" at all.  According to the UAW, if the parties to a settlement agreement had a mutual intention to "extinguish" a payment obligation of one of the parties arising under an earlier contract between them, they would include express language in the settlement agreement providing for such an "extinguishment."  THE UAW says this is particularly so where the payment obligation is of a magnitude—$450 million.  The UAW says that the absence of express language in the 2009 UAW Retiree Settlement Agreement leads to the conclusion that New GM is obligated to make the $450 million payment.

18

The UAW has turned the agreements on their head.  There is no significance in the fact that the 2009 UAW Retiree Settlement Agreement does not contain a provision which mentions or "extinguishes" Old GM's obligation.  What is significant is that the 2009 Retiree Settlement Agreement does not contain any language to indicate that New GM was obligated to, or assumed, Old GM's obligation under the 2007 MOU.

As New GM points out, the Introduction and Sections 2, 5.B, and 8 of the 2009 Retiree Settlement Agreement establishes that New GM did not take on the obligation relating to the $450 million payment.  Sections 2 and 5.B provide that the New VEBA and New Plan shall be "exclusively responsible" for all Retiree Medical Benefits and that "[New GM]'s sole obligations to the New Plan and the New VEBA are those set forth in this Settlement Agreement."  Setting forth those "sole obligations," Section 8 of the agreement then states that, "[p]ursuant to this Settlement Agreement, [New Co] shall have the following, and only the following, obligations to the New VEBA and the New Plan," and subsequently lists four categories of obligations that undisputedly do not include the $450 million payment.  Section 8 further states that "[New GM's] financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement" and provides for the termination of "all obligations of [New GM] and/or the [New GM] Plan for Retiree Medical Benefits for the Class and the Covered Group."  The New Plan is defined as the "retiree welfare benefit plan" for "providing Retiree Medical Benefits to the Class and the Covered Group."

Taken together, these provisions point to only one interpretation:  New GM's obligations to provide funding for retiree medical benefits are found solely within the

19

confines of the 2009 UAW Retiree Settlement Agreement.  That agreement does not

include the $450 million payment.  The $450 million payment is not mentioned as one of

New GM's "sole" remaining obligations in the 2009 UAW Settlement Agreement is fatal

to the UAW's claim.  By expressly listing New GM's "sole obligations to the New Plan

and the New VEBA" and by excluding the $450M Payment from that list, the 2009 UAW

Retiree Settlement Agreement reflects an intention that New GM have no obligation

regarding the $450 million payment.  See Serv. Employees Int'l Union Local 3 v. Knight

Facilities Mgmt., Inc., No. 04-73571, 2005 WL 1355092, at *6 (E.D. Mich. May 13, 2005)

("Had [defendant] intended to require the successful bidder to hire all of [the company's]

former employees and at their existing pay, it would have stated that requirement in the

RFP.  In short, the RFP cannot reasonably be read to contain the 'job guarantee'

provision that plaintiffs now say forms the gravamen of their claims.").

      Sections 14 and 25.C of the 2009 UAW Retiree Settlement Agreement are also

instructive.  Section 14 states:

> The UAW, acting on its own behalf and as the authorized representative of the
> Class and the Covered Group, also agrees not to seek to obligate [New GM] to:
> (i) provide **any** additional payments to the New VEBA other than those
> specifically required by this Settlement Agreement; (ii) make **any** other payments
> for the purpose of providing Retiree Medical Benefits to the Class or the Covered
> Group; or (iii) provide or assume the cost of Retiree Medical Benefits for the
> Class or the Covered Group through **any** other means.

(Emphasis added).  This language also reflects the parties' understanding that, "other

than those [payments] specifically required by th[e] Settlement Agreement," New GM is

not obligated to "provide any additional payments to the New VEBA" or to "make any

other payments for the purpose of providing Retiree Medical Benefits to the Class or the

20

Covered Group." Id.

Also important is Section 25.C, in which the UAW waives and releases all claims against New GM concerning Retiree Medical Benefits.  Id. § 25.C.

Finally, Section 32 of the 2009 Retiree Settlement Agreement contains an integration clause at § 32.C which reads:

> This Settlement Agreement constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this Settlement Agreement, other than representations, warranties and covenants contained and memorialized in this Settlement Agreement. This Settlement Agreement supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this Settlement Agreement.

The integration clause makes clear that the agreement not only represents the parties' "entire agreement regarding the matters set forth [t]herein," but also "supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth [therein]."  Coupled with the indisputable fact that one of the "matters set forth" in the 2009 UAW Retiree Settlement Agreement is the extent of New GM's obligations relating to Retiree Medical Benefits for Delphi retirees, the integration clause sets forth the parties' understanding that New GM has no obligations other than those set forth in the 2009 UAW Retiree Settlement Agreement- and thus it has no obligation to make the $450 million payment, which undisputedly relates to Retiree Medical Benefits for Delphi retirees.

## 2.  The New VEBA and "fixing and capping" language

21

The UAW, however, counters that the 2009 UAW Retiree Settlement Agreement expressly defines and describes the "New VEBA" as the legal entity formally known as the "UAW Retiree Medical Benefits Trust" that was established in 2008 pursuant to a settlement agreement between the UAW and Old GM–the "Henry II Settlement."  And, at the same time, the 2009 UAW Retiree Settlement Agreement defines and describes the DC VEBA—dubbed "the Existing External VEBA" in the Agreement—as the separate and distinct legal entity formally known as the "defined contribution – Voluntary Employees' Beneficiary Association trust" that was established in 2006 pursuant to a settlement agreement between the UAW and Old GM–the "Henry I Settlement."

Given these contractual definitions, and the recognition that the New VEBA and the DC VEBA were, at the time of contracting, separate and distinct legal entities, the UAW says that New GM's assertion that the language in the 2009 UAW Retiree Settlement Agreement "fixing and capping" New GM's payment obligations to the New VEBA is not tenable.  This argument proves too much.  In accordance with Section 12.C of the 2009 UAW Retiree Settlement Agreement, the assets and liabilities of the DC VEBA were transferred into the New VEBA on January 16, 2010, and the DC VEBA was then terminated.  The fact that the DC VEBA transferred its assets to the new VEBA and therefore ceased to exist does not mean that Old GM's payment obligation must have carried over to the New VEBA.

Moreover, the UAW's argument that extrinsic evidence, particularly relating to the Henry litigation, supports its position does not carry the day.  The general rule is that extrinsic evidence "cannot be considered when contract language is unambiguous."

22

See e.g. Winnett v. Caterpiller, 553 F.3d 1000, 1008 (6th Cir. 2009) (internal quotations omitted).  However, under an exception to this rule recognized by the Sixth Circuit and this Court, extrinsic evidence may be considered for the limited purpose of confirming the legal conclusion to be drawn from the unambiguous language of a contract.  See e.g. UMWA v. Apogee Coal Co., 330 F.3d 740, 747 (6th Cir. 2003) (relying on extrinsic evidence "to confirm the lack of ambiguity as to the meaning of the ['unequivocal' contract] term 'operations'."); Hardy v. Reynolds & Reynolds Co., No. 06-12331, 2007 WL 2713736, at *7 (E.D. Mich. Sept. 17, 2007) ("While the contractual language is clear enough that resort to extrinsic evidence is unnecessary to aid in construction, the Court notes that the parties' conduct lends support to its reading."), aff'd 311 F. App'x 759 (6th Cir. 2009).

As noted above, the New VEBA was established by the UAW and Old GM in 2008 pursuant to a settlement agreement referred to by the parties as the "Henry II Settlement."  Notably, the Henry II Settlement itself included language "fixing and capping" the payment obligations to the New VEBA established by that agreement. Second, that "fixing and capping" language in the Henry II Settlement was later carried over, word for word, into the 2009 UAW Retirement Settlement Agreement.

The problem with the UAW's position is that all of this extrinsic evidence addresses the effect of the Henry II Agreement, not the 2009 UAW Retiree Settlement Agreement.  The Henry II Agreement was a separate, earlier agreement between Old GM and the UAW regarding retiree healthcare benefits.  Both parties agree that Old GM's obligation to make the $450 million payment existed after the execution of the

23

Implementation Agreement and Global Settlement Agreements, in which the parties agreed to reformat the Delphi restructuring transaction after a variety of changed circumstances, including the effective date of the Henry II Agreement. New GM was not a party to the Henry II Agreement and never assumed that superseded agreement. Thus, the UAW's reliance on Henry II-related evidence is misplaced.

The UAW's argument also fails to recognize that the 2009 UAW Retiree Settlement Agreement—which was presented to and approved by the bankruptcy court—does not contain any language which could reasonably be interpreted to find that New GM is obligated to make the $450 million payment. The UAW participated in the bankruptcy proceedings; it did not mention the $450 million payment. This is so even after the Bondholders' exhibit (showing that the $450 million payment was excluded from New GM's obligations) was introduced into evidence, even when questioned about the consideration to be received by the UAW and UAW retirees in connection with the sale to New GM, and even during the UAW's closing argument discussing VEBA-related matters.

Moreover, countering the UAW's argument that the "fixing and capping" language has special significance in terms of carrying over Old GM's obligation to New GM, the Implementation Agreement, carefully read, does not support the UAW's position. That agreement shows that when the parties intended that Old GM preserve an obligation relating to the $450 million payment notwithstanding changed circumstances and new agreements, they included express language setting forth the obligation. Such language carrying over the obligation is included in the Implementation Agreement but it

24

is absent from the 2009 UAW Retiree Settlement Agreement.

Frederick Henderson's deposition testimony also does not support the UAW's

claim.  Henderson, then President and Chief Executive Officer of Old GM, testified that,

although it simply "hadn't occurred to" him or others that the Henry II Agreement

extinguished the $450 million payment obligation, he was certain that the 2009 UAW

Retiree Settlement Agreement extinguished the obligation.  Henderson, the lead

negotiator for the 2009 UAW Retiree Settlement Agreement, explained that "it was quite

clear to us [that the 2009 UAW Retiree Settlement Agreement] was fully encompassing

because we were getting ready to go through bankruptcy and we wanted to deal with

everything, absolutely everything before coming out."

## B.  The Supplemental Filings

Following the hearing on the parties cross motions the Court directed the parties

to submit a supplemental filing.  (Doc. 61).  The Court said in part:

> whether or not [New] GM agreed to be bound by the terms of the MOU depends
> on the events which occurred from September 26, 2008 (the date of the
> Implementation Agreement between Delphi, UAW, and Old GM) to July 5, 2009
> (the date of the approval of the § 363 sale of Old GM).

The record shows that, while New GM assumed certain obligations set forth in

the 2007 MOU (including particularly certain obligations relating to pensions), it did not

assume the $450 million payment for retiree medical benefits.  The single essential and

controlling undisputed fact on this question is the language of the 2009 Retiree

Settlement Agreement.  This conclusion follows from a review of the facts during the

relevant time - September 26, 2008 to July 5, 2009.  These facts follow.

On September 26, 2008, Old GM, Delphi and the UAW entered into the
Implementation Agreement.  The Implementation Agreement was required to implement
certain provisions of the amended global settlement agreement ("Amended GSA")
between Old GM and Delphi, and specifically to make certain provisions of the 2007
MOU immediately effective.

In the Implementation Agreement (among other provisions), the UAW requested,
and Old GM agreed, to make the $450 million payment "as set forth in the Restructuring
MOU [i.e., the 2007 MOU]."  The $450 million payment is a payment for retiree
healthcare obligations.  Retiree healthcare obligations are separate from pension
obligations and are included in an employer's liability for OPEB (i.e., other
post-employment benefits).  See, e.g., Southwestern Bell Tel. Co. v. FCC, 28 F.3d 165,
168 (D.C. Cir. 1994) (recognizing that "[t]he 'other', which explains the 'O' in the OPEB
acronym, is intended to exclude pension benefits; what is left generally consists of
retirees' life insurance and medical and dental care benefits").

On September 26, 2008, the Delphi bankruptcy court approved both the
Amended GSA and Implementation Agreement.  In re DPH Holdings Corp., et al., No.
05-44481, Dckt. 14287 (Bankr. S.D.N.Y. Sept. 26, 2008).  The Amended GSA is the
"comprehensive settlement agreement" referenced in the 2007 MOU.

On December 31, 2008, Old GM and the U.S. government entered into a Loan
Agreement, by which the government provided emergency funding to Old GM.

As an express condition of the loan, the government required Old GM to address
its UAW OPEB obligations, and specifically its obligations for retiree medical benefits

which were to be funded and provided by a VEBA.  Under the Loan Agreement, Old GM was required to modify the nature and extent of its contributions to the healthcare VEBA ("VEBA Modifications") such that: "not less than one-half of the value of each future payment or contribution made by the Borrower and its Subsidiaries or any of them to the VEBA account (or similar account) pursuant to the Settlement Agreement in place as of December 31, 2008, shall be made in the form of the stock of the Borrower or one of its Subsidiaries, and that the total value of any such payment or contribution shall not exceed the amount of any such payment or contribution that was required for such time period under the Settlement Agreement in place as of December 31, 2008." (Doc. 41, Ex. 37 at Appendix A at § 1.01, p. 5; see also In re General Motors Corp.,

407 B.R. 463, 473, 478 (Bankr. S.D.N.Y. 2009).

The federal government's requirement of Old GM, as to its obligations to value and restructure its UAW OPEB liability, applied to all such OPEB obligations arising under any agreement between Old GM and the UAW in place as of December 31, 2008, including the Implementation Agreement.  Under the Loan Agreement, "Settlement Agreement" was contractually defined as: "that Settlement Agreement, dated February 21 2008 (as amended, modified or otherwise supplemented prior to the Effective Date), between the Borrower, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and certain class representatives, on behalf of the class of plaintiffs in (1) the class action of Int'l Union, UAW, et. al. v. General Motors Corp., Case No. 07-14074 (E.D. Mich. filed Sept. 9, 2007) and/or (2) the class action of UAW et al. v. General Motors Corp., No.

27

05-CV-73991, 2006 WL 891151 (E.D. Mich. Mar. 31, 2006, aff'd, Int'l Union, UAW v. General Motors Corp., 497 F.3d 615 (6th Cir. 2007)) and the transactions, agreements or arrangements contemplated thereby or by similar agreements."  See Doc. 41, Ex. 37 at Appendix A at § 1.01 at p. 4 (emphasis added).

On March 30, 2009, the federal government reiterated that Old GM had to address its UAW OPEB obligations as a condition of continued financing.  President Obama "stated that the U.S. Government would provide assistance to avoid such a result [i.e., the loans becoming due], if [Old] GM took the necessary additional steps to justify that assistance – including reaching agreements with the UAW, GM's bondholders, and the VEBA Trust."  See In re General Motors Corp., 407 B.R. 463, 479 (Bankr. S.D.N.Y. 2009) (emphasis in original).

Old GM and the UAW negotiated modifications to the VEBA which culminated in meetings beginning on May 18, 2009, among representatives of Old GM, the UAW and the government.  (Doc. 42, New GM SMF ¶ 80).  At a May 18, 2009 meeting, Old GM made a VEBA proposal, which valued Old GM's total VEBA obligations at approximately $20 billion.  (Id. at Ex. 33-2, p. 4.  In justifying this number to the UAW, Old GM expressly valued the contingent $450 million payment at $0, excluding the $450 million payment from future VEBA funding obligations.  Id  Old GM's VEBA proposal also specified that (with the required modifications) any remaining UAW OPEB would be $0. Id., Ex. 33-2 at p. 11.

In the May 2009 meetings regarding the VEBA, the UAW did not overlook nor forget about the $450 million payment.  The UAW's consultant and restructuring expert,

Andrew Yearley, and then-UAW general counsel Daniel Sherrick both knew that the payment would not part of the VEBA funding being negotiated by the parties, but said "let's go to getting a deal" and that the UAW would "go litigate" to get the $450 million payment, if necessary.  See Doc. 42, New GM SMF ¶ 84, Ex. 33, Yearley Depo. at p. 140.[4]

On June 1, 2009, Old GM filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code.  On the same day that it filed for bankruptcy, Old GM filed a motion with the bankruptcy court to approve a sale of Old GM's assets to New GM pursuant to a proposed Master Sale and Purchase Agreement under Section 363 of the Bankruptcy Code.  In re General Motors Corp. et al., Case No. 09-50026 (Bankr. S.D.N.Y.)).  Old GM requested the following:

1. Approval of the Master Sale and Purchase Agreement ("MPA");

2. The sale of the Purchased Assets to be made "free and clear of liens, claims, encumbrances, and interests. . . .";

3. The assumption of the Assumable Executory Contracts;

4. The establishment of certain Cure Amounts; and

5. Approval of the 2009 UAW Retiree Settlement Agreement

---

[4]This does not appear to be an unreasonable position.  Old GM and the UAW had a multitude of issues to be discussed, including how the collective bargaining agreements which cover a host of issues, would relate to New GM's operations.  It is quite possible that the UAW did not want to raise the issue of the $450 million payment directly with Old GM, perhaps believing it had a contractual right to the payment which it could pursue later.

On June 1, 2009, Old GM presented to the bankruptcy court for approval the negotiated and agreed-upon form of the 2009 Retiree Settlement Agreement, attached as Exhibit D to the MPA.

On June 25, 2009, UAW representative David Curson provided a declaration to the bankruptcy court "in support of approval of the UAW Retiree Settlement Agreement and in response to objection letters submitted by individual UAW represented retirees." (Doc. 41, Ex. 31-3 at p. 1; Doc. No. 2518 in In re General Motors Corp. et al., Case No. 09-50026 (Bankr. S.D.N.Y.).  In his declaration, Curson stated that "[o]ne critical factor that the UAW considered during the negotiation process was the ability of New GM to fund the VEBA."  (Doc. 41, Ex. 31-3 at ¶ 7).  Curson further explained that "[t]he solicitation package [provided to his union brothers and sisters] contained a description of the revised funding arrangements for retiree health benefits through the UAW Retiree Settlement Agreement."  Id. at ¶ 12.  There is no mention of the $450 million payment.

On June 26, 2009, Old GM, New GM and certain other third parties entered into an Amended and Restated Master Sale and Purchase Agreement.  There was no change to the form of the 2009 Retiree Settlement agreement in the amended MPA.

The 2009 UAW Retiree Settlement Agreement" is a defined term under the MPA. Under that agreement, which superseded prior agreements, the $450 million payment was not an assumed liability of New GM.

Under the MPA, New GM's assumption of the "UAW Collective Bargaining Agreement" followed by New GM and the UAW's entry (and court approval) of the "UAW Retiree Settlement Agreement" (which superseded other agreements with

30

respect to VEBA funding) were both non-waivable conditions of the closing of the sale transaction.  (Doc. 33, Ex. 10, MPA at p. 87, § 7.2 (introduction), p. 90, §§ 7.2(d) and 7.2(e), p. 93, §§ 7.3(h) and 7.3(l).

On June 30, 2009, Bondholders Ex. 3, a draft of the VEBA proposal made by Old GM at the May 18, 2009 meeting, was introduced into evidence at the Old GM bankruptcy hearing.  See Doc. 42, New GM SMF ¶ 54; Doc. 41, Ex. 40 at pp. 81-82, This Bondholders' Exhibit 3 is the only mention of the $450 million payment at Old GM's bankruptcy hearing, and it states that the $450 million payment was excluded from VEBA funding and that any remaining UAW OPEB liability would be $0. (Doc. 41, Ex. 44 at pp. 3, 11.

On July 1, 2009, Curson testified on behalf of the UAW and in support of the 2009 Retiree Settlement Agreement.  Curson did not mention any outstanding additional $450 million payment obligation.

On July 5, 2009, the bankruptcy court approved the June 26, 2009 MPA.  See Ex. 62, Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement with NGMCO, Inc., A U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases In Connection With The Sale; and (III) Granting Related Relief.

As part of its approval of Old GM's motion, the bankruptcy court expressly approved the 2009 Retiree Settlement Agreement, finding it to be "fair, reasonable and in the best interests of retirees."  The bankruptcy court instructed that "[t]he Debtors, the Purchaser, and the UAW are authorized and directed to perform their obligations under,

31

or in connection with, the implementation of the UAW Retiree Settlement Agreement and to comply with the terms of the UAW Retiree Settlement Agreement." Id.  The bankruptcy court further ordered that "all obligations of the Purchaser and the Sellers to provide Retiree Medical Benefits to members of the Class and the Covered Group shall be governed by the UAW Retiree Settlement Agreement," with capitalized terms as defined in the 2009 Retiree Settlement Agreement.  Id. at ¶ 20.

In its opinion, the bankruptcy court stated that "[a]s part of the 363 Transaction, the Purchaser and the UAW have reached a resolution addressing the ongoing provision of those [retiree medical] benefits.  New GM will make contributions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits.  And under the 'UAW Retiree Settlement Agreement,' [i.e., the 2009 Retiree Settlement Agreement] New GM will put value into the New VEBA, which will then have the obligation to fund retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the 'UAW-Represented Retirees')." See In re General Motors Corp., 407 B.R. 463, 484 (Bankr. S.D.N.Y. 2009).  In making this determination, the bankruptcy court particularly credited the testimony of Curson, finding that "[t]he UAW was successful in preserving an acceptable level of core medical benefits." Id. at 519.

## C.  In Sum

In the final analysis, the record confirms that under the 2009 UAW Retiree Agreement, New GM has no contractual obligation to make the $450 million payment. The obligation is not found anywhere within the confines of the 2009 UAW Retiree

32

Settlement Agreement, which superceded any and all prior agreements as to retiree medical benefits.  New GM assumed only what was in that agreement; the $450 million payment was not among those obligations.  Whether New GM has a moral obligation regarding the payment is another matter and not relevant in the face of clear contractual language which is supported by the record extrinsic evidence.  It is not to say that Old GM's obligation was "extinguished" or "not extinguished" by New GM.  Rather, the obligation never arose in New GM in the first instance.[5]  The UAW's efforts to turn the absence of language into language is reminiscent of the efforts to capture a "will o' the wisp."[6]

## IV.  Conclusion

For the reasons stated above, GM's motion for summary judgment is GRANTED. The UAW's motion for summary judgment is DENIED.  This case is DISMISSED.[7]

---

[5]Given this determination, it is not necessary to address the parties' arguments as to whether the conditions precedent in the 2007 MOU for payment of the $450 million have been satisfied.

[6]The UAW is in effect stuck with the language of the 2009 Retiree Medical Settlement Agreement which simply does not contain the $450 million payment obligation.  The UAW's predicament calls to mind another case before the undersigned in which the defendants were bound by language and were ultimately successful on changing the language through reformation.  See JP Morgan Chase Bank, N.A. v. Winget, et al, 08-13845 (E.D. Mich.), particularly Doc. 29, (2009 WL 440900 (E.D. Mich. Feb. 23, 2009)) and Doc. 365 (901 F. Supp. 2d 955 (E.D. Mich. 2012)).

[7]It is quite likely that this is not the end of litigation flowing from GM's bankruptcy. See, for example, Haviland v. Met. Life Ins. Co.,730 F.3d. 563 (6th Cir. 2013).  In Haviland, salaried retirees of GM brought various ERISA claims against Metropolitan

SO ORDERED.


 sAvern Cohn
UNITED STATES DISTRICT JUDGE


Dated:  December 10, 2013


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 10, 2013, by electronic and/or ordinary mail.


 s/Carol Bethel for Sakne Chami
Case Manager, (313) 234-5160

---

Life Insurance Company, who provided life insurance benefits under a plan sponsored by GM.  In GM's bankruptcy, the plaintiffs' continuing life insurance benefits were reduced from varied amounts to $10,000.  The Court of Appeals for the Sixth Circuit affirmed the dismissal of plaintiffs' complaint.