# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | 100 EAST FIFTH STREET, ROOM 540 | |
|---|---|---|
| Deborah S. Hunt | POTTER STEWART U.S. COURTHOUSE | Tel. (513) 564-7000 |
| Clerk | CINCINNATI, OHIO 45202-3988 | www.ca6.uscourts.gov |

Filed: May 14, 2015

Mr. Andrew Dean Roth
Bredhoff & Kaiser
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC 20005

Mr. Robert Stanley Walker
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Re: Case No. 14-1019, *UAW v. General Motors LLC*
Originating Case No. : 2:10-cv-11366

Dear Counsel:

The Court issued the enclosed Opinion today in this case.

Sincerely yours,

s/Jeanine R. Hance
Case Manager
Direct Dial No. 513-564-7037

cc: Mr. Corey D. Clay
Mr. Shay Dvoretzky
Ms. Johanna Fabrizio Parker
Ms. Ramya Ravindran
Mr. David J. Weaver

Enclosure

Mandate to issue

# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: May 14, 2015

Mr. Andrew Dean Roth
Bredhoff & Kaiser
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC 20005

Mr. Robert Stanley Walker
Jones Day
901 Lakeside Avenue, E.
Cleveland, OH 44114

Re: Case No. 14-1019, *UAW v. General Motors LLC*
Originating Case No. : 2:10-cv-11366

Dear Counsel:

The Court issued the enclosed Opinion today in this case.

Sincerely yours,

s/Jeanine R. Hance
Case Manager
Direct Dial No. 513-564-7037

cc: Mr. Corey D. Clay
Mr. Shay Dvoretzky
Ms. Johanna Fabrizio Parker
Ms. Ramya Ravindran
Mr. David J. Weaver

Enclosure

Mandate to issue

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0361n.06

No. 14-1019
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, | ) ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| GENERAL MOTORS, LLC, | ) ) | OPINION |
| Defendant-Appellee. | ) | |

FILED
May 14, 2015
DEBORAH S. HUNT, Clerk

Before BOGGS, SUTTON, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. This case involves one union, two car-company bankruptcies, and the healthcare benefits of many retired workers. From 1998 to 2005, hourly workers, represented by Plaintiff-Appellant the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), worked for Delphi, a company that manufactured car parts. Delphi, like many employers, provided hourly workers with retirement benefits. In 2005, Delphi filed for bankruptcy protection. Among the creditors that asserted claims against Delphi was the UAW, on behalf of Delphi's current and former employees. The UAW asserted a claim concerning retirement benefits for $450 million. Delphi's most important creditor, Defendant-Appellee General Motors (GM), also took an interest in Delphi's bankruptcy. GM agreed to contribute $450 million toward the workers' retirement, in

consideration for the UAW's cooperation with Delphi's reorganization and, GM asserts, if Delphi fulfilled certain conditions.

But GM's debt to Delphi's retirees was not its only debt (and not close to its only debt to retirees) and Delphi's bankruptcy was not the last bankruptcy in the automobile industry. In 2009, GM itself declared bankruptcy. The UAW participated in GM's reorganization. In the reorganization, neither the UAW nor GM explicitly took a position on the claim for the $450 million contribution.

The parties subsequently disputed the disposition of that $450 million. The UAW demanded payment, GM refused to pay, and the UAW sued GM in the United States District Court for the Eastern District of Michigan. The parties cross-moved for summary judgment. The district court granted summary judgment in favor of GM and denied summary judgment in favor of the UAW. The UAW appeals.

The last-in-time relevant agreement between the litigants extinguishes the UAW's claims. Therefore, we affirm the district court's grant of summary judgment to GM and its denial of summary judgment to the UAW.

**I. Facts**

This case turns on the interpretation of four documents signed by the UAW and GM: the June 22, 2007 Memorandum of Understanding (MOU), the 2008 Retiree Settlement Agreement (2008 RSA), the Master Sale and Purchase Agreement (MPA), and the 2009 Retiree Settlement Agreement (2009 RSA).

No. 14-1019, *Int'l Union v. Gen. Motors*

**A. 1998-May 16, 2009: Delphi's incorporation and bankruptcy and the *Henry* lawsuits**

In 1998, Old[1] GM incorporated an automotive-parts manufacturer as a wholly owned subsidiary. Old GM called that subsidiary manufacturer "Delphi." In early 1999, Old GM sold Delphi. In October 2005, Delphi filed for Chapter 11 protection.

Also in 2005, Old GM attempted to relieve "the fiscal strain of maintaining healthcare benefits for [its] retirees well in excess of those provided by [its] foreign competitors . . . . by reducing retiree healthcare benefits." *UAW v. General Motors Corp.*, 497 F.3d 615, 619 (6th Cir. 2007). UAW had negotiated for the aforementioned retiree benefits. UAW responded to the reductions by proposing a class of retirees, who then litigated *Int'l Union, UAW v. General Motors Corp.* (No. 05-73991) (E.D. Mich. filed 2005) (*Henry I*).

In 2006, that class of retirees, along with UAW and Old GM, entered into a settlement agreement resolving *Henry I*. That agreement established, among other things, a trust to pay for some medical costs of retired employees of Old GM. To protect Old GM from the rising but uncertain costs of health care benefits, the parties agreed to *define* Old GM's *contributions* to the trust; accordingly, they called it the Defined Contribution Voluntary Employees' Beneficiary Association (DC VEBA). At least from the UAW's perspective, "[t]he purpose of the DC VEBA was to help fund retiree health benefits by . . . mitigating the costs that GM retirees would have to bear going forward for retiree medical coverage."

"In June 2007, Delphi—still in Chapter 11—, Old GM, and UAW entered into a tripartite 'Memorandum of Understanding.'" The provision of the 2007 MOU most relevant to the

---

[1] GM manufactures automobiles and has for many years. In 2009, GM declared bankruptcy. In the litigation that followed, courts and litigants alike developed the convention of referring to the pre-bankruptcy organization as Old GM and the post-bankruptcy organization as New GM. New GM manufactures automobiles and is a party to this suit.

3

No. 14-1019, *Int'l Union v. Gen. Motors*

present dispute is "that Old GM would make a one-time contribution of $450 million to the DC VEBA." The 2007 MOU explained that:

> [t]he UAW has asserted a claim against Delphi in the amount of $450 million as a result of the modifications encompassed by this Agreement and various other UAW agreements during the course of Delphi's bankruptcy. Although Delphi has not acknowledged this claim, GM has agreed to settle this claim by making a payment in the amount of $450 million . . . .

In addition, the 2007 MOU explicated conditions precedent to Old GM's obligation to pay $450 million. "The 2007 MOU also contained an agreement among the parties that Delphi would continue to own and operate four 'Keep Sites' . . . each of which employed UAW workers."

In 2007, UAW and a class of Delphi and GM retirees again sued Old GM, *Int'l Union, UAW, et al. v. General Motors Corp.*, (No. 07-14074) (E.D. Mich. filed Sept. 9, 2007) (*Henry II*). In February 2008, the parties settled *Henry II*, signing the 2008 UAW Retiree Settlement Agreement (2008 RSA). The 2008 RSA established a New VEBA to transfer "responsibility for GM and Delphi retiree medical benefits from Old GM to the New VEBA." In September 2008, Delphi, Old GM, and the UAW entered into another tripartite agreement—the 2008 Implementation Agreement—to implement the 2008 RSA. "Under the 2008 Implementation Agreement . . . , the parties agreed to the immediate triggering of some of Old GM's commitments under the 2007" MOU, including the $450 million payment.

Also in September, Old GM and Delphi signed a Global Settlement Agreement (2008 GSA). Under the 2008 GSA, Old GM agreed to support Delphi's restructuring financially, in exchange for compensation from Delphi, including "$2 billion in allowed administrative expense claims, as well as an allowed general unsecured claim in the amount of $2.5 billion." On September 26, 2008, the bankruptcy court approved the 2008 GSA. The bankruptcy-court order

4

of approval authorized Delphi "to implement certain provisions of the agreement immediately pursuant to separately negotiated 'implementation agreements'" with the UAW and other unions.

### B. June 1, 2009-July 10, 2009: The GM Bankruptcy

On June 1, 2009, Old GM filed for Chapter 11 protection and moved for approval of a sale of its assets under 11 U.S.C. § 363. Subsequently, in support of the sale, certain GM bondholders entered an exhibit purporting to show that "[k]ey terms of Delphi deal/consideration have changed significantly since" the parties signed the 2007 MOU.

Later that month, on June 26, Old GM, related businesses, and New GM signed the "Master Sale and Purchase Agreement" (MPA). The MPA provided that "[t]he 'Assumed Liabilities' shall consist" in part of "[a]ll Liabilities [of sellers] under each Purchased Contract." (emphasis omitted). The Purchased Contracts, in turn, included "the UAW Collective Bargaining Agreement" and constituted, along with other assets, the "Purchased Assets."

On July 5, 2009, nine days after the MPA was signed, the bankruptcy court approved the sale. *In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009). The 2009 Sale Order provides:

> In accordance with the terms of the UAW Retiree Settlement Agreement, . . . *all obligations of the Purchaser and the Sellers to provide Retiree Medical Benefits to members of the Class and Covered Group shall be governed by the UAW Retiree Settlement Agreement*, and, in accordance with section 5.D of the UAW Retiree Settlement Agreement, all provisions of the Purchaser's Plan relating to Retiree Medical Benefits for the Class and/or the Covered Group shall terminate as of the Implementation Date or otherwise be amended so as to be consistent with the UAW Retiree Settlement Agreement (as each term is defined in the UAW Retiree Settlement Agreement), and the Purchaser shall not thereafter have any such obligations as set forth in Section 5.D of the UAW Retiree Settlement Agreement.

(emphasis added). The "Purchaser" refers to New GM. The "UAW Retiree Settlement Agreement" refers to the 2009 UAW Retiree Settlement Agreement (2009 RSA), negotiated and signed by GM and the UAW. The 2009 RSA did not come into legal effect until July 10, five days after the bankruptcy court approved GM's § 363 sale.

The 2009 RSA does *not* explicitly mention the $450 million payment. The 2009 RSA also does not explain the benefit of the bargain to the UAW. It does indicate that the parties acknowledge "the costs, risks, and delays associated with litigating the issue," and that New GM "releases and forever discharges the Class Representatives and Class Counsel from any and all claims . . . that arise from their . . . involvement with respect to the assertion of the claims and negotiations leading to this agreement."

### C. October 6, 2009-today: Delphi liquidation and instant lawsuit

On October 6, 2009, a few months after New GM's purchase of Old GM's assets, "Delphi sold substantially all of its core businesses to a third-party . . . . Delphi then liquidated, disposing of its remaining assets, and paying its retained liabilities." That same month, UAW sought New GM's payment of the $450 million contribution. New GM refused to pay, arguing both (1) that it owed no payment for retiree medical benefits other than those expressed in the 2009 RSA and (2) that none of the conditions precedent to the payment of the contribution had come to fruition.

UAW disputes both claims. On April 6, 2010, the UAW filed this case against New GM in United States District Court for the Eastern District of Michigan. New GM asserted that the bankruptcy court that had approved the sale of Old GM had exclusive jurisdiction over the suit. The bankruptcy court determined that it would answer both whether it had jurisdiction and, if so,

6

whether it should exercise that jurisdiction; pending the bankruptcy court's ruling, the district court stayed proceedings.

The bankruptcy court found that it did have jurisdiction, but found several reasons that tipped the balance in favor of abstention including: that "this controversy . . . involves, or arguably involves, an asserted element of a New GM-UAW deal that was never mentioned in any [bankruptcy court] proceedings . . . [and that] does not need to be decided by [the bankruptcy court] to enable new GM to secure the benefit of its bargain," and also that the case involved "no bankruptcy issues at all." *In re Motors Liquidation Co.*, 457 B.R. 276, 289-90 (Bankr. S.D.N.Y. 2011). Following the bankruptcy court's ruling, the district court lifted the stay and the parties filed cross-motions for summary judgment.

In its decision and order, the district court granted New GM's motion for summary judgment and denied UAW's motion. The UAW timely appealed. Accordingly, we now consider whether the $450 million obligation survived the 2009 MPA and Sale Order and, if it did, whether the 2009 RSA extinguished that obligation.

## II. Did the $450 million obligation survive the MPA and Sale Order?

This court reviews a grant of summary judgment de novo. *See, e.g.*, *Smith v. Jefferson Cnty. Bd. of Sc. Comm'rs*, 641 F.3d 197, 205 (6th Cir. 2011). In construing a collective-bargaining agreement, courts apply "traditional rules of contract interpretation as long as their application is consistent with federal labor policies." *Moore v. Menasha Corp.*, 690 F.3d 444, 450-51 (6th Cir. 2012). Courts look first to an agreement's explicit language to determine parties' clear intent. If the agreement's explicit language does not make it possible to determine the parties' clear intent, courts look at each provision and attempt to construe it "consistently with the intire document and the relative positions and purposes of the parties." *Id.* at 451.

7

Whether there is a clear intent or the agreement remains ambiguous is a question of law that "may be resolved summarily." *Int'l Union, UMWA v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003) (citation and internal quotation marks omitted). Resolution of the case on summary judgment is appropriate where there is no question as to intent. *Ibid.*

### A. Did New GM assume the $450 million obligation per the MPA and Sale Order?

The district court concluded that New GM never assumed Old GM's obligation to pay $450 million. The text of the MPA demonstrates otherwise. We hold that, under the MPA, New GM assumed Old GM's obligation to pay $450 million.

On June 26, 2009, Old GM and New GM (and other parties) signed the Master Sale and Purchase Agreement (MPA), which articulated the details of the § 363 sale. The MPA language demonstrates that New GM assumed Old GM's liabilities under the UAW Collective Bargaining Agreement (CBA). The CBA includes the $450 million obligation originally undertaken in the 2007 MOU because the MPA defines the CBA to mean "*any* . . . [c]ontract, understanding or mutually recognized past practice between [Old GM] and the UAW with respect to Employees," (emphasis added), whom the MPA defines, in part, as "each individual recognized under any [CBA] as being employed by or having rights to employment by any of Sellers or their Affiliates. For the avoidance of doubt, Employees includes all employees of Sellers or any of their Affiliates, whether or not Transferred Employees." The 2007 MOU was such an understanding between Old GM and Delphi retirees, most of whom Old GM once had employed. This language is unambiguous.

But even if the 2009 MPA's language were ambiguous, two pieces of evidence extrinsic to the text demonstrate that New GM assumed the obligation under the MPA. "[I]f the collective bargaining agreement is ambiguous," we have observed, we "may consider extrinsic evidence of

8

the parties' intent at the time of execution." *Apogee Coal*, 330 F.3d at 744. First, in advance of a November 9, 2010 deadline, GM moved in the bankruptcy court to enforce that court's sale order. In that motion, GM alleged that under the Sale Order and MPA, New GM *assumed* the UAW CBA. Second, GM conceded the same in its filings in the Delphi bankruptcy case. This suggests the parties intended New GM to assume the obligation. Accordingly, we hold that the district court was incorrect to hold that New GM did not assume Old GM's $450 million obligation. But this holding does not end the matter before us.

### B. Did the 2009 RSA extinguish the $450 million obligation?

As stated above, we hold that New GM assumed the $450 million obligation under the 2009 MPA. But the 2009 RSA *extinguished* that obligation. Accordingly, we affirm the judgment of the district court, albeit on different grounds.

Both parties agree that the 2009 RSA does not explicitly discuss the $450 million obligation. We construe contracts in order to determine the contracting parties' intent. *Moore*, 690 F.3d at 450-51. They would be strange parties who intended their silence to control their expression. Because here there is language to construe, we construe the language.

According to the 2009 RSA's integration or merger clause, the 2009 RSA

> constitutes the entire agreement between the parties regarding the matters set forth herein, and no representations, warranties or inducements have been made to any party concerning this [RSA], other than representations, warranties and covenants contained and memorialized in this [RSA. It] supersedes any prior understandings, agreements or representations by or between the parties, written or oral, regarding the matters set forth in this [RSA].

GM argues that this language is dispositive. We do not agree.

Although "the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a

9

proceeding in which a court interprets the document," *Security Watch, Inc. v. Sentinal Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999), this integration clause language does not dispose of the question because it does not specify what "matters" the RSA "set forth." Logic does not require assuming that "the matters set forth" include the precise issue of the $450 million. Whether the 2009 RSA constitutes an integration with respect to the $450 million obligation depends on what "matters" the RSA "set forth." Accordingly, we turn from the integration clause to the other relevant sections of the RSA.

First, we note that Section 8 of the RSA, like the integration clause, does not dispose of the question, as the UAW correctly argues. The so-called "fixed and capped" language of the 2009 RSA § 8 provides: "[New GM's] financial obligation and payments to the New Plan and New VEBA are fixed and capped by the terms of this Settlement Agreement." GM argues that, taken in concert with the other sections, the fixed-and-capped "language forecloses additional obligations . . . to any . . . funding source for UAW-retiree medical benefits." Appellee Br. at 37. UAW counters by observing that § 8's language does not refer to the *DC* VEBA, but only to the *New* VEBA. *See* Appellant Br. at 50; Reply Br. at 16-17 (correctly claiming that GM misstates the language of § 8). UAW has the stronger reading here. But even if GM only "fixed and capped" the New VEBA by this language, and not the old DC VEBA, other provisions may release GE from responsibility. In point of fact, they do.

The sections of the RSA most relevant to the present case are sections 2, 5, and 25. They identify the matters set forth and unambiguously dispose of the question. In Section 2, the 2009 RSA provides:

> *The New Plan and the New VEBA shall*, after the Implementation Date, *be* the employee welfare benefit plan and trust that are *exclusively responsible for all Retiree Medical Benefits for which* [*New GM*], the [New GM] Plan and any other

10

No. 14-1019, *Int'l Union v. Gen. Motors*

> [New GM] entity or benefit plan *formerly would have been responsible with respect to the Class and Covered Group*. . . . All obligations of [*New GM*], the [New GM] Plan and any other [New GM] entity or benefit plan for Retiree Medical Benefits for the Class and the Covered Group *arising from any agreement(s)* between [New GM] and the UAW *shall be forever terminated as of the Implementation Date*. [New GM]'s sole obligations to the New Plan and the New VEBA are those set forth in this [RSA].

(emphases added).

Further, in Section 5.B, the 2009 RSA provides:

> With respect to claims incurred after the Implementation Date, the New Plan and the New VEBA shall have sole responsibility for and be the exclusive source of funds to provide Retiree medical Benefits for the Class and the Covered Group . . . . Neither [New GM], the [New GM] Plan, the Existing Internal VEBA, nor any other [New GM] person, entity, or benefit plan shall have any responsibility or liability for Retiree medical Benefits for individuals in the Class or in the Covered Group for claims incurred after the Implementation Date. [*New GM*]*'s sole obligations to the New Plan and the New VEBA are those set forth in the Settlement Agreement*.

(emphasis added).

Most decisively, in Section 5.D, the 2009 RSA provides:

> The Approval Order shall provide that *all obligations* of [New GM] and all the provisions of the [New GM] Plan *in any way related to Retiree Medical benefits* for the Class and/or the Covered Group, *and all provisions* of applicable collective bargaining agreements, contracts, letters and understandings *in any way related to Retiree Medical Benefits* for the Class and the Covered Group *are terminated* on the Implementation Date, or otherwise amended *so as to be consistent with* this [RSA] and *the fundamental understanding that all [New GM] obligations regarding Retiree Medical Benefits* for the Class and the Covered Group *are terminated*, as set forth in this Settlement Agreement.

(emphases added).

This language supports GM's position. Even § 5.D's allowance for "amendment" requires that amendment to be consistent with the "fundamental understanding" that the RSA

11

terminates all obligations. Finally, in Section 25, the UAW, UAW-represented retirees of GM and Delphi, and others "release and forever discharge [New GM] . . . with respect to any and all rights . . . *related to* (a) *any* of the claims arising . . . *in connection with* Henry I, Henry II, or the GM bankruptcy proceedings, *concerning* the provision of Retiree Medical Benefits and the terms of this [RSA]" (emphases added).

Although the provision of services is not the same as funding for services, the two are related. Under § 25 of the 2009 RSA, the UAW forever discharged GM from all obligations related to any claim arising in connection with *Henry I*, *Henry II*, or the GM bankruptcy proceedings concerning the provision of Retiree Medical Benefits. The $450 million GM owed to DC VEBA is such a claim.

The UAW calls the relevant provisions "belt-and-suspenders contract language." Appellant Br. at 49. But the very implication of that phrase favors GM. After all, the *purpose* of belt-and-suspenders is to support a position if one explanation fails. To extend the UAW's metaphor and implication, if GM's negotiators included this release language so that a court would not catch them with their pants down, they seem to have been wise to do so.

Because the 2009 RSA is *not* ambiguous, we, like the district court, do *not* consider evidence extrinsic to the text of the 2009 RSA.

For the foregoing reasons, we AFFIRM the judgment of the district court.